Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                      MIAMI DIVISION
 3
                CASE NO.:  1:16-CV-24504-MGC
 4
 5   FLEXFUNDS ETP, LLC, a
     Delaware limited liability
 6   company,
 7        Plaintiff,
     vs.
 8
     MARKETP, LLC, a Florida
 9   limited liability company,
     MARKETP USA, LLC, a Florida
10   limited liability company,
     GLOBAL SECURITIES MANAGEMENT,
11   LLC, a Florida limited liability
     company, CERTUS FINANCE, INC.,
12   a Florida corporation, and
     FLORENT RIGAUD, an individual,
13
          Defendants.
14   _____/
15                      1221 Brickell Avenue
                        Suite 2400
16                      Coral Gables, FL  33131
                        Thursday, 9:45 a.m.
17                      June 8, 2017
18
          VIDEOTAPED DEPOSITION of MARIO RIVERA
19
20
21        Taken before JENNIFER A. QUINTANA, Florida
22   Professional Reporter and Notary Public in and for
23   the State of Florida at Large, pursuant to Notice of
24   Taking Deposition filed in the above-styled cause.
25
```

Page 2

1  APPEARANCES:
2
   ON BEHALF OF THE PLAINTIFF:
3
      Allen Dyer Doppelt & Gilchrist, P.A.
4  1221 Brickell Avenue
      Suite 2400
5  Coral Gables, FL  33134
      BY: ROBERT H. THORNBURG, ESQ.
6     CAMERON C. MURPHY, ESQ.
7
   ON BEHALF OF THE DEFENDANTS:
8
      Trenam Law
9  101 East Kennedy Boulevard
      Suite 2700
10 Tampa, FL 33602
      BY: ERIC S. KOENIG, ESQ.
11
12 ALSO PRESENT:
   Andres Idarrga, General Counsel for FlexFunds
13 Florent Rigaud
14
15        I N D E X
16 WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
17 MARIO RIVERA
18   By Mr. Koenig      6
19
20
21
22
23
24
25

Page 3

1        E X H I B I T S
2  DEFENDANTS'                    PAGE
3  Exhibit 1..........................8
   (Notice of Taking Deposition)
4
   Exhibit 2..........................43
5  (E-mail)
6  Exhibit 3..........................57
   (Separation of Employment Agreement)
7
   Exhibit 4..........................113
8  (Bristol Investments Engagement Letter)
9  Exhibit 5..........................133
   (Letter dated July 27, 2016 from Mason Hayes to
10 Gustavo Hernandez)
11 Exhibit 6..........................135
   (E-mail)
12
   Exhibit 7..........................138
13 (E-mail Chain with Flexfunds and Deutsche Bank Re:
   PDVSA Project Issuance)
14
   Exhibit 8..........................148
15 (E-mail)
16 Exhibit 9..........................159
   (E-mail)
17
   Exhibit 10..........................163
18 (E-mail)
19 Exhibit 11..........................179
   (E-mail)
20
   Exhibit 12..........................181
21 (Cost Table)
22 Exhibit 13..........................187
   (Balance Sheet 2015)
23
   Exhibit 14..........................187
24 (Profit and Loss Statement 2015)
25

Page 4

1        E X H I B I T S (Continued)
2  DEFENDANTS'                    PAGE
3  Exhibit 15..........................200
   (Transaction Memorandum)
4
   Exhibit 16..........................203
5  (Flexfunds Presentation to Bank of New York)
6  Exhibit 17..........................208
   (E-mail)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        P R O C E E D I N G S
2            - - -
3        THE VIDEOGRAPHER:  Good morning.  We're
4  now on the record.  The time is 9:45 a.m. on
5  June 8, 2017.
6        Please note that the microphones are
7  sensitive and may pick up whispering, private
8  conversations, and cellular interference.
9  Please turn off all cell phones or place them
10 away from the microphones as they can
11 interfere with the deposition audio.
12       Audio and video recording will continue
13 to take place unless all parties agree to go
14 off the record.
15       This is Media Unit 1 of the video
16 recorded deposition of Mario Rivera taken by
17 counsel for Defendant in the matter of
18 FlexFunds ETP LLC, versus MarkETP, LLC,
19 et al., filed in the United States District
20 Court, Southern District of Florida, Miami
21 Division.
22       This deposition is being held at -- I'm
23 sorry, let me skip that part.
24       My name is Michael Abarca from the firm
25 Veritext Legal, and I am the videographer.

1 The court reporter is Jennifer Quintana from
2 the firm Veritext Legal.
3     I'm not authorized to administer an
4 oath, I'm not related to any party in this
5 action, nor am I financially interested in the
6 outcome.
7     Counsel and all present in the room and
8 everyone attending remotely will now state
9 their appearances and affiliations for the
10 record.
11     MR. KOENIG:  Eric Koenig from Trenam Law
12 on behalf of the defendants.
13     MR. THORNBURG:  Robert Thornburg and
14 Cameron Murphy on behalf of Allen, Dyer,
15 Doppelt & Gilchrist on behalf of FlexFunds ETP
16 as well as the witness, Mario Rivera.
17     MR. IDARRAGA:  Andres Idarraga, general
18 counsel of FlexFunds.
19 THEREUPON:
20         MARIO RIVERA
21 was called as a witness and, after having been
22 first duly sworn, was examined and testified as
23 follows:
24         DIRECT EXAMINATION
25 BY MR. KOENIG:

1   Q   Good morning, Mr. Rivera.  How are you?
2   A   Good morning.
3   Q   You and I have met a couple of times
4 throughout the course of depositions, and we are
5 here today for your deposition.
6   A   Yes.
7   Q   Have you ever had your deposition taken
8 before?
9   A   No.
10   Q   I'm going to lay down not necessarily
11 ground rules but just some -- some thoughts to
12 keep in mind as we go that should keep things a
13 little bit quicker and smoother today.  And
14 that's, first and foremost, if you don't
15 understand one of my questions or I ask it in a --
16 in an improper way or there's something wrong with
17 it, please ask me to -- to repeat or rephrase the
18 question.  As you're under oath, I want to make
19 sure that all of your answers are true and
20 accurate.  Do you understand that?
21   A   Understood.
22   Q   And the same thing goes for the court
23 reporter, as this is being taken down and may
24 ultimately be transcribed, that if we start
25 walking over each other and conversation-wise if

1 you see where I'm going and I cut you off or I do
2 it too sometimes, I'll cut you off, at times we
3 need to stop and -- and slow down and make sure
4 that we complete the questions and complete the
5 answers.
6     And in that same vein, that at times if
7 I ask you yes-or-no questions and you answer with
8 either a head shake or "uh-uh" or "huh-uh," the
9 poor court reporter takes it down, it looks almost
10 identical.
11   A   Makes sense.
12   Q   And then, lastly, if you need a break or
13 we need to take a -- you know, stop for any
14 reason, we can do so just as long as there's not a
15 question pending.
16   A   Makes sense.
17   Q   Otherwise, if something comes up or I'm
18 not clear on something, be sure to tell me.
19   A   Okay.
20   Q   Let me show you --
21     MR. KOENIG:  Can I see some of the
22 exhibit stickers?
23     (Discussion held off the record.)
24     (Thereupon, Rivera Exhibit 1 was marked
25 for identification.)

1 BY MR. KOENIG:
2   Q   Let me show you what's been at least
3 hand-marked for now --
4   A   Yep.
5   Q   -- Exhibit 1.  Have you seen this
6 document before?
7   A   Yes, I have.
8   Q   And -- and what is your understanding of
9 this document?
10   A   These are the interrogatories that the
11 defendant has.
12   Q   All right.  It -- it's a Notice of
13 Deposition?
14   A   Yes.
15   Q   And is it your understanding that you
16 are here as the corporate representative of
17 FlexFunds ETP, LLC?
18   A   Yes, that's correct.
19   Q   And that, if you turn to the last page
20 of Exhibit 1, it shows Attachment A.  Do you see
21 that?
22   A   Yes.
23   Q   And there are five categories or at
24 least areas of -- of inquiry.  Do you see those?
25   A   Yes.

Page 10

1   Q   And are you here prepared to discuss
2 each and every one of those areas?
3   A   Yes, I am.
4   Q   And what did you do to prepare for
5 today's deposition?
6   A   Well, there's not much to prepare
7 because these -- these questions are very
8 straightforward and -- but yesterday we did meet
9 just to make sure I understood the questions and
10 to tell me the same thing.  It's my first
11 deposition, so I wanted to understand the rules of
12 the game.  So we met for around two to three hours
13 here.
14   Q   And I certainly don't want to hear
15 anything you and -- and your attorneys talked
16 about.  But outside of speaking with your
17 attorneys, did you speak to anyone else at
18 FlexFunds in preparation for today?
19   A   Not in preparation for today.  We did,
20 as a team, prepare the information that you needed
21 to answer these questions.
22   Q   And when did you do that?
23   A   In the past two to four weeks, I
24 accounted for between 150 to 200 hours that the
25 team had put together to answer your questions.

Page 11

1   Q   Are you referring to the
2 interrogatories?
3   A   Yes, sorry.  When I say "questions," I
4 mean interrogatories.
5   Q   So combined total of 150 to 200 hours
6 you spent in answering the interrogatories?
7   A   I think so.  Me personally, I spent over
8 20 to 30 hours to make sure that I -- I got the
9 right -- the right answers for -- for you.
10   Q   And then did you spend any additional
11 time with your team in preparation for today above
12 and beyond what you spent in preparing the
13 responses to the interrogatories?
14   A   No.
15   Q   What about documents, what kind of
16 documents did you review in preparation for today?
17   A   I -- I just looked at the -- the -- I
18 forgot the name of the paper itself, but the --
19 the answers.
20   Q   The in-- -- the interrogatory responses?
21   A   Thank you.
22   Q   That's fine.  So -- so just so I'm
23 clear, you spent approximately 150 -- your team
24 spent approximately 150 to 200 hours in gathering
25 information to respond to the interrogatories?

Page 12

1   A   Yes.
2   Q   And then you didn't spend any additional
3 time, other than the two hours or so with your
4 attorneys, in preparing for today?
5   A   I read the -- the final responses and I
6 read through them and internalized them, yes.
7   Q   Yep.
8   A   And that took me another two hours, I
9 guess.
10   Q   And then with regard to document review,
11 what kind of documents did you review to prepare
12 the answers to the interrogatories?
13   A   We -- as a team, we went through all the
14 different type of documents that we prepared
15 during normal course of business.  We have
16 marketing pieces.  We have transaction
17 memorandums.  We have presentations.  We have
18 series memorandums, which are the legal documents
19 for the -- the securities that we issue.
20       We have the program documents, the
21 master documents which are the confidential
22 documents that we -- you know, we have stored and
23 how those documents have evolved over -- over time
24 through our work and that were investments.
25       I reviewed numerous e-mails back and

Page 13

1 forth between myself and Florent and -- and the
2 different clients and, of course, the information
3 that was exchanged through those e-mails, so.
4   Q   And that was with regard to the
5 interrogatory responses.  Did you -- did you or
6 your team review -- I guess, did you review any
7 additional documents in preparation for today?
8   A   I don't recall every -- but that's --
9 that's it.
10   Q   So -- so, generally speaking, your
11 preparation for today was based on your -- you and
12 your team's preparation of the answers to
13 interrogatories and then your review of those
14 interrogatories and then a couple of hours with
15 your attorney recently?
16   A   Yes.
17   Q   With regard to those interrogatories
18 that had been recently answered, we noticed that
19 they were executed under oath by Jose Gonzalez.
20 Do you know why Jose Gonzalez executed those
21 instead of you?
22   A   Yes.  I believe it was because he was
23 supposed to do a deposition before me and it was
24 canceled by your side.
25   Q   So he was using -- well, I guess that --

4 (Pages 10 - 13)

Page 14

1 that doesn't quite answer my question.
2    A   Okay.
3    Q   So you said he was preparing for
4 deposition. Was the idea that he was gathering
5 the information and -- and taking the front seat
6 to answering the interrogatories?
7    A   No.
8       MR. THORNBURG:  Object to the form.
9       THE WITNESS:  I'm -- I'm the -- the
10    person that is the front seat of the company.
11 BY MR. KOENIG:
12    Q   Okay.
13    A   He was deposed ahead of me and I believe
14 he was here present so he could sign those
15 documents. I was actually traveling during
16 those -- those dates, and I believe that's the
17 reason he signed. I would have signed it.
18    Q   So it may have been out of convenience
19 that you weren't available and he signed?
20    A   I would think so. That's -- that's a
21 legal matter that since it was done that way, I
22 believe that it's okay.
23    Q   And -- and generally speaking, speaking
24 of Jose, I -- your -- your attorney had spent some
25 time and you sat through these depositions. Your

Page 15

1 attorney spent some time speaking with -- with my
2 clients and -- and representatives discussing some
3 agreements that Jose had with Mr. Rigaud. Do
4 you -- do you recall that?
5    A   Repeat the question.
6    Q   There's some discussions in depositions
7 involving an agreement with GWM, I believe, and
8 IA Capital that Mr. Rigaud had with those
9 companies with -- with Mr. Gonzalez.
10    A   Correct.
11    Q   Do you recall that?
12    A   Yes.
13    Q   And I'm trying to get a feel for what
14 Mr. Gonzalez's role is in FlexFunds. So if you
15 could -- if you could share with me, what -- what
16 role does he have in FlexFunds?
17    A   Sure. Jose -- let me take a step back.
18 Jose and I know each other from -- from a long
19 time ago. He works in the exchange traded product
20 industry. I guess he's been very successful
21 there. He's actually a serial entrepreneur, a
22 successful serial entrepreneur. He started with a
23 broker-dealer, and then he started with an ETF.
24    Q   You said a serial entrepreneur?
25    A   Yeah. Like he does -- he does -- sorry.

Page 16

1 Yes, thank you. He does startups and he does them
2 very well. He started with a broker-dealer. He
3 was very successful with that. He started with an
4 ETF company that J.P. Morgan actually is a
5 shareholder now, very successful.
6       And during the time of the growth of
7 that ETF company, a lot of asset managers came to
8 him to create their own ETF, but those ETFs are
9 not flexible enough to what they were looking for,
10 and that's why he created the -- what -- what we
11 have now, FlexFunds, right. Back -- back then, it
12 started with another name, which was IA Capital
13 Management. And the intention of that -- of that
14 program was to provide that added flexibility.
15    Q   And -- and I'm going to break my -- one
16 of my first rules of interrupting. I just want to
17 try to get some answers as we go.
18    A   That's fine.
19    Q   So IA Capital, you said IA Capital
20 became FlexFunds?
21       MR. THORNBURG:  Yeah, and I -- we'll --
22 we'll allow you to kind of interrupt the
23 witness at this point, but, I mean, as long
24 as --
25       Were you okay with finishing your

Page 17

1 ques- --- your answer at this point or did
2 you --
3       THE WITNESS:  That's fine.
4       MR. THORNBURG:  Okay.
5       THE WITNESS:  I -- I --
6       MR. THORNBURG:  I know -- I know you're
7 just trying to speed things up and short-track
8 it, but, you know, I'd like the witness to be
9 able to answer when he needs to.
10       MR. KOENIG:  I -- I get that.
11       THE WITNESS:  It's okay. I -- I --
12 BY MR. KOENIG:
13    Q   So whichever's easier for you, I can cut
14 you off as we go or I can just let you finish and
15 I'll circle back. We'll --
16    A   Don't worry. We'll -- we'll make it
17 work.
18    Q   So I guess describe to me the
19 relationship of IA Capital and FlexFunds.
20    A   Yes.
21    Q   And -- and when I say "FlexFunds," I'm
22 referring to FlexFunds ETP, LLC.
23    A   Right. I'm trying to answer the first
24 question, what was Jose's role in the company, and
25 I will -- will answer the second question as well.

5 (Pages 14 - 17)

Page 18

1    Q   Perfect.
2    A   So Jose created the program, right, on
3  day one, right, and the program -- the program
4  name is IA Capital Structures, which is an Irish
5  SPV, right, that creates the different series --
6  or let's call them funds.  And the company that
7  was to manage this was IA Capital Management,
8  right.
9         Under that company is how Florent
10  started the agreement with -- with the company,
11  right.  Then the arranger of that program, IA
12  Capital Structures, was still EWM, which is the
13  broker-dealer, that's what Jose had.  It -- it
14  evolved to then create this company called
15  FlexFunds because it was a more commercial name,
16  and we separated the arranger function from the
17  broker-dealer functioning, GWM, into FlexFunds,
18  right.
19         But as Florent Rigaud would agree, in
20  his deposition, and I agree as well, they're all
21  the same in terms of the activities in the
22  program, right.
23    Q   As IA --
24    A   Sorry.  One thing.  So Jose's role, to
25  go back to the original question, he -- he was

Page 19

1  the -- the founder and he's a shareholder and he's
2  a sounding board, let's say, for the -- for the
3  company, but he does not have an active recurrent
4  role within the company.  That's my role.  I act
5  as the CEO, even though my title is director.
6    Q   So did IA Capital become FlexFunds or is
7  FlexFunds a separate entity created separate and
8  distinct from IA Capital?
9         MR. THORNBURG:  Object to the form.
10         He may answer.
11         THE WITNESS:  I will answer.  I mean,
12    clearly they have different names, right, so
13    they're different companies, but in essence
14    their -- their function is the same.  And like
15    I said before, Florent would agree that
16    they're all in the same, all in the same, and
17    I agree as well.
18  BY MR. KOENIG:
19    Q   And -- and with regard to objections,
20  from time to time, Mr. Thornburg may object to
21  questions.  And unless he advises you not to
22  answer on some sort of basis -- and we can deal
23  with that as attorneys -- you still need to answer
24  the question to the extent that you can.
25    A   Fine.

Page 20

1    Q   With regard to -- you said IA Capital is
2  a different name but it was really sort of the
3  same as FlexFunds.
4    A   Not sort of.  I mean, the -- the
5  function of -- of the companies is the same.
6    Q   But -- but my question is, did IA
7  Capital legally change its name or was it
8  otherwise merged into FlexFunds or is FlexFunds a
9  new company created separate and distinct from IA
10  Capital?
11         MR. THORNBURG:  I'm going to object to
12    the form.
13         You can -- you may answer.
14         THE WITNESS:  Again, you can -- you
15    can -- if you look at their filings, of
16    course, they have different papers.  But the
17    company is the same.  I mean, they do the same
18    thing.
19         So to give you more color, I know
20    Florent signed an agreement with IA Capital
21    Management, but he was paid by FlexFunds, and
22    we saw -- nobody saw any problem with that
23    because we understand it's the same company.
24    He also signed an agreement with GWM, right.
25  BY MR. KOENIG:

Page 21

1    Q   For tax purposes, is it the same
2  company?
3         MR. THORNBURG:  Object to the form.
4    Calls for legal conclusion.
5  BY MR. KOENIG:
6    Q   You can answer the question.
7    A   IA Capital Management, I believe, never
8  filed for taxes because it was just the first name
9  that we started with, but it never filed for taxes
10  because it --
11    Q   And -- and I think you answered my
12  question.  You talked about separate filings, and
13  I think the answer to my --
14    A   IA Capital Management never filed for
15  taxes, as far as I know.
16    Q   But at least with regard to the separate
17  entities, I'd asked you whether FlexFunds was the
18  same entity as IA Capital, just rebranded, or is
19  it a separate and distinct company under the laws
20  of Florida?
21         MR. THORNBURG:  Objection to the form.
22    First of all, it misstates prior testimony,
23    but also calls for legal conclusion.
24         And I do think that you mean FlexFunds
25    ETP, LLC; right?

Page 22

1 BY MR. KOENIG:
2     Q   Yes, when I said -- for now, when I say
3 "FlexFunds," I mean --
4     A   ETP, LLC.
5     Q   -- ETP, LLC unless -- unless I'll say
6 otherwise. My -- so my -- I'm just trying to get
7 a feel that --
8     A   My answer is the same. They were --
9 they were -- FlexFunds was not created to do
10 something else. It was -- it's the same company.
11    Q   But -- but you're not answering my
12 question. My -- my question is, did IA Capital
13 become FlexFunds somehow? Was -- is it the same
14 organization, or did FlexFunds exist by a separate
15 creation?
16        MR. THORNBURG:  And objection to the
17    form. Still calls for legal conclusion. I
18    think it's been asked and answered.
19        But if you can answer it further.
20        THE WITNESS:  I don't know how to answer
21    the question, then.
22        MR. KOENIG:  Well, I -- and -- and we're
23    going to stop here. Whatever your opinions
24    are going to be on this is -- he hasn't
25    answered my question. I'm going to keep

Page 23

1    asking. So I think you're also kind of
2    leading him on to how he might answer, that he
3    said "I've already answered" or "It's a legal
4    conclusion."
5        That if you object to the form, I have
6    no problems.
7        MR. THORNBURG:  No, I -- I -- I'm fairly
8    confident of my Rule 30 obligations, as well
9    as under the local rules of our jurisdiction,
10   I'm making an appropriate objection. I'm not
11   trying to lead the witness in any way. I
12   think you're asking a very complex question.
13   I think that you're entitled to an answer to
14   that question. I think he's answered to the
15   best of his ability.
16       MR. KOENIG:  I'll -- I'll keep going.
17 BY MR. KOENIG:
18   Q   So --
19   A   Do you want me to --
20   Q   So let me -- let me try to ask it as
21 clearly as I can.
22   A   Okay.
23   Q   I don't think it's a complex question.
24   A   No, I mean --
25   Q   So the question is, so IA Capital

Page 24

1 exists. Do we -- do we agree on that? Does it
2 still exist today?
3        MR. THORNBURG:  Object to the form.
4        THE WITNESS:  Yes.
5 BY MR. KOENIG:
6    Q   Is that an LLC? Is that an -- is that
7 incorporated, if you know?
8    A   Yes.
9    Q   So it's a -- it's a separate entity.
10 FlexFunds is a -- is -- Flex- -- FlexFunds ETP,
11 LLC is an LLC under -- filed in Florida; is that
12 correct?
13   A   Uh-huh.
14   Q   Are they two different companies?
15   A   Let me try to answer that question.
16 I'll do my best.
17   Q   Are they -- are they two different
18 companies, at least with regard to their corporate
19 existence?
20   A   I mean, the answer is of course.
21 They --
22   Q   Okay.
23   A   But again, those two companies were
24 created to do the same thing. It's just that
25 we're using a different brand name, but it's the

Page 25

1 same thing.
2    Q   I -- I understand. I'm just --
3    A   You asked -- there is no -- there is no
4 conversion document or a merging document because
5 this company, IA Capital Management, just turned
6 into FlexFunds. Since we -- we -- we didn't file
7 taxes, we just used FlexFunds from then on, right.
8 And again, I insist that all the parties involved
9 from inception, including Jose, including Florent,
10 including myself, we understood it was very well
11 understood and we're high-level people, that IA
12 Capital Management and FlexFunds were all the
13 same.
14   Q   Where is IA Capital incorporated?
15   A   In Texas, I believe.
16   Q   Where is FlexFunds incorporated?
17   A   It's a Delaware company, but it's --
18 yeah.
19   Q   And how much -- are you a shareholder
20 also of FlexFunds?
21   A   Of the holding company, yes.
22   Q   And so -- so describe to me the --
23 what's the holding company?
24   A   The holding company is the company that
25 owns the subsidiary companies.

7 (Pages 22 - 25)

**Page 26**

1    Q   So what's the name of the holding
2  company?  Let's start with that.
3    A   It's FlexFunds Holdings.
4    Q   Is it FlexFunds Holdings -- is there --
5    A   LLC.
6    Q   So that's our -- that's the holdings
7  company.  And where is that incorporated?
8    A   Also in Delaware.
9    Q   And what does FlexFunds Holdings, LLC
10  own?
11    A   It owns FlexFunds ETP, LLC, which is the
12  U.S. operating company, and FlexFunds Limited,
13  which is a Cayman incorporated company.
14    Q   Anything else?
15    A   No.
16    Q   And you are a shareholder of FlexFunds
17  Holding?
18    A   Yes.
19    Q   And what is the percentage of your
20  share?
21    A   I'm sorry, I misspoke.  Sorry about
22  that.  It's -- it's not -- FlexFunds Holding is
23  owner of FlexFunds Holding Limited in Cayman and
24  then FlexFunds Holding owns FlexFunds Limited, so
25  it's another company within -- in Cayman.  And

**Page 27**

1  that's -- I just want to make sure it's -- it's
2  correct.
3    Q   Thank you.  So we have FlexFunds Holding
4  LLC, a Delaware company?
5    A   Yes.
6    Q   Wholly owns FlexFunds Limited, a Cayman
7  company?
8    A   FlexFunds Holding Limited.
9    Q   FlexFunds Holding Limited.
10    A   That wholly owns FlexFunds Limited,
11  right.
12    Q   That wholly owns FlexFunds ETP, LLC and
13  FlexFunds Limited?
14    A   Let me -- let me start over.  I'm sorry
15  that that caused confusion.  FlexFunds Holding,
16  LLC owns two companies: FlexFunds ETP, LLC, U.S.
17  company, and FlexFunds Holding Limited, a Cayman
18  company.  That's it.
19    Q   And what is your ownership interest in
20  FlexFunds Holdings, LLC?
21    A   It's wholly owned by the -- by the
22  FlexFunds Holding, right.  So FlexFunds Holding,
23  LLC -- that was your question, sorry -- it's
24  25 percent.
25    Q   And who owns the remaining 75 percent?

**Page 28**

1    A   Jose Gonzalez.
2    Q   And then -- and FlexFunds Holdings is
3  the sole owner of both FlexFunds ETP and FlexFunds
4  Holdings Limited?
5    A   Correct.
6    Q   Between the two of us, we'll get --
7  we'll get through this.
8    A   Thank you.
9       MR. THORNBURG:  And maybe it's easier to
10    call it Delaware versus Cayman, but, you know,
11    if you -- it's like one singular, one plural,
12    but...
13  BY MR. KOENIG:
14    Q   As far as -- and we'll just -- we'll --
15  we'll finish up with -- with Jose's involvement.
16  I saw a variety of -- you know, thousands of
17  e-mails that both parties have -- have put back
18  and forth in discovery.  And I see that oftentimes
19  your name and your FlexFunds e-mail address is on
20  a lot of these e-mails.
21       And I think you had testified you're the
22  operations person for FlexFunds; is that right?
23    A   I would consider myself the, like, CEO
24  of FlexFunds.
25    Q   When you say you consider yourself the

**Page 29**

1  CEO of FlexFunds, is there a formal structure for
2  this LLC of -- of titles, directors, managers?
3    A   Yeah.  My title is director, but I act
4  as CEO because I make all the decisions, both
5  operations and sales.
6    Q   Is FlexFunds a manager-managed LLC, do
7  you know?
8    A   It is.  It is.
9    Q   And who's the manager?
10    A   The manager's going to be -- we're
11  actually -- the reason I'm hesitating is because
12  we're actually defin- -- redefining that, but it
13  will be Jose and myself.  That's why I hesitated
14  for a second.
15    Q   Who is it now -- or who has it been for
16  the past couple of years?
17    A   Just me.
18    Q   And why are you making a change to the
19  management to include Jose?
20    A   Because we recently included the holding
21  company in the -- in the -- in the Delaware versus
22  Cayman structure.
23    Q   And when you say that you were the --
24  considered yourself to be the CEO, did you have
25  any other officers within FlexFunds, the -- the

Page 30

1 U.S. company?
2    A   "Officers" meaning?
3    Q   President, vice president, CEO,
4 secretary/treasurer?
5    A   No.  Below me, I have a person that
6 handles sales, a person that handles operations, a
7 person that handles legal, and a person that
8 handles finance.
9    Q   And with regard to these -- these
10 e-mails I went through, I found quite a few
11 e-mails that had Jose involved as well.  What --
12 what kind of active role did Jose take over the
13 last few years in FlexFunds?
14    A   He's been, like I said, like advisory, a
15 sound -- like a sounding board for the company.
16 Of course, he has a share in the company and he's,
17 of course, interested in making it successful.
18    Q   Did he have any role in decision-making
19 as part of FlexFunds for the past few years?
20    A   Yes, of course.  I take his advice very,
21 very seriously.
22    Q   As far as percentage of -- of time, what
23 percentage of your time would you say you put into
24 FlexFunds?
25    A   100 percent.

Page 31

1    Q   And what about Jose?
2        MR. THORNBURG:  Object to the form.
3 BY MR. KOENIG:
4    Q   If you were to estimate?
5    A   I would say less than 50 percent.
6    Q   So he's still fairly active in
7 management and the running of FlexFunds the last
8 couple of years?
9        MR. THORNBURG:  Objection to the form.
10 BY MR. KOENIG:
11    Q   Just not as active as you?
12    A   I wouldn't say he's -- I keep repeating
13 myself.  He's like a sounding board.  So every
14 time we have a question or we need a
15 recommendation or we believe he can add value in
16 a -- in a decision or direction we should take,
17 we -- we tap his shoulder.
18    Q   Let's say, on average, how many hours a
19 week would you say that Jose would be involved in
20 the -- the management and -- and decision-making
21 of FlexFunds in a given week?
22        MR. THORNBURG:  Objection to the form.
23        THE WITNESS:  Again, it's hard to tell.
24 I want to speak in a very general way because
25 some weeks he -- he's not involved at all and

Page 32

1 some weeks maybe he's heavily involved because
2 there is a specific situation.  But I would
3 say, in terms of hours, six to ten hours a
4 week maybe.
5 BY MR. KOENIG:
6    Q   Okay.  And sometimes more, sometimes
7 less?
8    A   Of course.  It depends on the -- on the
9 situation.
10    Q   What is Global X Funds?  Does that name
11 sound familiar?
12    A   Of course.  That's Jose's second
13 company, successful company, that he has.
14    Q   Is there any interplay between Global X
15 Funds and FlexFunds?
16    A   No.
17    Q   Do you have any ownership interest in
18 Global X?
19    A   No.
20    Q   We discussed a little bit about GWM
21 Group.  Is there a GWM Limited also?
22    A   Yes.
23    Q   What's the structure?  If you can walk
24 me through -- you did a great job on the FlexFunds
25 structure.  What's the GWM structure?

Page 33

1    A   I would say that Jose would be better
2 than me to answer that question.  However, there
3 are two GWMs, one that is based in the U.S. and
4 one that is based in Bermuda.  That's it,
5 actually.
6    Q   And what do each of those companies do?
7    A   They're both broker-dealers.
8    Q   Are there -- does each entity handle
9 different types of transactions?  I guess, why --
10 why, to the extent that you know, are there two
11 entities and not one?
12        MR. THORNBURG:  Object to the form.
13        You may answer.
14        THE WITNESS:  The reason is since we
15 work with non-U.S. companies, it's just a lot
16 more efficient to -- to work with a
17 broker-dealer outside of the U.S. on those
18 transactions.
19        MR. KOENIG:  Okay.
20        THE WITNESS:  If we work with -- with
21 U.S. counter-parties, then we work with a --
22 with a U.S. broker-dealer.
23 BY MR. KOENIG:
24    Q   Do you have any ownership interest in
25 either of those GWM companies?

9 (Pages 30 - 33)

**Page 34**

1   A   No.
2   Q   Do you have any sort of title or
3 employment with either of those companies?
4   A   I am -- on the Limited, I believe I'm --
5 I'm part of the -- the board in that -- in that
6 company so I just listen to quarterly call.
7   Q   But, otherwise, what kind of interaction
8 do you have with-- with either GWM entity?
9   A   The interaction is -- is for business
10 purposes.  GWM acts as a bookrunner for the
11 FlexFunds program.  What it is is that every time
12 investors want to buy a -- a participation in the
13 funds or -- or series that we issue, they place
14 that -- that order with the bookrunner, with GWM.
15 Then GWM aggregates the -- the order and gives it
16 to CitiBank, our issuing agent, to then do the
17 transaction with the -- with the counter-parties.
18 So it's like -- it's like an order-taking role.
19   Q   Let's talk about Mr. Rigaud's status.
20 Was he an employee of FlexFunds?
21   A   He was regarded as an employee of
22 FlexFunds for sure.  He had a FlexFunds e-mail and
23 he represented FlexFunds around the world.
24   Q   When you say "he was regarded as an
25 employee of FlexFunds," what does that mean?

**Page 35**

1   A   I mean, the answer is yes.  I mean, he
2 was -- he was an employee of FlexFunds because he
3 was paid by FlexFunds.  The reason I -- I said
4 "regarded" is because your previous question on
5 the -- on the IA Capital Management thing.  But,
6 again, he was a FlexFunds employee.  He worked for
7 me.
8   Q   And what was the employment
9 understanding between FlexFunds -- and I'm
10 referring, obviously, to the ETP LLC entity --
11 between that FlexFunds entity and Mr. Rigaud?
12 What was the employment understanding?
13   A   That he would act as a manager/director
14 and just work on sales in certain regions
15 representing FlexFunds.
16   Q   Was there any sort of employment
17 agreement that FlexFunds had with Florent?
18   A   The employment agreement was originally
19 signed between GWM and IA Capital Management, but
20 Florent was paid initially by GWM and then was
21 paid by FlexFunds.  Like I said before, we all
22 understood it was all in the same.  And then when
23 Florent resigned, he resigned from all three
24 companies.
25   Q   Was there a separate agreement between

**Page 36**

1 FlexFunds and Florent?
2   A   There was no need.
3   Q   Could you have prepared one and had him
4 sign it?
5   MR. THORNBURG:  Objection to the form
6   Calls for speculation.
7 BY MR. KOENIG:
8   Q   Was it within FlexFunds' ability to have
9 a -- an employment agreement drafted and ask
10 Mr. Rigaud to sign it?
11   MR. THORNBURG:  Renew my objection.
12   Hypothetical.
13 BY MR. KOENIG:
14   Q   You can answer.
15   A   Sure, we could.
16   Q   Do you have any documentation that would
17 reflect that Mr. Rigaud's employment with
18 FlexFunds was identical to GWM or IA Capital?
19   A   Repeat the question.
20   Q   That there's some sort of document
21 incorporating any other agreement Mr. Rigaud had
22 with third parties that would provide any sort of
23 obligations or rights or responsibilities as to
24 FlexFunds.
25   MR. THORNBURG:  Objection to the form.

**Page 37**

1   THE WITNESS:  There was no need because
2   his -- his role and responsibilities were
3   clearly defined when he was hired to work as a
4   salesperson for FlexFunds.
5 BY MR. KOENIG:
6   Q   Was there anything within the GWM
7 agreement that specifically requires Mr. Rigaud to
8 do anything for FlexFunds at all?
9   MR. THORNBURG:  Objection to the form.
10   THE WITNESS:  I'm not familiar with the
11   entirety of the GWM agreement, but, again, he
12   was hired by GWM to work from the GWM office
13   but for FlexFunds.  He -- for example, I mean
14   everybody that works at GWM but also has a
15   participation -- or not a participation, a
16   role within FlexFunds, they have to report
17   that.  If you have a license, like I think
18   Florent had, you can hang it in -- at the --
19   at the broker-dealer, but you can still work
20   for another company as long as you disclose
21   it.
22 BY MR. KOENIG:
23   Q   What was Mr. Rigaud's em- -- employee
24 status for FlexFunds?  Was he considered an
25 independent contractor or a true employee with

10 (Pages 34 - 37)

Page 38

1  benefits?
2        MR. THORNBURG: Objection to the form
3        THE WITNESS: He had a distributor
4  agreement.
5  BY MR. KOENIG:
6    Q   And was that distributor agreement with
7  FlexFunds?
8    A   Distributor agreement, I believe it was
9  with IA Capital Management, which I believe, as I
10 mentioned to you before, it applied to FlexFunds.
11 And he had FlexFunds e-mail address, his business
12 card. If you look at his LinkedIn, it says
13 FlexFunds. It is FlexFunds.
14   Q   I'm just trying to get a feel because
15 the lawsuit is -- is on behalf of FlexFunds. Do
16 you agree with that?
17   A   Of course.
18   Q   And do you agree that the lawsuit is not
19 on behalf of GWM?
20   A   But, again, as I mentioned to you
21 before, we all work in the same -- with the same
22 objective and the same goals.
23   Q   But the -- but the plaintiff in this
24 matter is not GWM. Will you agree with me on
25 that?

Page 39

1    A   I -- I believe you're right.
2    Q   And the plaintiff on -- in this lawsuit
3  is not IA Capital; is that -- do you agree with
4  that as well?
5    A   I agree with that. However, as I
6  mentioned before -- and you -- you're trying to
7  separate the companies where, again, I keep
8  tell- -- I keep repeating myself that it's the
9  same thing. It's -- GWM works alongside
10 FlexFunds, which, again, started being IA Capital
11 Management, and they all work on the same goals
12 and objectives, the same company.
13       We do -- we have -- all -- we all have
14 the same e-mail address even though Florent had a
15 distribution agreement with IA Capital Management.
16 And we all work for the same company with the same
17 business card that says "FlexFunds," and we all
18 get paid from FlexFunds.
19   Q   So you're -- you're -- you -- you
20 testified that you think I am separating the
21 companies, but isn't it true all three companies
22 are separate?
23       MR. THORNBURG: Objection to the form.
24       THE WITNESS: I think we're going in
25 circles. Like I said, I understand that when

Page 40

1  you -- when you create a company, you have a
2  piece of paper that says, "This is a Delaware
3  company," and, of course, it's -- each company
4  has a separate piece of paper. I understand
5  that. If you file taxes, you have a separate
6  piece of paper. I understand that. But those
7  companies didn't act independently. They act
8  in conjunction.
9  BY MR. KOENIG:
10   Q   Well, let me ask you, then -- then,
11 the -- the reciprocal. Is it your understanding,
12 then, that FlexFunds, IA Capital, and GWM should
13 be treated as the same company?
14   A   For -- for this situation, yes.
15   Q   Well, either is it just for this
16 situation with Mr. Rigaud or is it for all
17 situations?
18   A   The reason I said for this situation is
19 because, on the regulatory aspect, GWM is the only
20 company that is FINRA and SEC-regulated. That's
21 why I said that.
22   Q   So for FINRA purposes, it's a separate
23 company. But for Mr. Rigaud's purposes, it should
24 be treated the same?
25       MR. THORNBURG: Objection to the form.

Page 41

1  Argumentative.
2  BY MR. KOENIG:
3    Q   Is that -- is that your testimony?
4    A   Can you repeat the question again?
5    Q   Sure. You had said for FINRA purposes
6  GWM needed to be a separate entity, but I thought
7  I understood your previous testimony that GWM and
8  FlexFunds should be treated one and the same with
9  regard to Mr. Rigaud?
10       MR. THORNBURG: Object to the form.
11 Misstates prior testimony.
12 BY MR. KOENIG:
13   Q   Is that -- is that accurate?
14       MR. THORNBURG: Renewed.
15 BY MR. KOENIG:
16   Q   You can answer.
17   A   When you're an employee and you're
18 working for the three companies; right?
19   Q   Yes.
20   A   You are under the same, I guess, policy
21 and procedures of all three companies, right. But
22 there are certain activities that one company can
23 do that are -- that is -- that are -- that affects
24 certain parts of the regulations and some are not.
25       For example, the work of the arranger

11 (Pages 38 - 41)

Page 42

1 does not need to be regulated by FINRA or the SEC.
2 The work of the trader does. So all I'm talking
3 about is the activities. But all those companies
4 work together for the same purpose. It's just
5 certain activities are regulated and certain
6 activities are not.
7    Q   But that's still not answering my -- my
8 question. It's -- it's -- your testimony was that
9 the documents signed by Mr. Rigaud with IA Capital
10 and GWM somehow carry into obligations owed to
11 FlexFunds; is that accurate?
12    A   Yes, that is accurate.
13    Q   And that for Mr. Rigaud's purposes, we
14 should treat GWM, IA Capital, and FlexFunds as one
15 and the same?
16    A   That's correct.
17    Q   Would FINRA do the same?
18       MR. THORNBURG: Objection to the form.
19 Calls for speculation.
20       THE WITNESS: Like I mentioned to you
21 before, there are certain activities that GWM
22 does are FINRA regulated.
23 BY MR. KOENIG:
24    Q   Okay. How did you come about -- who's
25 involved in hiring Mr. Rigaud? Was that Jose?

Page 43

1    A   Yes.
2    Q   And before -- before Mr. Rigaud was
3 actually hired, what did you know about him?
4    A   That he worked at Pershing.
5    Q   Did you get a chance to meet him before
6 he was hired?
7    A   Good question. It's been awhile. I'm
8 not sure.
9    Q   Well, was -- was Mr. Rigaud flat out
10 hired by -- by Jose without checking with you?
11    A   He did mention to me about the -- the --
12 the possibility. And on paper, of course, it
13 makes complete sense. And he was very convinced
14 that this was a good move. So I -- of course, I
15 agree with him. Again, I just don't know if I met
16 him before he was -- he was -- he was hired. I'm
17 not sure about that specific point.
18    Q   Did you have a hand in writing
19 Mr. Rigaud's press release?
20    A   Yes.
21    Q   Let me show you what's been marked as
22 Exhibit 2.
23       (Thereupon, Rivera Exhibit 2 was marked
24 for identification.)
25       THE WITNESS: Yep.

Page 44

1 BY MR. KOENIG:
2    Q   You've seen this before?
3    A   Yes, of course.
4    Q   All right. And -- and what is it we're
5 looking at?
6    A   When Florent was hired for us, he was --
7 he was very important because he's a high-level
8 person and very respected in the industry, so
9 we -- we took this chance to advertise that he was
10 coming to work with us.
11    Q   And I'll direct your attention to the --
12 so we have on the first page here, it says --
13 looks like an e-mail on April 7, 2015. It appears
14 to be from you to Mr. Rigaud; is that -- is that
15 accurate?
16    A   Yes.
17    Q   And it states, "Revised your and created
18 a new one. Let me know what you think."
19       What does that mean?
20    A   That means that Florent -- by the way, I
21 told this magazine -- not magazine, digital
22 newspaper that we're going to be writing this --
23 this article. So I told Florent, "Florent, why
24 don't you write your own press release that you're
25 coming to work for FlexFunds." So he wrote the

Page 45

1 first draft and I revised it.
2    Q   Do you recall any of the major -- any
3 major revisions you made? And I know -- I know it
4 was a few years ago.
5    A   No, I don't.
6    Q   All right. If you turn to the next
7 page, it states in the first paragraph, "Florent
8 Rigaud, former head of Pershing Latin America,
9 recently announced his decision to accept the
10 position of director of Miami-based company,
11 FlexFunds, to distribute their flagship product
12 FlexETP."
13       So this appears to announce that
14 Mr. Rigaud is coming to work for FlexFunds?
15    A   (Nods head.)
16    Q   Sorry, is that yes?
17    A   Yes. Sorry.
18    Q   Is there a reason why you left out that
19 Mr. Rigaud was an employee of GWM or IA Capital or
20 otherwise was affiliated with them?
21    A   There was no need.
22    Q   And why is that?
23    A   Because they were representing what the --
24 what FlexFunds is doing.
25    Q   But it doesn't say anything in here

12 (Pages 42 - 45)

Page 46

1 about IA Capital or GWM?
2    A    Correct, there was no need.
3    Q    And then at the last paragraph, states,
4 "Mario Rivera, director and head of the FlexFunds
5 Miami office, states, 'It is a great privilege to
6 welcome such an accomplished addition to our
7 team.'"
8         What did you mean by "accomplished
9 addition"?
10    A   He was a director of Pershing Latin
11 America. That's a pretty good accomplishment.
12    Q    What -- what kind of background did you
13 do on Pershing? Were you -- were you familiar
14 with Pershing at the time?
15    A   Yes.
16    Q    And did you do any sort of due diligence
17 on your own to find out more about Rigaud before
18 you drafted this press release?
19    A   I believe that I looked at his LinkedIn
20 page. I spoke with Jose and I took his -- his
21 opinion of -- of Florent. And since it was a
22 highly regarded opinion, I accepted it.
23    Q    Did you talk to anyone from Pershing?
24    A   No.
25    Q    Do you know if Jose did?

Page 47

1    A   Jose worked with -- with Florent in the
2 past.
3    Q    Okay.
4    A   So that's -- that's a good reference.
5    Q    And then it says, the next sentence,
6 "Florent is already proving himself to be a great
7 asset, bringing with him 20 years experience in
8 the industry with an established reputation in the
9 region." What did you mean by that?
10    A   I mean, that's exactly what it says,
11 that --
12    Q    Well, first, let's start with what was
13 he doing already to prove himself to be a great
14 asset?
15    A   Good question. It's a good marketing
16 piece, I know. I would think that he was already
17 bringing in his -- some of -- some of his
18 relationships that he has gathered over the past
19 in Pershing.
20    Q    And it discusses 20 years experience in
21 the industry. Which industry were you referring
22 to?
23    A   The financial industry.
24    Q    And was Mr. Rigaud, was he familiar with
25 ETP?

Page 48

1    A   Not at all.
2    Q    And do you know why he was hired to come
3 onboard FlexFunds ETP to -- to start working with
4 ETPs?
5    A   Florent was hired because he -- again,
6 he was an established person in the industry. He
7 worked for Pershing. Pershing is a -- is a
8 flagship custody provider in the -- in Latin
9 America region. So when he was there, he was --
10 all the companies tried to get an account at
11 Pershing so, of course, they -- they -- they tried
12 to -- to befriend Florent and tried to get
13 Pershing to approve them. So the relationship --
14 the relationships he had built through Pershing
15 were -- were relevant, or so we thought, and that
16 was the only reason.
17    Q    And when you discussed that he was
18 already proving himself to be a great asset, had
19 he brought new business into FlexFunds?
20    A   I don't believe at this point he did.
21    Q    Did he ultimately?
22    A   Yes, of course.
23    Q    And at least with regard -- it discusses
24 20 years experience in the industry. How quick a
25 learner was Mr. Rigaud with regard to ETPs?

Page 49

1    A   I would say average, like not too quick,
2 not too slow.
3    Q    And his -- his knowledge in the
4 industry, was this just a different product in the
5 industry he was used to anyway?
6         MR. THORNBURG: Object to the form.
7         THE WITNESS: Repeat the question again.
8 BY MR. KOENIG:
9    Q    I guess walk -- walk me through the --
10 the -- the issue. So you -- you hire someone who
11 had experience in what, the securities industry?
12    A   Financial industry.
13    Q    In the financial industry.
14    A   I wouldn't say securities. At Pershing,
15 what I believe he did for the most part was
16 custody. Custody, do you know what --
17    Q    What do you mean by "custody"?
18    A   Custody is opening a bank account where
19 you put in securities, right, but you don't
20 necessarily need to know anything about
21 securities. It's just about how you deposit or
22 how do you maintain or keep those securities into
23 a bank account, a custody account. That's what it
24 is.
25    Q    How many other companies, approximately,

13 (Pages 46 - 49)

Page 50

1 are -- are out in the world doing what FlexFunds
2 ETP does?
3    A   Nobody.
4    Q   As far as what about companies that --
5 that handle ETPs?
6    A   That's a broad question.
7    Q   Is it -- is it something there's only
8 three or four competitors out there or are there
9 closer to a hundred competitors out there?
10    A   FlexFunds ETP, LLC is unique.  There is
11 no other company that does the same thing we do.
12 There are companies that do products that are
13 substitutes.  Like, for example, an ETF is a
14 substitute, a UCIT or a mutual fund could be a
15 substitute.  UCIT is U-C-I-T.
16    Q   What about ETPs, are there other
17 companies out in the world?
18    A   Sorry, ETPs is like an overarching term,
19 exchange traded products --
20    Q   Sure.
21    A   -- that entails ETFs.  It -- it also
22 includes ETNs, notes, right.  And our type of ETP
23 is new.  So we call it FlexETP because there is
24 nothing out there like it -- like this.
25    Q   Did you ever file for patent protection

Page 51

1 or something like that to protect the process of
2 ETPs?
3        MR. THORNBURG:  Object to the form.
4    That calls for attorney-client privilege.
5        And I instruct the witness not to
6    answer.
7 BY MR. KOENIG:
8    Q   So as far as the -- are you aware of the
9 filing for a patent is something that is in the
10 public record, or is that something that the
11 public has no access to?
12        MR. THORNBURG:  You're asking him a
13    legal question.
14        I'm instructing him not to answer that
15    question as well.
16 BY MR. KOENIG:
17    Q   You're -- just so we're clear on the
18 record that I have asked the witness a question
19 whether he has knowledge about the patent process,
20 and your counsel has instructed you not to even
21 attempt to answer the question; is that accurate?
22        MR. THORNBURG:  I think what you're
23    trying to elicit is what -- is a legal
24    conclusion of whether a filing is or isn't
25    public.  I think that -- well, let me ask --

Page 52

1    if you want to ask a yes-or-no question is is
2    he aware of whether patent applications at the
3    inception of filing are public or private, you
4    may ask that.  But it's a legal conclusion
5    that you're seeking.
6        MR. KOENIG:  I'm pretty sure I asked him
7    almost exactly that question.
8        MR. THORNBURG:  You didn't, but...
9 BY MR. KOENIG:
10    Q   I'll ask again.  Are you aware whether
11 the application for a patent is something that is
12 in the public record that you can look up or it's
13 not?
14    A   So you're asking me -- just to repeat
15 the question so I understand.
16    Q   Yes.
17    A   You're asking me if there is an existing
18 patent nowadays?
19        MR. THORNBURG:  No.  He's trying to
20    elicit that by asking that question.
21 BY MR. KOENIG:
22    Q   What I'm -- what I'm asking you is --
23        MR. THORNBURG:  That's why I'm not
24    allowing you to answer.
25 BY MR. KOENIG:

Page 53

1    Q   What I'm asking is, are you aware
2 whether -- if you were to make a patent
3 application, whether that is something that you
4 can find online on a basic search in the public
5 records?
6    A   I don't know that answer.
7    Q   Okay.  Do you currently own a patent on
8 the ETP process?
9        MR. THORNBURG:  Well, first of all, are
10    you asking him with the term "you" or are you
11    talking about FlexFunds ETP or a --
12        MR. KOENIG:  He is a corporate
13    representative.
14 BY MR. KOENIG:
15    Q   And when I say "you," I will mean
16 FlexFunds.  If I ask about you something
17 personally, I'll try to delineate.
18        But does FlexFunds own a patent -- does
19 FlexFunds own any patents at all?
20    A   The answer is no.
21    Q   Thank you.  Do you know if FlexFunds has
22 ever been rejected for a patent application?
23        MR. THORNBURG:  I'm going to instruct
24    you not to answer that question.
25        MR. KOENIG:  On what basis?

14 (Pages 50 - 53)

Page 54

1     MR. THORNBURG:  That's privilege.  If
2   you want to ask him has he published patent
3   applications, that would be past the 18-month
4   provision.  But your questions are so
5   inarticulate that you are eliciting privileged
6   communications.
7 BY MR. KOENIG:
8     Q    And what was the -- and we're getting
9 back to Exhibit 2 here on the second page, the
10 last sentence that states that "Mr. Rigaud had an
11 established reputation in the region."  Is this
12 the region in Miami?
13    A    Latin America.
14    Q    And what was Mr. Rigaud's reputation in
15 the region?
16    A    It was good.
17    Q    We discussed a little bit earlier about
18 whether FlexFunds had the ability to have
19 Mr. Rigaud enter into an employment agreement.
20 What about whether FlexFunds could have had
21 Mr. Rigaud enter into a noncompetition agreement,
22 was that something that FlexFunds could have
23 drafted?
24    MR. THORNBURG:  Objection to the form.
25   It calls for a hypothetical.

Page 55

1     You may answer.
2     THE WITNESS:  I believe that -- it's a
3   three-pronged answer that I'm going to tell
4   you.  Number one, the distribution agreement
5   had confidentiality provisions.
6     Number two, within the policies and
7   procedures that overarch GWM and, of course,
8   the companies that we all work for, it entails
9   a code of ethics that people on our level, we
10   completely understand that we have to abide
11   by.
12    And number three, the nature of our
13   business is clearly confidential.  I mean, not
14   only do we have those overarching code of
15   ethics, everything we do is underneath a
16   unique password-protected cloud system, so all
17   those documents that we create, not only for
18   our internal programs, not only for our
19   clients and between our clients, but also our
20   internal processes, are unique and are all
21   under a password-protected cloud system which
22   is Dropbox.
23    Not only that, there is a tier system
24   that we have internally at FlexFunds where not
25   everybody -- or not all the employees have

Page 56

1   access to these folders.  Only the ones that
2   are designated or that are allowed to use
3   those folders have specific access to those
4   folders.  So we are very careful to who has
5   access to what.
6     Then if you look at the documents that
7   we put together, they have a confidentiality
8   footer in them.  When we exchange this
9   information with any clients, we use unique
10   password-protected e-mail.
11    And when we talk to these clients, this
12   last point is that we don't send this
13   information, which is sensitive, to the
14   clients.  Of course, this is the growth plans,
15   the strategic plans that we take very
16   seriously, that's very sensitive information.
17   We provide them with our solution for --
18   for -- to -- to resolve those -- the plans
19   that they have to grow and their strategies
20   and that's our sensitive information.
21    And when we -- we send those e-mails in
22   this password-protected way, we only limit the
23   audience to the client, the decision-maker on
24   the client's side, and the relationship
25   manager on our side, and maybe myself as the

Page 57

1   CEO of the company.
2 BY MR. KOENIG:
3    Q    Just so you know, my question didn't ask
4 at all about confidentiality.  I asked about a
5 noncompetition agreement.  Did FlexFunds have the
6 wherewithal and the ability to draft a
7 noncompetition agreement when Mr. Rigaud came
8 onboard?
9    A    There was not any --
10    MR. THORNBURG:  Objection to the form.
11    THE WITNESS:  Sorry.  The answer is that
12   there was no need because if you read the code
13   of ethics within the -- the policy and
14   procedures that Florent abide by, on several
15   occasions includes that -- that statement.
16 BY MR. KOENIG:
17    Q    Let me show you what's been marked as
18 Exhibit 3.
19    (Thereupon, Rivera Exhibit 3 was marked
20   for identification.)
21 BY MR. KOENIG:
22    Q    Have you seen Exhibit 3 before?
23    A    Yes.
24    Q    And -- and what is Exhibit 3?
25    A    So during the last weeks that Florent

15 (Pages 54 - 57)

Page 58

1  was still employed by -- by FlexFunds, we -- we
2  wanted to sign this document between -- between
3  the parties as a separation of employment
4  agreement.
5      Q   And within this agreement, there are
6  certain provisions regarding confidential
7  information?
8      A   Yes.
9      Q   As well as non-solicitation?
10     A   Do you mean 7?
11     Q   Number 7, correct.
12     A   Yes.
13     Q   As well as non-competition?
14     A   I'm sure there is -- where is is -- where
15  is it?
16     Q   At least what Number 7 discusses, any of
17  the businesses that competes with FlexFunds, that
18  you cannot engage in any business that competes
19  with FlexFunds.
20     A   Okay.  Correct.
21     Q   So even though you testified there was
22  no need to have any document with Mr. Rigaud at
23  the inception of employment that had
24  confidentiality, solicitation, non-competition,
25  yet, didn't you want Mr. Rigaud to execute Exhibit

Page 59

1  3 before he left FlexFunds?
2      A   Of course.
3      Q   And this agreement is only with
4  FlexFunds ETP, LLC; correct?
5      A   Yes.
6      Q   Why isn't this also including IA Capital
7  and GWM?
8      A   Well, it says here, "On behalf of
9  itself, its current and former divisions,
10  subsidiaries, affiliates, related issuance" -- dah
11  dah, dah, dah -- "collectively readed as
12  FlexFunds."
13     Q   So is it -- is -- for example, is GWM a
14  division of FlexFunds?
15     A   No, I would call it an affiliate maybe
16  or related-issuance program company.  That's for
17  sure it is.
18     Q   Do you have any FlexFunds employees who
19  have signed an agreement like this one?
20     A   No, we haven't had a need to do this.
21     Q   Whose idea was it to have Mr. Rigaud
22  execute this?
23     A   Both Jose's and -- and mine.
24     Q   And if you had all these other
25  protections that you believe were afforded by

Page 60

1  Mr. Rigaud's contracts with third parties, why
2  have him execute Number 3?
3      A   Why not?  That's my answer.
4      Q   Well, I guess, why, if you were afforded
5  all these other protections, did you need
6  additional protections with this document?
7      A   And my answer is why not?
8      Q   I don't understand -- I don't understand
9  your answer.
10         MR. THORNBURG:  Is that a question?
11  BY MR. KOENIG:
12     Q   When I asked "why would you have him
13  sign it," are you saying there was no reason for
14  him to sign it?
15     A   No, no.  What I'm trying to tell you is
16  that you can have as many protections as you -- as
17  you can, as you want, but if you can have an
18  additional one, why not?
19     Q   Is it that -- so -- so you wanted to
20  have him sign it just to give additional
21  protections?
22     A   Why not?
23     Q   Were these the same protections you
24  thought you -- you thought you already had?
25     A   We just underlined the same protections,

Page 61

1  yes.  It should be, yes.
2      Q   So it's your understanding that
3  Exhibit 3 encompasses the same protections that
4  you had via Mr. Rigaud's execution of agreements
5  with GWM and IA Capital?
6          MR. THORNBURG:  Objection to form.
7          THE WITNESS:  I cannot say if it's
8      exactly the same, but that was the idea.
9  BY MR. KOENIG:
10     Q   Was this the first time you had ever
11  asked Mr. Rigaud to execute an agreement with
12  FlexFunds at all?
13     A   I believe so.  I'm not entirely sure,
14  but I believe so.
15     Q   Let's talk about FlexFunds files.  How
16  would you describe the -- and when I say "files,"
17  I'm referring to handling client documents, these
18  trust materials, engagement letters, nondisclosure
19  agreements, things like that.  Are these types of
20  documents, are they maintained in a -- in an
21  organized way or are they more haphazard?
22     A   I -- I mentioned to you just in the
23  previous answer, but, yes, they're very -- they're
24  maintained in an organized way -- in an -- in an
25  organized way.

16 (Pages 58 - 61)

**Page 62**

1    Q   And do you have any sort of policy about
2  when you would destroy certain documents after a
3  certain period of time?
4    A   Yes. We have a policy that I believe,
5  after three years, we destroy everything. I
6  believe that's what it is. I -- I'm not entirely
7  familiar with it, but my legal counsel is.
8    Q   Does FlexFunds have any sort of
9  obligations under FINRA?
10   A   No.
11   Q   And with regard to client retention, for
12 example, you've had a client for -- for several
13 years, do you maintain, for example, the
14 engagement letter on file the whole time?
15   A   When -- you mean an ongoing client?
16   Q   Ongoing client.
17   A   Of course, because the ongoing client,
18 we are -- we are -- is an engaged client, right,
19 so it's -- I don't know if you're familiar with
20 what we do. We issue a -- I'm pretty sure you're
21 familiar with what we do. We issue a fund-like
22 product. Right.
23   Q   Right.
24   A   And this fund has a term. Right. It
25 could have a finite term. It could be indefinite.

**Page 63**

1  And throughout the life of that fund, we need to,
2  of course, keep all the documentation.
3    Q   What about do you keep materials
4  regarding your marketing efforts for prospective
5  new clients?
6       MR. THORNBURG: Object to the form.
7       THE WITNESS: Marketing efforts for
8    prospective new clients. In certain
9    situations, yes, we do keep some marketing
10   efforts. Can you define "marketing efforts"?
11 BY MR. KOENIG:
12   Q   Sure. Maybe pitch materials, creating
13 PowerPoints or sending out pricing or something
14 trying to entice a new customer?
15   A   Okay. Yes, on certain occasions, we do
16 keep that in a -- in a folder.
17   Q   And what kind of situations would you
18 keep that?
19   A   When we believe that the -- that this
20 ongoing communication could lead to -- to an
21 engagement.
22   Q   And with regard to nondisclosure
23 agreements, is that something you would also keep
24 in the course of business?
25   A   Yes. When they are necessary, yes, we

**Page 64**

1  would sign an NDA and we would, of course, keep it
2  in the password-protected cloud system, yes.
3    Q   With regard to those prospective
4  clients, for example, you -- you pitch a client,
5  let's say, four years ago and you provide to the
6  client pricing terms and, you know, a variety of
7  confidential information, and you have the
8  prospective client sign an NDA, does that type of
9  thing happen?
10   A   Not quite. If you want me to walk you
11 through how --
12   Q   Please do.
13   A   -- our usual process. Okay. Because,
14 as you understand and I mentioned to you before,
15 the -- the type of information that is exchanged,
16 not only from us to the client but from the client
17 to us, is sensitive. So it's not that we meet
18 someone and five minutes later we just dump all
19 our confidential information to them. Right.
20      So the way that it works -- the way that
21 it works is there is an initial meeting or phone
22 call where we explain what we do, right, in
23 high-level terms. What I mean by "high level" is
24 what you see in the website. It's what FlexFunds
25 is, what FlexFunds does. And then the client can

**Page 65**

1  understand whether or not they can use us.
2       At that point either -- if -- if --
3  either they can tell us in which way they can use
4  our services or they go back, they think it
5  through, and then we have another phone call or
6  another meeting to discuss a specific project.
7  Right.
8       So there is an education meeting first,
9  and there's a second education -- second meeting
10 to talk about a specific project. Right. In that
11 project, there is an understanding of an exchange
12 of confidential information between the parties
13 because they're going to tell us what they're
14 trying to do; and us, we're going to tell them how
15 we can resolve that specific project using our
16 solutions.
17   Q   And is that at that second meeting?
18   A   I believe that's -- I would say that at
19 that point is when we start exchanging sensitive
20 information between the parties. And it's well
21 understood that any information exchanged between
22 those parties is confidential.
23      And I'll tell you why. If we create a
24 documentation or a presentation to explain to them
25 how to resolve a specific project that they're

17 (Pages 62 - 65)

Page 66

1 trying to do, that's called either a presentation
2 or a transaction memorandum that has confidential
3 information in the footer.
4       All those other information is located
5 within our unique password-protected cloud-based
6 system, and it's also like tiered so not everybody
7 has access to it. Only the relationship manager
8 has access to that folder.
9       We exchange via e-mail. Of course, in
10 both sides, e-mail is secured. We all have
11 password-protected e-mail, obviously. And it's
12 only between the parties involved, the
13 decision-maker on this side and the decision-maker
14 on our side, which is the relationship manager.
15       When we move to the next stage --
16    Q   Can I -- can I stop you there and talk
17 about that stage?
18    A   Yes, you can.
19    Q   And thank you for -- for making it
20 clear. So we have the -- there's an initial
21 meeting whereby there's -- there's 30,000-foot
22 approach discussions of what the big issues are or
23 the problems to be solved?
24    A   We're educating the client about what we
25 do because, as I continue, we're unique. So no

Page 67

1 one knows what we do because there is nothing like
2 us in the market, and there's always an education
3 process to educate the market about this new
4 product.
5    Q   And then the second meeting is when you
6 start getting into sensitive information
7 potentially passed by -- by both parties about
8 the -- the issues and the potential products and
9 the solutions; is that accurate?
10    A   Yes. I mean, they will share with us
11 what they're trying to do, which again their
12 growth strategy or the funds they're trying to put
13 together, et cetera, and how we propose our
14 approach to resolve that -- that project.
15    Q   At the stage where there is a -- a
16 sharing of some of this sensitive information, do
17 you have a nondisclosure agreement in every
18 circumstance where that occurs?
19    A   There is no need at that -- at that
20 stage. It's sensitive information but it's not to
21 the extent that we need an -- an NDA.
22    Q   At -- at the -- at that second meeting
23 stage, what kind of sensitive information is
24 FlexFunds typically sharing with a prospective
25 client?

Page 68

1    A   We share a diagram of how we would
2 resolve that --
3    Q   Is that the transaction memorandum?
4    A   Exactly, it's a transaction memorandum
5 that illustrates how we would go about resolving
6 this -- the -- the project that this company wants
7 to do. So the transaction memorandum, if you
8 haven't seen one, it includes a diagram so you --
9 so they can understand how -- how the flow and the
10 different parties, how they work together. They
11 have timeline and a description of the different
12 parties and a description of the timeline.
13       So again, that information is sensitive,
14 is confidential. It is understood by the parties
15 that it is confidential. However, if your
16 question is do we have to sign NDA before that, I
17 don't think there is no need at that point. That
18 will be the next stage.
19    Q   And then with regard to that -- that
20 second meeting, you discussed the sensitive
21 information, the transaction memorandum. What
22 else would FlexFunds typically share? Would
23 FlexFunds typically share some pricing structure
24 so the client has an idea of what this might cost?
25    A   I mean, of course they -- you always

Page 69

1 share some pricing -- some pricing numbers, right,
2 so they can understand what we're talking about.
3       But if you -- if you look at our cost
4 table, it has says confidential in nature in the
5 footer as well.
6    Q   And -- and just so I'm clear, when we
7 say "pricing," I was referring to the pricing of
8 FlexFunds. Did you understand it the same? Like
9 the cost that FlexFunds would charge --
10    A   Yes, the fees.
11    Q   And -- and isn't there also some
12 additional fees for other vendors?
13    A   Right. And that also takes some
14 education because since this product is unique,
15 our pricing structure is also unique. The way
16 FlexFunds charges, it didn't start that way.
17 It took years of -- of -- of work and research,
18 experience and client relationships to develop
19 this pricing structure.
20       And you're completely correct, we have a
21 setup fee, right, that is mainly a passthrough of
22 fees that go to the different service providers
23 that we use to set up the fund.
24    Q   And -- and -- and just so -- just so I
25 don't derail us off another way, when we talk

18 (Pages 66 - 69)

1 about pricing, it sounds like when you say
2 "pricing," that you would share at this -- we'll
3 call it at the second meeting; is that fair?
4     A   It could be shared at that meeting or --
5     Q   It could be.  Or at least historically
6 you have shared it at -- at those meetings?
7     A   I mean, they ask us for, you know, a
8 tentative price, yes.
9     Q   And I have a couple of documents, maybe
10 I can show you as we go, to clear it up, but
11 these --
12     A   Some pricing of -- some pricing of --
13 what's the word I'm looking for?  Like some
14 pricing levels, right.
15     Q   Okay.
16     A   Nothing is defined in black and white.
17     Q   And the pricing would not only be those
18 fees that FlexFunds would charge and that would go
19 directly to FlexFunds to -- to keep, but there
20 would also be fees and costs that are merely
21 pass-through to other entities such as Sanne or
22 one of these other --
23     A   Right.
24         MR. THORNBURG:  Objection to form.
25         THE WITNESS:  I was trying to explain

1 that before, that that -- that pricing
2 structure evolved with time because our hard
3 work and is very unique again.  And yes, there
4 is a setup fee.  There is mainly a
5 pass-through.  There is a maintenance fee,
6 which includes a service provider's fee, like
7 you mentioned.  And there's an arranger fee,
8 which is the fee that FlexFunds would charge
9 for the maintenance and administration of
10 the -- of the vehicle throughout the life of
11 the vehicle.
12 BY MR. KOENIG:
13     Q   Right.  Is there -- is there anything
14 else that you recall, other than the transaction
15 memorandum and some pricing information, that may
16 be shared by FlexFunds to the prospective client
17 at this second meeting?  Again, we're all still --
18     A   Could be --
19     Q   And again, we're still talking without
20 the NDA.  You said the NDA is the next --
21     A   Yeah, it could be that we -- we share a
22 sample series memorandum.  And the series
23 memorandum is a clean version of the series
24 memorandum which is, for clarity purposes, like
25 the prospectus of -- of the security that is

1 issued.
2     Q   When you say "a sample series
3 memorandum," would you show the whole product?
4 Which it's my understanding that there are master
5 terms and conditions, that there are -- there are
6 many parts.
7     A   There are many documents.  There's like
8 over twenty documents that we produce.
9     Q   I've learned more about some of these
10 things than I thought I would ever care to.  That
11 I -- I know there are lot of documents.  Would you
12 bring those documents to that second meeting to
13 say --
14     A   No, no, no.  We wouldn't bring those
15 documents.  First of all, we only show them if
16 we're asked, number one.
17         Then think about two sets of documents.
18 You have the master program documents and you have
19 the series documents; right?
20     Q   Right.
21     A   The master program is where the
22 uniqueness and the -- our trade secrets are
23 buried.  The series documents, they do have some
24 customization as well.  Right.  They're embedded
25 in -- many of the series documents, especially

1 in the constituting instrument.
2         But one of those twenty documents that
3 form the series documents is the series
4 memorandum, which, again, is only a description of
5 the security, and that document is -- is -- is
6 available, is public.
7     Q   Okay.  Okay.  So -- so you would provide
8 the sample series memorandum but not the master
9 documents?
10     A   Correct.
11     Q   Do you recall if any prospective client
12 asked to see a sample of the master documents at
13 that second meeting?
14     A   Not at the second meeting.  So if --
15 if -- just to -- just to define the stages, the
16 next stage, right --
17     Q   Have we covered everything that would be
18 shared at the second meeting before we move on to
19 the third?
20     A   Generally speaking, yes.
21     Q   Okay.  So now we move on to the third.
22 What happens at the third meeting?
23     A   In the third stage is when we just move
24 toward the engagement letter.  Right.
25     Q   And when you say "move toward," is that

19 (Pages 70 - 73)

**Page 74**

1 when the engagement letter is executed?
2    A   It's submitted, right, for execution
3 obviously.  The engagement letter includes the
4 pricing and includes all the confidentiality
5 provisions, non-compete, et cetera, for the client
6 to sign on top of, of course, the engagement.
7 Right.
8    Q   And -- and at the time that you submit
9 the engagement letter, they're -- they're still
10 not a client yet?  You're still trying to get --
11 get the business?
12    A   Correct.
13    Q   Have you -- I assume it's happened, but
14 have you had opportunities where you submit the
15 engagement letter and -- after that second
16 meeting, and the prospective client says,
17 "We're -- we're not interested"?
18    A   Yes, it happens to all of us in the
19 service business.
20    Q   And you -- you send the letter out, but
21 you don't get a signed one back?
22    A   It's not the norm.  I would say that,
23 for the most part, when we send an engagement
24 letter is when the client has already -- is
25 already going to move forward.  But has it

**Page 75**

1 happened?  I would -- I guess so, yes.  In a few
2 instances, yes.
3    Q   Okay.  And at that point that you --
4    A   Sorry.  Just for -- for the record, we
5 have over 100 and something engagement letters
6 signed.
7    Q   And at least -- I'm just trying to
8 get -- I work as a timeline is probably the
9 easiest way for me.
10    A   Yes.
11    Q   So we -- so we finish up with this --
12 with this second meeting.  We get closer to the
13 third meeting.  We still don't have an NDA yet.
14 You send out the -- do you send the engagement
15 letter out before the NDA?
16    A   Well, there's no need for an NDA because
17 the engagement letter has NDA language in it.
18    Q   Okay.  So you -- you send out the
19 engagement letter, and more often than not, that's
20 executed, that you -- you brought them in, they
21 want to be clients, they sign it, they go, in some
22 circumstances, the engagement letter has not been
23 signed?
24    A   Few circumstances.
25    Q   Few.

**Page 76**

1    A   Very few.
2    Q   Do you recall if that happened recently
3 or has it been a -- a good while since it's
4 happened?
5    A   I don't even recall.  If you ask me a
6 specific instance, I wouldn't be able to tell you
7 one right now.
8    Q   So -- so you -- you send out the
9 engagement letter.  Assuming the engagement letter
10 comes back that's executed, do you at that point
11 move -- what's -- what's the next step, then?
12    A   After the -- the engagement letter is
13 signed, we kick-start the onboarding process --
14 sorry, one -- one step I -- we would also send the
15 setup fee invoice for the client to -- to pay the
16 setup fee up front, and then we start the -- the
17 onboarding process.
18    Q   And I was writing.  I'm not sure I got
19 everything.  Is -- at that point -- is there a --
20 a point in the continuum that a nondisclosure
21 agreement is signed?
22    A   No.  Let me explain that part.  The
23 nondisclosure agreement is only signed when --
24 sorry, I'm speaking in general terms.  It's --
25 it's only signed when the client wants to see

**Page 77**

1 confidential information before signing the
2 engagement letter.  So, for example, if we are in
3 the second meeting and he wants to see the master
4 documents, it has happened, we would only show the
5 master documents if they sign an NDA.  Right.
6       But if we move forward toward the
7 engagement and they sign the engagement and we
8 move forward to the issuance, then there's no need
9 to sign the NDA because there is NDA language in
10 the engagement letter.  And for -- for the most
11 part, very, very few clients have asked to see the
12 master documents.  Very few.
13    Q   Okay.  What if you had gone through
14 these -- these processes so far, and let's assume,
15 you know, you've shown some confidential
16 information, some sensitive information, some
17 pricing, some things like that, and, you know,
18 they -- you know, one of these few cases that the
19 client -- or the prospective client says, "I'm not
20 interested, for whatever reason it's not going to
21 work out," do you maintain that information of
22 your dealings with the client just -- or the
23 prospective client, for example, in the event
24 years down the road this person runs around and
25 shares your pricing information across the board,

Page 78

1  would you share all your communications so you can
2  go back saying, "Hey, you signed this or you
3  agreed to that"?
4        MR. THORNBURG: Objection to the form.
5     Calls for hypothetical.
6        THE WITNESS: I actually didn't
7     understand the question. I'm sorry.
8  BY MR. KOENIG:
9     Q   So do you maintain some sort of database
10  of client pitch materials, let's say, that you
11  say, "Hey, we came and gave a pitch, we showed
12  these program diagrams and -- and whatnot that --
13  that we think are sensitive and confidential, and
14  we've provided them some pricing terms," and three
15  years later, they run out and start sharing your
16  pricing terms with everybody. They publish it
17  online or something.
18        Do you maintain any sort of database of
19  your communications? Do you maintain those
20  e-mails or something?
21        MR. THORNBURG: Objection to the form.
22     Calls for hypothetical.
23        THE WITNESS: If I understand the
24     question correctly, we have a folder within
25     our password-protected cloud-based system

Page 79

1     that -- I believe it's called "New Issuances"
2     where we have these type of exchanges of
3     prospective clients.
4        Once they become a client, they go to
5     "Existing Issuances." That's right. So in
6     that -- in that folder, we keep that
7     information for -- the -- the exchange of
8     information we had had with prospective
9     clients.
10        Is that the question? Did I answer the
11     question?
12  BY MR. KOENIG:
13     Q   It basically is. I guess it's what
14  protections does FlexFunds take to -- to follow up
15  that it had disseminated some trade secret
16  information, its -- its pricing structure?
17     A   I mean, from our perspective internally
18  at FlexFunds, we take reasonable measures to
19  protect all the information that we have in-house.
20  As mentioned to you before, the pass- -- unique
21  password-protected cloud system, the Dropbox
22  system, is also tiered in the sense that only a
23  few people have access to these documents. Right.
24  And all those documents have the confidential
25  footer. Right. So --

Page 80

1     Q   So -- so let's talk for a minute about
2  the confidential footers. Is it -- is it
3  FlexFunds' position that such a footer protects --
4  protects that information from being disseminated?
5     A   That's the intention.
6     Q   And what's -- and what's the basis?
7  Why -- how did you come to be to put that -- that
8  footer on there? And again, if it's, you know,
9  discussion with legal counsel, I don't want to
10  hear about it. But the idea is when you have
11  something like an NDA available to you, why have
12  the footer and not an NDA?
13     A   Yeah.
14        MR. THORNBURG: Object to the form.
15        THE WITNESS: I understand the question.
16     In a business environment, right, you cannot
17     go to a meeting and say, "Hi, my name is Mario
18     Rivera, please, sign this NDA," as soon as you
19     meet someone --
20  BY MR. KOENIG:
21     Q   Sure.
22     A   -- as you can imagine. So to -- to be
23  efficient in the marketing process, we -- we
24  understand being high-level individuals and, of
25  course, under the code of ethics and the policies

Page 81

1  and procedures of the company, that we have to
2  abide by those ethics, right.
3        And we produce these documents, and we
4  exchange them with the clients, understanding a
5  certain level of sensitive information. We
6  understand it's sensitive, right, and we move it
7  up to that -- up to that moment.
8        If we go past, right, what we believe
9  is -- is -- is highly or even a high level of
10  confidentiality is when we sign the NDA, which is
11  when we go, for example, to -- to see the master
12  documents which is -- I believe, is very, very
13  confidential.
14        I don't know if I answered the question
15  correctly.
16     Q   Right. And I know we're running low on
17  the tape here, so we'll take a quick break. I
18  think he said he had five minutes left on the
19  tape.
20        But I wanted to follow back on when we
21  were discussing the files kept by FlexFunds and
22  that FlexFunds, you think maybe every three
23  years --
24     A   I'm sorry. I just forgot --
25     Q   Go ahead.

Page 82

1    A   Because I got -- I got -- and I tell
2  you, I'm sorry.
3        We don't -- we don't put confidential in
4  the footer in every single document.  Right.  We
5  put confidential in the footer with the documents
6  that include sensitive information either from the
7  client or from FlexFunds.  Right.  But -- so we --
8  we are cognizant of -- of that.  Right.  Sorry,
9  I -- I --
10   Q   That's fine.  As far as the files
11 maintained, you thought that maybe you would
12 destroy all your files every three years maybe,
13 but you --
14   A   I -- to be honest with you, I -- I'm --
15 I'm not a hundred percent sure of the internal
16 policies, but I believe we have a policy that
17 every three years, we can -- we can destroy.
18       One thing that I should say is that, of
19 course, when an employee leaves the company, he or
20 she should destroy the files, and I was shocked to
21 see that Florent still has his.
22   Q   Is there something in writing or even --
23 even if it's just a basic e-mail, that would tell
24 any employee of FlexFunds that upon leaving the
25 company for whatever reason, that they were

Page 83

1  obligated to destroy anything?
2    A   Yes, there is.
3    Q   And what's that?
4    A   Two parts.  One is in the employment
5  agreement.  Right.  Not in this -- not now --
6  you're talking about now?
7    Q   I'm talking at least with Florent.
8    A   With Florent, it was in the procedures
9  and processes in the code of ethics that he abide
10 by with GWM, that he's supposed to --
11   Q   And that was with GWM?
12   A   Again, with the company.
13   Q   I'm just --
14   A   If we look at this, it's with the
15 affiliates and related-issuance program companies.
16   Q   That's fine.  So -- so my -- my question
17 is that since this litigation has began -- and I
18 think you had testified that you think every three
19 years or so, files are purged or things are
20 deleted, even though you said you weren't a
21 hundred percent sure, and I understand.
22       Has FlexFunds put anything into place
23 since the filing of this lawsuit to not destroy
24 any more documents?
25       MR. THORNBURG:  Objection to the form.

Page 84

1  Misstates prior testimony.
2        THE WITNESS:  The answer to the question
3  is that we have not destroyed any documents
4  since we started this lawsuit.
5        MR. KOENIG:  Okay.  You want to take a
6  break?  We've got just a couple minutes left.
7        MR. THORNBURG:  Sure.
8        THE VIDEOGRAPHER:  Going off the record.
9  The time is 11:05 a.m.
10       (Thereupon, a brief recess was observed
11 by all parties present from 11:05 a.m. to
12 11:28 a.m.)
13       THE VIDEOGRAPHER:  We're now on the
14 record.  The time is 11:28 a.m.
15       MR. KOENIG:  All right.  We're back on
16 the record.
17 BY MR. KOENIG:
18   Q   Mr. Rivera, let me circle back on a
19 couple of things I forgot to ask as we went along
20 when we were discussing the initial meeting, the
21 second meeting, third meeting.
22       At the second meeting, we discussed the
23 transaction memorandum that may have been shared,
24 pricing information, as well as sample series
25 memorandum.  Is that also the time that you would

Page 85

1  typically have PowerPoints and the like?
2        For example, I think there's a PDVSA
3  PowerPoint we can talk about a little later.  In
4  our continuum of time, is that the time that it
5  would have been shared?
6    A   It could be.  I mean, a PowerPoint could
7  be replaced by a transaction memorandum.  Let's
8  put it that way.
9    Q   Okay.  And then also you discussed that
10 you would typically not share the master terms and
11 conditions of a -- of a program or the trust
12 documents if there was no engagement letter signed
13 or no NDA signed; is that accurate?
14   A   Correct.  The few times that we've been
15 asked to provide master documents, we sign an NDA.
16   Q   Is that as you -- as you sit here today,
17 are you certain that was the case every time?
18   A   I -- I don't want to sound -- I don't
19 want to say something that I'm not 100 percent
20 certain, but I'm 99.9 percent certain that that is
21 the way and it should be the way.
22   Q   Okay.  Let's talk about the -- the trade
23 secrets confidential information involved with
24 this lawsuit.  What -- what are they?  What are --
25 I'm just trying to get a close universe of what

22 (Pages 82 - 85)

Page 86

1 these secrets are.
2    A   Okay. I would -- I would put them in
3 two compartments. I mean, the -- the first one is
4 in the -- in the -- in the master document.
5 Right. And, of course, it took -- took Jose
6 hundreds of thousands of euros to put together the
7 initial master documents that kick-start the
8 program.
9        And then throughout time and experience
10 and -- and exchanges with -- with either clients
11 or personal -- personal experience inside --
12 inside the company, experiences with the service
13 providers as well, we improved, fine-tuned the
14 master documents to add more flexibility. Of
15 course, that's where the FlexFunds name comes in.
16 Right. The type of underlying, the way that the
17 program works, and also more security, more
18 protection for the note holders.
19        That's pretty -- I mean, there's been
20 many changes, but that's the two main things.
21    Q   So if it's fair with you -- and I'm
22 try- -- I was trying to track how the complaint is
23 drafted and the interrogatory responses are --
24 would it be fair to call those documents the trust
25 materials?

Page 87

1    A   I believe they're calling them that way,
2 yes.
3    Q   Is it -- are you -- are you fine with
4 calling them that way?
5    A   Sure.
6    Q   So I'll -- I'll refer to them as trust
7 materials. So we have one category of documents,
8 and those are the master, the terms, the
9 conditions --
10    A   Can I finish? There's one more point I
11 wanted to make.
12    Q   Oh, sure. Go ahead. I'm sorry.
13    A   The one side is the -- the -- the trade
14 secrets includes the changes, improvements in the
15 master documents that make our product unique,
16 right, because when you start a program like this,
17 it's a -- it's just a program, another program.
18        But when you customize it and you add
19 certain changes and certain improvements, and you
20 change the way it operates, of course, it makes it
21 very unique. And that's what has made our company
22 grow, I mean, exponentially in the past three
23 years if you look at our growth path. I don't
24 think you've seen that.
25        The second part that I believe is our

Page 88

1 trade secrets is our -- is how our -- our process
2 is. Right. The way that we work with -- with
3 clients, I mentioned to you the way that we
4 exchange information with them, the way that
5 the -- the prices are put together.
6        As I mentioned to you, we did not start
7 with that three-step approach. Right. We started
8 with just, I believe, basis points, and when --
9 with time and experience, we modified the -- the
10 price structure.
11        As you mentioned before, I mean, the --
12 the -- the maintenance -- sorry, the setup fee and
13 the maintenance fees include -- part of those fees
14 include the service provider's fees. Of course,
15 there's always a delta that comes to us because
16 they want to -- it's not one to one. Right.
17 There's always a -- there's always a delta within
18 those prices. And then there is a price that is
19 entirely to -- to -- to FlexFunds. Right.
20        Then the -- the relationship we have
21 with our service providers is also -- I believe is
22 a -- is a trade secret because when you talk to
23 the banks, CitiBank or other banks we work with,
24 or Sanne or Price Waterhouse or the lawyers, there
25 is no one like us that they work with. And

Page 89

1 they're impressed with what we built, right, and
2 that relationship with them and the way we operate
3 with them and the way we're integrating their
4 services into our solution is unique, and it's
5 also a trade secret, the same way as our contracts
6 with them, right, is also a trade secret.
7        And I would say the vast piece of the
8 trade secrets are our client interactions. Right.
9 As I mentioned to you before, we -- we take very
10 seriously the -- the sensitive information that
11 the clients provide to us. We keep it in our
12 unique password-protected cloud-based system,
13 right, and we never publicize the details of the
14 transaction unless, of course, the client wants
15 to -- wants to publicize a commercial fund or
16 anything like that.
17        For the most part, we don't -- we don't
18 publicize what we do. I mean, we can say we
19 issued a -- a $20 million fund, but we don't say
20 the specific details of the strategy of who the
21 client is, et cetera.
22        Sorry to take this long, but those were
23 the trade secrets.
24    Q   That's fine. Are there other trade
25 secrets, as we sit here today, that are at issue

23 (Pages 86 - 89)

Page 90

1  in this lawsuit?
2      MR. THORNBURG:  Object to the form.
3      MR. KOENIG:  What's wrong with the form?
4      MR. THORNBURG:  Well, I think it's
5  you're eliciting a memorization exercise
6  saying, you know, identify every single thing
7  and anything you don't say is not a trade
8  secret.  And I think that we went through in
9  detail in the interrogatories what the trade
10  secrets were.  And so to sit here and have a
11  memorization exercise of what's in a document,
12  I think is improper and outside the bounds.
13      MR. KOENIG:  That's fine.
14  BY MR. KOENIG:
15      Q   So as we sit here today, are there other
16  trades secrets you can think of?
17      A   Outside the categories of the trust
18  documents, service providers and cost price
19  structure and client interface and also the
20  financials of the company, of course, there is no
21  other trade secret that I can think of right now.
22  There might be others.
23      Q   And I'll ask you about a couple also,
24  just so -- I just want to make sure we have
25  everything.  That's my --

Page 91

1      A   Please.
2      Q   My purpose today is to find out what it
3  is that is at issue and how it's been allegedly
4  used and how FlexFunds has been damaged.
5  That's --
6      A   Makes sense.
7      Q   That's what I'm trying to get.  So at
8  any point if you feel like you haven't given me a
9  complete answer or say, "You know what, I thought
10  back.  You asked me 15 minutes ago about
11  something.  I just remembered something," I --
12  I -- I want to know what you know about this, so
13  I'm trying to -- trying to put caps on this to say
14  this is the information.
15      A   One thing -- now that you mentioned
16  that, one thing you mentioned with the trust
17  document, I mean, like I said to you, we spent
18  hundreds of thousands of euros to -- to create and
19  another hundreds of thousands of euros to -- to
20  improve.  Right.  And it took the last five years
21  to get to where we are and we continue to improve
22  that, right, and that's what Florent stole and
23  took with him to create the same program within
24  weeks.
25      That's -- that's what we're talking

Page 92

1  about mainly.  Of course, not -- it's not only
2  that.  He had access to the contracts between us
3  and our service providers.  He -- he knows the
4  price structure, obviously, and the way that it
5  works.  And then he knows -- he was party of some
6  of the exchanges with the clients so he knows the
7  solutions that we have developed.  Right.
8      Q   Okay.  So I have trust materials that we
9  discussed a little bit, and these would be the
10  master documents, but not the series documents?
11      A   I mean, the series documents do have
12  certain level of customization.  They're embedded
13  for the most part in the constituting instrument
14  which is not readily available.  But one of these
15  series documents -- and remember, there are
16  twenty -- it's a series memorandum.  The series
17  memorandum is -- is usually available.  If you
18  want to -- if you even have access to Bloomberg,
19  which is not in the public, right, you can access
20  it.
21      Q   But for the purposes of this lawsuit, I
22  have written down that the master documents,
23  possibly the constituting document are deemed
24  confidential or trade secrets.  Do you agree with
25  that?

Page 93

1      A   I would -- I would say yes because it
2  includes the customization needed for certain
3  customers and certain issuances for -- for the
4  customers.
5      Q   And then the series documents, I have
6  maybe.  Is the -- is the --
7      A   I mean --
8      Q   Are the series --
9      MR. THORNBURG:  Objection to the form.
10      THE WITNESS:  The reason I said maybe is
11  because a broker can access it.  So, in -- in
12  essence, it's -- it's -- it's more readily
13  available than constituting instrument and
14  even more difficult is to get the master
15  documents.
16  BY MR. KOENIG:
17      Q   For purposes of this lawsuit, is it
18  FlexFunds' position that the series documents
19  constitute trade secrets or other confidential
20  information?
21      MR. THORNBURG:  Objection to the form.
22      THE WITNESS:  Certain parts of the
23  series documents, yes.
24  BY MR. KOENIG:
25      Q   Is there anything else that you can

24 (Pages 90 - 93)

Page 94

1 think of? I'm trying to get some good definitions
2 for each of these categories. Is there anything
3 else within the trust materials that you haven't
4 already told me that FlexFunds takes the position
5 is confidential or trade secret?
6    A   Other than the master documents, no,
7 that's it.
8    Q   Then the next, I have the process. And
9 is this, just generally speaking, how FlexFunds
10 conducts business in general?
11    A   Yes, and the pricing, right.
12    Q   I -- I put pricing as a separate
13 section.
14    A   Oh, all right. Well -- no, no, it's
15 okay. I mean, the way that -- the way that we
16 conduct business is -- is also unique because,
17 again, we are trying to educate the market with a
18 new product. But maybe combine the two to make a
19 stronger case because the proposal of the pricing
20 structure is the way that we -- we work
21 together -- sorry. On the process itself is maybe
22 what you were referring to is the integration of
23 how we work with the service providers or you have
24 that separate?
25    Q   I have service providers separate so --

Page 95

1 so let's just talk for a minute about the process.
2    A   Okay.
3    Q   Is this just the aggregate idea of
4 creating and issuing these ETPs?
5    A   Yes. I mean, it's not just a marketing
6 process, but also the issuance process. Right.
7 That -- that process has never been done before
8 because, again, our product is unique and we
9 defined it. Right. And we defined it in a way to
10 be a scalable so we are very efficient. Right.
11       If you want to create one fund or one --
12 one -- one of these series, just one, it would
13 take months, right, and -- and hundreds of
14 thousands of euros. We did it in a way that we do
15 it in a few weeks and it takes -- and it's very
16 affordable, right, to use our prices, right.
17 That's unique. That efficient process that we
18 defined it now.
19    Q   So there's no one else doing anything
20 similar at all?
21    A   Nobody.
22    Q   And -- and I -- and you testified before
23 that FlexFunds does not have a patent on this
24 process?
25    A   No.

Page 96

1    Q   Okay. And then the service provider,
2 I -- I'd written down "service provider
3 relationships."
4    A   Yes.
5    Q   So what is -- what is a trade secret
6 there?
7    A   Number one is the contract with them,
8 the agreement, how much we -- we pay them and how
9 much -- how they -- not only the amount, but and
10 how they get paid. Right. As I mentioned to you
11 before, the -- the -- the price that we provide to
12 clients is not one to one to the price, but it --
13 it should cover that. That's the -- that's the
14 thought process.
15       But the -- the -- the price structure,
16 of course, it takes -- has taken years to actually
17 be developed and make it work between them and us,
18 right, because before it was very different, and
19 it just evolved into something now that works very
20 well to make it scalable.
21       And also the integration of the service
22 providers in the issuance process. All right.
23 The way that we have crafted this issuance process
24 is extremely unique because being able to issue a
25 fund in two weeks, two weeks, and you have a

Page 97

1 listed product that you can actually manage as a
2 portfolio manager securities fund is -- no one has
3 seen that before.
4    Q   And is it your position that the
5 defendants are using the identical process?
6    A   Yes.
7    Q   And -- and what evidence do you have of
8 that?
9    A   Everything I've seen that they have
10 produced is a copycat of what we have.
11    Q   So -- so what -- what specifically are
12 they doing that only FlexFunds does?
13    A   Well, they're doing several things that
14 are -- I mean, you want to go through the trade
15 secrets and how they have stole those trade
16 secrets and --
17    Q   Well, I actually have -- have the
18 particular trade secrets chunked in a kind of
19 category so we can talk about them a little more
20 in detail. I'm just trying to get a broad brush
21 because I didn't have the process down because I
22 didn't see that within the interrogatory
23 responses. So I just want to try to get --
24    A   Sure.
25    Q   -- that flushed out a little bit more,

25 (Pages 94 - 97)

**Page 98**

1   that --
2       A   No worries.
3       Q   -- what about the process that you say
4   "only we do, nobody else" --
5       A   Let me rephrase that. They have
6   attempted to do. As you -- as you know, Florent
7   and Gustavo, they both contacted all of our
8   service providers, like completely with no shame,
9   to -- to try to get them onboard to -- to work
10  with them in the same manner as they work with
11  FlexFunds, claiming to be part of FlexFunds, I
12  believe.
13      They provide them -- they provide --
14  they provided them our existing master documents,
15  and as you can understand is the -- it is our --
16  our most guarded secret and --
17      Q   Well, let's talk about that just for a
18  minute.
19      A   Sure. One second.
20      Q   Go ahead.
21      A   And they asked Mason Hayes, our lawyers,
22  to redline it. When I talked to Mason Hayes, "Why
23  are you doing this," they said, "Well, I
24  thought -- I thought this was a FlexFunds
25  project."

**Page 99**

1       I'm like, "No, no, no. This is
2   completely separate years ago, so Florent fooled
3   you."
4       He's like, "I guess so." Right. And
5   when they had learned the situation, they stopped
6   working with him.
7       Q   So do you have e-mails from -- did you
8   ultimately receive e-mails from Mason Hayes that
9   was a back-and-forth between the defendants and
10  Mason Hayes?
11      A   Yes.
12      Q   And --
13      A   I --
14      Q   And within those e-mails, did you find
15  where the defendants had e-mailed to Mason Hayes
16  the master documents from FlexFunds?
17      A   I have an -- I received an e-mail, and I
18  believe it was by accident, that -- that it was
19  from Mason Hayes. And if you read through the
20  e-mail -- and again, I don't remember specifically
21  the -- but I remember saying, "Let's redline IA
22  Capital Structures master documents to create your
23  documents, MarkETP's documents."
24      Q   And has that document been produced as
25  part of the discovery in this lawsuit?

**Page 100**

1       A   The -- the redline document?
2       Q   The -- the -- the e-mail you're talking
3   about.
4       A   I believe so.
5       Q   Okay. So you think there's an e-mail
6   out there whereby Mason Hayes says, "Let's just
7   redline the IA Capital document"?
8       A   Yes.
9       Q   And then with regard to the client
10  relationships, I hadn't seen that much in the
11  interrogatories either. Is it -- are you
12  referring to prospective customers?
13      A   Prospective and existing. I mean,
14  Florent Rigaud had access to the folders where
15  we've got -- we have new issuances and existing
16  issuances. He was party of a lot of conversations
17  and exchanges of transaction memorandums where a
18  solution -- a customized solution was provided to
19  these customers.
20      These solutions was -- they were
21  developed by -- by the operations team and myself.
22  And that -- those customized solutions, I believe,
23  are trade secrets because our -- a way to use this
24  new program, this product that we have to resolve
25  a situation or a project that the customers have.

**Page 101**

1       Q   Have any of the defendants taken any
2   existing customers from FlexFunds?
3       A   From a deposition that I heard from
4   Florent, they have no customers. They just got
5   some engagement letters, but they don't even have
6   a program as far as I know.
7       Q   So that's a no? At least as far as --
8       A   I believe -- I mean, let me -- can I...
9       Q   Sure.
10      A   I believe that they have not taken any
11  customers. However, they have affected our
12  relationship with our customers because they come
13  in some discussions when we -- when we're trying
14  to -- to -- to market customers, they're --
15  sometimes it happens that they also talk to
16  MarkETP about their solution, whatever that may
17  be, and that causes disruption in our -- in our
18  marketing process.
19      Q   Have you -- have you lost any customers
20  as a result of any of the defendants --
21      MR. THORNBURG: Object to the form.
22  BY MR. KOENIG:
23      Q   And these are existing customers.
24      A   I wouldn't know.
25      Q   Who would?

26 (Pages 98 - 101)

Page 102

1    A   Maybe Florent knows.
2    Q   I mean, do -- I mean, do you not track
3 your customers?  Have you had contact with your
4 customers?
5    A   No -- sorry, let me -- not -- what I'm
6 trying to say is, like, I don't know if they have
7 managed to create -- issue a fund or get an
8 engagement letter from one of my customers.  I
9 just -- from what I saw in the list of customers
10 that they, I believe, engaged, I believe there
11 were a couple that were our previous prospect
12 customers.
13    Q   And how many of those prospects were
14 prospects that Mr. Rigaud worked on personally?
15    A   Of what?  Of the two that I mentioned?
16    Q   Yes.
17    A   I think Florent knew them before,
18 when -- when -- before coming into FlexFunds.  But
19 we -- what usually happens is that before Florent
20 joined FlexFunds, I was there for three years,
21 right, so, of course, I developed the initial
22 stages of FlexFunds and I had my -- or FlexFunds'
23 Rolodex built up, let's say, to -- I don't know --
24 500 leads or prospects.  Right.
25        And when Florent came in, he added his

Page 103

1 Rolodex.  Maybe he added another -- just a
2 number -- a hundred different customers.  Of those
3 hundred, there was some overlap.  Right.  Some of
4 them were new, some of them I already talked to.
5 But with -- I have to admit that Florent helped
6 some of those customers evolve into a -- into a
7 better relationship because, of course, he -- he
8 put in his relationship alongside -- alongside
9 mine, so that that happened.
10    Q   And -- and who were the two prospects
11 that FlexFunds believes that there was some sort
12 of an issue with?
13    A   I would say that -- I don't remember the
14 second one.  The first one was Pro Capita.  I
15 remember that.
16    Q   Pro Capita?
17        MR. THORNBURG:  Are these current
18    issuers or --
19        THE WITNESS:  No, they're not current
20    issuers.  It's not that we issued something
21    with this customer.  It's that we would have
22    been in --
23        MR. THORNBURG:  So you're in ongoing
24    negotiations with these?
25        THE WITNESS:  No.

Page 104

1        MR. THORNBURG:  I'm just trying to probe
2    for confidentiality.
3        MR. KOENIG:  I said -- I asked if these
4    were prospects.
5        THE WITNESS:  Prospects.
6 BY MR. KOENIG:
7    Q   So -- so one was Pro Capita.  And what
8 was it that the defendants did with regard to
9 Pro Capita?
10    A   I don't know what they have done.  I
11 just saw the list of -- of clients.  I believe it
12 was a list of clients.  And I saw that name that
13 is a customer that -- or a prospect that we've --
14 we have been talking for three or four years.
15    Q   Do you know who the lead person was for
16 Pro Capita on behalf of FlexFunds?
17    A   It was Florent because it was in his --
18 his region while he was working at -- at
19 FlexFunds.  We always try to provide -- even
20 though -- regardless if it's my connection or his
21 connection or anybody in the firm's connection,
22 since Florent was focusing on Latin America, we
23 provide him -- we provided him with all the leads
24 we could.
25    Q   And then do you recall the name of the

Page 105

1 second prospect?
2    A   No, I don't.  Sorry.
3    Q   Do you know what it was that the
4 defendants did to cause an issue with that
5 prospect?
6    A   I -- it's not a -- I'm not saying that
7 caused an issue.  All I'm saying is that list,
8 including that prospect that we spoke before.
9 That's what I said.
10    Q   Are there any prospects or customers
11 that FlexFunds believes were lost or harmed -- the
12 relationship was harmed based on anything the
13 defendants did?
14    A   Yes, harmed.
15    Q   And -- and -- and who are they?
16    A   I have to get back to you with the list.
17 It's been -- I mean, I'm -- since I'm the -- the
18 CEO of the company, I have regional offices --
19 both Miami, Buenos Aires, and Madrid, they have
20 encountered situations where the clients have been
21 speaking with -- they already spoke with MarkETP
22 for some reason, and of course MarkETP, they
23 claimed to offer a program that is better, they
24 claimed to offer a -- a pricing structure that's
25 better, something, and that has harmed the

27 (Pages 102 - 105)

**Page 106**

1 marketing process.
2    Q   So -- so how did it harm it?  Were
3 these -- were these customers that FlexFunds would
4 have -- would have landed but for the defendants?
5    A   We would have landed sometimes, I would
6 say, either faster or, with our pricing structure,
7 we didn't have to provide them a discount to try
8 to get them, right, which we had to.  And also the
9 same thing happened with a distributor because
10 Florent Riguad also tried to get distributors in
11 the different regions, right, and he was working
12 with our distributors, right.
13        And in fact, because of that, we had to
14 enter into an agreement -- a long-term agreement
15 with a distributor in Uruguay, and we had to
16 lower -- sorry, in this case, increase the fee to
17 them because of the situation.
18        One of our existing distributors
19 provided -- erroneously sent me an engagement
20 letter of one of Florent's prospects and, again,
21 he was our distributer for an existing issued
22 series, and then Florent took him from underneath
23 us to be his distributor.
24    Q   So as far as the prospects, you
25 mentioned that some were harmed, that you could

**Page 107**

1 have done these deals faster or cheaper --
2    A   And in better terms, yes, for sure.
3    Q   And -- and who were they?
4    A   Again, I already answered that question.
5 I don't know the list.  What I said is, like,
6 these three offices that I have -- Miami, Buenos
7 Aires, and Madrid -- they have encountered the
8 situation.  I will ask them each to provide me a
9 list of these -- of these prospects.  I'm not in
10 the day-to-day sales cycle anymore.  I mean, in
11 certain situations, I am, but for the most part,
12 we have relations managers to handle this.
13    Q   With regard to the -- the areas of
14 inquiry for your deposition today, you were asked
15 to discuss non-monetary and monetary damages that
16 FlexFunds has suffered as a result of Defendants'
17 alleged misappropriation of the information.
18        So what did you do to prepare for that
19 aspect of how FlexFunds has been harmed by the
20 defendants' conduct?
21    A   For that, I -- I can give you a -- three
22 bullet points that I think are important to -- to
23 understand.  Of course, the figure is -- I mean,
24 there's -- there's a figure in mind, but there is
25 nothing definite.  So I cannot give you a specific

**Page 108**

1 calculation.
2    Q   What -- what's the figure in mind?
3    A   The figure in mind is an eight-figure
4 figure.
5    Q   And what's the eight figure?
6    A   I wouldn't be able to tell you yet
7 because it has not been analyzed in detail.
8 However, number one, our master program has taken,
9 as I mentioned to you before, hundreds of
10 thousands of dollars to create, another hundreds
11 of thousands of dollars to improve to what it is
12 now.
13        Number two, we have entered into
14 long-term agreements with distributors, and we
15 have actually created a new program with a lower
16 fee that's going to affect the program in its
17 entirety for -- for its duration, all right,
18 because of the situation with MarkETP, to try to
19 not have this discussion whether or not we are
20 cheaper or better or faster.  I mean, those things
21 happened because of the MarkETP situation.
22        And then number three, there are some
23 specific instances that we have had to lower our
24 fees to -- to get the -- to get the lead because
25 of MarkETP alleged program, whether they have it

**Page 109**

1 or not, but they did do that.
2        So those three things need to be taken
3 into account.  And again, we are expecting the
4 figure to be in the eight figures.
5    Q   With regard to the master documents, you
6 discussed the cost that it took to -- to have them
7 drafted and revised over time or otherwise.
8 You've had the opportunity to see the e-mails
9 between the defendants -- or at least some of the
10 defendants and Mason Hayes; is that right?
11    A   Yes, one e-mail.
12    Q   And -- and you've seen what Mason Hayes
13 charged the defendants to actually draft -- draft
14 the master documents, and was that amount around
15 $80,000?
16    A   Could be.
17    Q   I mean, does that sound reasonable what
18 you saw based on what -- your review in preparing
19 for today?
20    A   Again, it could be, but it's not --
21 we're not comparing apples to apples.
22    Q   I understand, but -- but the idea is
23 that Mason Hayes charged 80-plus thousand dollars?
24    A   To redline an existing master document?
25 Okay.

28 (Pages 106 - 109)

Page 110

1    Q   Does that sound like a reasonable amount
2 to charge?
3    A   To redline an existing document?
4    Q   Yes.
5    A   I'm not a lawyer. I can tell you, to
6 create one and to improve it throughout four or
7 five years to be what it is right now, it cost a
8 lot more than that.
9    Q   But given how many years you -- you've
10 been doing this and how many of these master
11 documents that they've been revised, is it
12 reasonable for a law firm to charge, let's say,
13 six figures to merely redline an existing master
14 set of documents? Does that sound reasonable to
15 you as a business person?
16       MR. THORNBURG: Object to form.
17       THE WITNESS: Again, as a business
18    person, it could be reasonable, yes, sure.
19    But I want to point the fact that we're not
20    comparing apples to apples.
21 BY MR. KOENIG:
22    Q   And the financial info- -- we'll talk
23 about that. The financial information of
24 FlexFunds, you discuss the prices. So as -- as
25 we've been talking about these, are there any

Page 111

1 other trade secrets or confidential information
2 that you can think of that is the subject of the
3 lawsuit?
4       MR. THORNBURG: We're jumping back from
5    damages to the trade secrets now?
6       MR. KOENIG: Yes.
7       THE WITNESS: I -- I spoke about the
8    trust documents, as you mentioned. I spoke
9    about the contracts between the service
10    providers and FlexFunds. Right. I spoke
11    about the process on how we work with
12    customers and with our service providers in a
13    very integrated and efficient manner. I spoke
14    about the pricing structure, the way that we
15    have a setup fee, maintenance fee, and
16    arranger fee.
17       And the last point I would say, of
18    course, in terms of the finances of the
19    company, right, you can see everything there.
20    You can see every single inflow from each of
21    the customers that we have for each of the
22    programs that we have, every single outflow to
23    each of the service providers, to each of the
24    staff and the distributors.
25       I mean you can pretty much see

Page 112

1    everything in the financial statement that
2    Florent was -- actually had access to that
3    those statements for 2015.
4 BY MR. KOENIG:
5    Q   Let me ask you a broad question. Is it
6 FlexFunds' position that Florent should not be
7 allowed to compete in the ETP industry with
8 FlexFunds based upon his prior employment and
9 exposure to information to FlexFunds?
10       MR. THORNBURG: Object to the form.
11       MR. KOENIG: What's wrong with the form?
12       MR. THORNBURG: I think to the extent it
13    calls for a hypothetical, and I think it also
14    calls for a legal conclusion. But that was
15    the two bases that I objected on.
16       MR. KOENIG: Okay.
17       THE WITNESS: I mean, the reason that I
18    believe he's not allowed -- should not be
19    allowed to work in the ETP industry is because
20    he stole our trade secrets while he was
21    working at FlexFunds.
22 BY MR. KOENIG:
23    Q   So -- so it's your position he shouldn't
24 be in the ETP industry at all?
25    A   Not in this manner. That is -- I will

Page 113

1 believe is unethical and it should be illegal.
2    Q   Okay.
3       MR. KOENIG: We're up to 4.
4       (Thereupon, Rivera Exhibit 4 was marked
5    for identification.)
6       (Discussion held off the record.)
7 BY MR. KOENIG:
8    Q   Let me show you what's been marked as
9 Exhibit 4. Let me know when you're ready to talk
10 about this document.
11    A   I'm ready.
12       (Excerpt of this transcript has been
13    declared confidential and is sealed under
14    separate cover.)
15
16
17
18
19
20
21
22
23
24
25

29 (Pages 110 - 113)

| Page 114 | Page 116 |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 [CONFIDENTIAL] | 12 [CONFIDENTIAL] |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

| Page 115 | Page 117 |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 [CONFIDENTIAL] | 12 [CONFIDENTIAL] |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

30 (Pages 114 - 117)

Page 118

1      MR. THORNBURG:  Off the confidential
2   record at this point.
3   BY MR. KOENIG:
4      Q    We talked about the trust materials for
5   a bit.  And have you seen master terms and
6   conditions for any other company's ETPs?
7      A    No.
8      Q    Do you know if anyone within FlexFunds
9   has?
10     A    Probably our legal counsel or our
11  operations team.
12     Q    And what evidence do you have that all
13  of the defendants viewed your -- your trust
14  materials?  I know you testified Florent had
15  access to the information.  I -- what about Certus
16  Finance?
17     A    I believe that's the same thing.
18  Florent, Certus Finance, Certus USA, and so forth,
19  it's the same person.
20     Q    So -- so certainly Florent is an -- is
21  the owner of Certus Finance; is that your
22  understanding?
23     A    That's my understanding.
24     Q    And that by virtue of him having viewed
25  it, Certus has viewed it as well?

Page 119

1      A    Yes.
2      Q    And then with regard to MarkETP and
3   MarkETP USA, is it your position that Florent had
4   some kind of ownership rights in those companies
5   and, therefore, the information's kind of imputed
6   to those companies as well?
7      A    I don't know if the right word is
8   "imputed."  The fact that Florent had access to
9   information and used it for MarkETP's purposes
10  allows me to believe that he had access to the
11  master documents and used them for his own
12  benefit.
13     Q    And then with regard to Global Services
14  Management -- that's one of the defendants in
15  this -- what information do you have --
16     A    Global Securities, you mean?
17     Q    Global Securities, I'm sorry.  Global
18  Securities.  What information do you have that
19  Global Securities, first of all, viewed the master
20  docs?
21     A    I believe Gustavo Hernandez, who is the
22  director or head of Global Securities, was also
23  copied in these e-mails with -- as MarkETP or
24  Global Securities -- I'm not -- I'm not sure -- in
25  the communications with Mason Hayes.

Page 120

1      Q    And as we sit here today, you can't tell
2   me the document number or anything specific about
3   this e-mail you're referring to about this -- this
4   redline IA Capital; is that right?
5      A    You mean a document number of the master
6   trust?
7      Q    The -- the -- I'm sorry, the -- the
8   document -- the Bates label.  During the course of
9   the litigation, in the bottom right corner of a
10  lot of our documents, we have labels.  In fact,
11  the one in front you does.
12     A    Yeah.  Yes.
13     Q    As you sit here today, are you able to
14  tell me or is that something I can follow up and
15  ask you --
16     A    You can follow up and ask me.  I'm --
17  I'm -- I'm positive it's got to be within the --
18  within the -- the case.  I just don't know the --
19  the Bates number.
20     Q    And so -- and we've touched on this, I
21  just want to make sure we -- we close the door on
22  it, that do you have -- that the basis for your
23  contention that the defendants utilized the master
24  documents, the trust materials we're talking
25  about, the basis of that is you believe there's an

Page 121

1   e-mail whereby Mason Hayes says, "Let's -- I
2   redlined the IA Capital document"?
3      A    Correct.
4      Q    Is there any other basis that you have
5   that these master documents were -- were used by
6   the defendants?
7      A    I believe there is an e-mail, where --
8   where Florent is copied, that the master documents
9   are sent.  Or again -- or maybe he had access to
10  them at some point during his tenure at FlexFunds.
11  I -- I -- I cannot be 100 percent sure.
12     Q    So -- so assuming -- assuming he had
13  access to it --
14     A    He had them.  I mean, I don't know how
15  he did it, but he had them.
16     Q    And I don't think that -- I don't think
17  that issue's disputed.  I think by virtue -- and I
18  think you would agree with me that as a -- as a
19  director at FlexFunds, Mr. Rigaud was -- was
20  provided this information?
21     A    Well, I wouldn't go as far as saying
22  that.  Even though he was a director and highly
23  regarded in the firm, his access within the unique
24  password cloud system that we have was limited to
25  the marketing folder, the new issuances, and the

31 (Pages 118 - 121)

Page 122

1 activation issuances.
2      We did not provide him access to the
3 master documents because we keep them as highly
4 confidential, and we have a very -- we try to have
5 reasonable measures of security and protection of
6 our documents.
7      Q   Was Florent ever on e-mail chains that
8 contained the master documents to clients?
9      A   Yes, he was. So sorry, sorry. I --
10 I -- I failed to -- to -- to hear the master
11 documents. I believe so.
12      Q   Okay. Are there any other bases, other
13 than you believe some correspondence from Mason
14 Hayes whereby Mason Hayes said basically, "We have
15 a copy of" -- now are these -- are these IA master
16 documents or are these FlexFunds' master
17 documents?
18      MR. THORNBURG: Objection to form.
19      THE WITNESS: It's IA Capital
20   Structures' master documents. Oh, and one
21   clarification. IA Capital Structures
22   (Ireland) PLC is the issuer. IA Capital
23   Management was the initial company that we
24   talked about earlier. It's two different
25   companies. I want to make sure that's clear.

Page 123

1 BY MR. KOENIG:
2      Q   Well, let's -- let's just talk for a
3 minute just so -- so I'm clear. There have
4 been --
5      Oh, and one more question is -- and I
6 think I saw it in -- in the complaint, and it's
7 been asked several times throughout the
8 depositions, is it FlexFunds' position that
9 MarkETP stole or misappropriated FlexFunds'
10 trademark?
11      MR. THORNBURG: Objection to the form.
12   Nonsensical.
13      THE WITNESS: "Trademark" meaning?
14 BY MR. KOENIG:
15      Q   Correct. Your -- your attorney showed a
16 couple of witnesses now -- let me show you the
17 FlexFunds mark and let me show you the MarkETP
18 mark --
19      A   Do they look alike?
20      Q   -- and I was asking about them looking
21 alike, et cetera, so.
22      A   Oh, yeah, I agree that the color scheme
23 and they look alike. If you look at the website,
24 the way that it's presented is -- is -- if you
25 look at their engagement letter, it's just -- if

Page 124

1 you take this out, it's the same one as they have,
2 yeah.
3      Q   So -- so -- so my question, albeit your
4 attorney thinks it's nonsensical, it's if -- if --
5 the parties are going to be asked whether
6 something looks alike or whether these marks look
7 alike, it leads me to believe there's an issue
8 with a potential trademark violation or the like.
9 Is that FlexFunds' position?
10      MR. THORNBURG: And that wasn't
11   nonsensical.
12      MR. KOENIG: Thanks, Bob.
13 BY MR. KOENIG:
14      Q   So as far as the owner of this
15 confidential proprietary information, is it the
16 same entity that owns the trademark owns all of
17 this confidential proprietary trademark
18 information we've been discussing?
19      A   Yes.
20      MR. THORNBURG: Objection to the form.
21   You can answer that.
22      MR. KOENIG: What's wrong with the form?
23      MR. THORNBURG: You threw in there
24   "trademark" with the "confidential proprietary
25   information." I thought you meant trade

Page 125

1 secrets, so I don't know if you're trying to
2 confuse the witness or not.
3      MR. KOENIG: I don't think it's --
4      MR. THORNBURG: It's also compound in
5   the sense that --
6      THE WITNESS: Let's define that.
7      MR. KOENIG: Yeah.
8      THE WITNESS: What are you trying to --
9 BY MR. KOENIG:
10      Q   So -- so we've been discussing -- you
11 gave me a list of trade secrets.
12      A   Correct.
13      Q   And you've -- we've also discussed the
14 trademark itself. And so -- and I just -- you
15 know, we talked about some master documents with
16 IA Capital, and I'm trying to get a feel for
17 who -- who actually owns these -- these trade
18 secrets, the trademark, you know, who owns this
19 proprietary information. And my question to you
20 is, is it the same entity that owns the trademark
21 owns all of this trade secret information we've
22 been discussing?
23      A   Yes.
24      Q   Okay.
25      A   The arranger of the program, FlexFunds,

32 (Pages 122 - 125)

Page 126

1 is who owns the trade secrets.
2    Q   So the -- okay. Thank you. Sometimes I
3 get off on these tangents, and I'm just trying to
4 make -- make some sense of it.
5         And has -- has that always been the case
6 or has it changed during the course -- since
7 Rigaud has left?
8    A   It's always been the case.
9    Q   Okay. Let's assume for the sake -- and
10 I know it's going to be a hypothetical and your
11 attorney may object, but I -- I need to ask you.
12 Let's assume there is no e-mail whereby Mason
13 Hayes says, "Hey, thank you, Florent or Gustavo,
14 for providing me the FlexFunds master documents,
15 and we're just going to mark it up and give it
16 back to you for your purposes."
17         Let's assume that doesn't exist and,
18 instead, the defendants went to Mason Hayes and
19 said, "We want to issue ETPs. We would like you
20 to draft us from scratch the master documents."
21         Do you believe that, in and of itself,
22 would be some sort of an actionable or -- or
23 violation?
24         MR. THORNBURG: Objection to the form.
25         THE WITNESS: Is this during Florent's

Page 127

1    term of employment within FlexFunds?
2 BY MR. KOENIG:
3    Q   This -- well, we'll do both. We'll do
4 while he's at FlexFunds, he asks Mason Hayes to
5 draft these master documents from scratch.
6    A   If you -- if you read the -- the
7 policies and procedures and the code of ethics
8 that we are all under and we abide by, right, it
9 says that you cannot compete. You cannot work
10 against -- I'm paraphrasing the wrong way, but you
11 can do -- you cannot do such a thing. Right. And
12 again, there is certain -- a certain term that you
13 have to abide by before you enter into competition
14 with the -- with the companies or the -- or the
15 clients or the affiliates of the companies.
16    Q   So the short answer is, no, he -- he
17 would not have been allowed to do that while he
18 was at FlexFunds?
19    A   Right, it's not ethical, not legal, I
20 believe.
21    Q   What about after he leaves FlexFunds?
22    A   After he leaves FlexFunds, to be honest
23 with you, I -- I believe that it's a term in
24 those -- in those policies and procedures that I
25 do not recall, I need to check. Usually there is

Page 128

1 a term. And after that term, by all means.
2    Q   Is it -- does it change your answer if
3 it was Gustavo Hernandez asking to have these
4 documents drafted?
5    A   Gustavo Hernandez was under an
6 engagement letter engagement. So he had to abide
7 by the -- the -- the terms and conditions of that
8 engagement letter, and his -- his issuance is
9 active. Right. And so throughout the engagement
10 with FlexFunds, he has to abide by the terms and
11 conditions of the engagement letter, which, again,
12 should impede him from competing with us.
13    Q   So the short answer is Gustavo should
14 not be permitted to go have master documents
15 drafted from scratch?
16    A   From scratch? I --
17    Q   From Mason Hayes.
18    A   Correct.
19    Q   Okay. As we sit here today, one of the
20 questions that we had in the interrogatories, that
21 is also subject to one of the areas of inquiry
22 that you were asked to prepare for today, was to
23 list all of the entities to whom or to which
24 FlexFunds provided these trade secrets and
25 confidential proprietary information. Does that

Page 129

1 sound accurate?
2    A   Yes, that's one of the -- one of the
3 questions.
4    Q   And are you able today to tell me who
5 all those entities are?
6    A   It's one of those questions that is hard
7 to give you an exact list of all those -- all
8 those parties we have engaged in sensitive
9 information.
10    Q   Is there a way that you could have found
11 this information via searching on your computer
12 and these files and databases we discussed?
13         MR. THORNBURG: Object to the form.
14         THE WITNESS: I mean, there's always a
15 possibility, but it's a daunting effort.
16 BY MR. KOENIG:
17    Q   Have you provided these trade secrets
18 and confidential information to just so many
19 parties that you can't tell me who they all are?
20         MR. THORNBURG: Object to the form.
21         THE WITNESS: That's -- that's not what
22 I'm trying to say.
23 BY MR. KOENIG:
24    Q   Because you had said it was -- it was
25 tough. Is it tough because you -- it's so many --

33 (Pages 126 - 129)

Page 130

1  it's been divulged so many times?
2      A   No, because -- because the trade
3  secrets, as I mentioned to you, is divided into
4  different categories.  So, of course, we haven't
5  sent the master documents to a thousand people.  I
6  can assure you that.  It's been very, very few on
7  that instance.
8          But when we talk about a transaction
9  memorandum that I consider a trade secret, that
10 has been shared with clients in -- in numerous
11 occasions, most of which have turned into an
12 engagement, some of which have not.  Right.  So to
13 go through every single time we have exchanged
14 information that is sensitive to both parties,
15 is -- is a -- is a difficult task, I believe.
16 That's what I was talking about.
17     Q   So you're telling me today that
18 you're -- you're unable to tell me to whom, for
19 example, FlexFunds has provided trust materials to
20 over the years?
21     A   No, no.
22         MR. THORNBURG:  Objection to the form.
23 Misstates prior testimony.
24         You may answer.
25 BY MR. KOENIG:

Page 131

1      Q   If I'm incorrect, tell me.
2      A   I mean, you're incorrect.
3      Q   Okay.
4      A   I mean, I can -- I would be able to
5  search through my e-mail, like you said, and find
6  out how or where has it -- master documents been
7  sent to.  I don't know that right now, but I can
8  assure you it's a -- it's a really short list that
9  is less than five or less than ten, I would say.
10     Q   And then with regard to any sort of
11 client pitch materials, do you know how many
12 prospective clients FlexFunds has sent that to?
13     A   That's what I was referring to as part
14 of our trade secrets.  Again, that would -- that
15 would entail all of our clients and -- and the
16 ones that are prospect clients, of course, that we
17 pitch to.  And, no, I don't have that list right
18 now.  Can I get it for you?  I would -- it would
19 take a long time to get but, of course, I can,
20 yes.  I mean, it will take a --
21     Q   Why would it take you a long time to
22 get?  How would you go about finding out that
23 information?
24     A   I would have to go through all of the
25 relationship managers' e-mails and my e-mail to

Page 132

1  see to who we have pitched, right, for five years
2  worldwide.
3      Q   And the same for cost structures or
4  fees, how many times do you think FlexFunds has
5  sent that information to clients and prospective
6  clients?
7      A   That will be a lower amount, of course.
8  But, also, I'll have to -- I'll have to research
9  it.
10     Q   Okay.  So as we sit here today, you can
11 tell me that you sent the information -- FlexFunds
12 has sent the information that we've been
13 discussing to prospective clients and clients, but
14 you can't tell me to whom they were sent?
15     A   What I'm telling you -- when you -- when
16 you say the information is too broad, I just want
17 to make sure we're talking about --
18     Q   The trade secret information that you --
19 you delineated for me.
20     A   It's still too broad.  I'm talking about
21 just a transaction memorandum or a -- or a pitch,
22 right, which I consider confidential with --
23 that -- that has been sent to, of course, a lot
24 more clients than, for example, the trust
25 documents that have been sent to like very, very,

Page 133

1  very few.  Right.  That I'm trying to
2  differentiate the two and not to put them in the
3  same bucket.
4      Q   What did you do to prepare for today to
5  ascertain the names of those companies and
6  individuals you did provide this -- this trade
7  secret information?
8      A   I believe we submitted certain samples
9  of transaction memorandums and presentations that
10 we have submitted to certain clients.
11     Q   As far as the areas of inquiry for
12 today, were you asked to come and provide certain
13 samples of people and companies to whom this
14 information has been sent or were you asked to
15 provide all of it?
16     A   We were asked to provide all.  I wasn't
17 able to provide all.
18     Q   And I think you testified earlier that,
19 other than preparing for the interrogatories, you
20 didn't prepare at all other than to review the
21 interrogatories and to talk with your counsel for
22 the purposes of today's deposition?
23         MR. THORNBURG:  Object to the form.
24 BY MR. KOENIG:
25     Q   Actually, no, you already answered it.

34 (Pages 130 - 133)

1 It was asked and answered.  That's fine.  We have
2 it.
3        MR. KOENIG:  We're up to 5.
4        (Thereupon, Rivera Exhibit 5 was marked
5    for identification.)
6 BY MR. KOENIG:
7    Q   Let me show you what's been marked as
8 Exhibit 5.  Have you seen Exhibit 5 before?
9    A   Nope.
10   Q   So you say yes or no?
11   A   No.
12       MR. THORNBURG:  He said "no."
13 BY MR. KOENIG:
14   Q   Okay.  And I -- and it appears to me
15 that it is a July 27, 2016 letter from Mason Hayes
16 to Gustavo.  And this was -- if you look at the
17 bottom left, you'll see, "FlexFunds Defendants
18 106.  So it's the 106th document that the
19 defendants in this case provided pursuant to your
20 document request.
21   A   Okay.
22       MR. THORNBURG:  Object to the form.
23 BY MR. KOENIG:
24   Q   And it appears to be the scope to me
25 that discusses -- it says, "MarkETP Securities

1 Program PDVSA Notes Series."  The series.
2    A   Okay.
3    Q   Have you seen -- did you have a similar
4 retainer like this one with FlexFunds?
5        MR. THORNBURG:  Objection to form.
6        THE WITNESS:  I'm not sure how similar
7    it is.  Do I have a contract with Mason Hayes?
8    Yes.  I don't know how similar it is.
9 BY MR. KOENIG:
10   Q   And looking at this and based on your
11 communications with Mason Hayes, what does this
12 letter appear to do?
13       MR. THORNBURG:  Objection to form.
14   Calls for legal conclusion.
15       THE WITNESS:  I believe it's an
16   engagement letter between Mason Hayes and
17   MarkETP.
18 BY MR. KOENIG:
19   Q   This appears -- if you look at the
20 bottom, it's a draft, at least, series documents;
21 is that right?
22   A   What are you looking at?
23       MR. THORNBURG:  Objection to the form.
24 BY MR. KOENIG:
25   Q   Number 2 at the bottom, "Drafting the

1 Constituted Documents of the Series."
2    A   Okay.
3    Q   So this appears to be a retainer letter
4 between MarkETP and Mason Hayes?
5    A   Okay.
6    Q   Do you see anywhere in this letter that
7 discusses merely redlining a FlexFunds document?
8    A   No.  I think this is talking about a
9 series, so it's not about the master document.
10   Q   Yeah.  Okay.
11   A   I'm -- I'm assuming.
12   Q   That -- that's how it reads to me too.
13 I just wanted to be certain on that.
14       (Thereupon, Rivera Exhibit 6 was marked
15   for identification.)
16 BY MR. KOENIG:
17   Q   Let me show you what's been marked as
18 Exhibit 6.  Let me know when you're ready to
19 discuss.
20       MR. THORNBURG:  You're marking it as 6?
21       MR. KOENIG:  I think we're at 6; right?
22       MR. THORNBURG:  It's already been
23   marked.  That's all I asked.
24       MR. KOENIG:  You can scratch out the 77
25   if you'd like.  If I had a sticker, I would

1    put a sticker there.
2        THE WITNESS:  Okay.  I'm ready.
3 BY MR. KOENIG:
4    Q   Have you seen this document before?
5    A   I'm not sure if -- if this is the -- the
6 same e-mail I was referring to before or a part
7 of -- part of it.  I'm not sure, but -- because it
8 talks about the master document and it's an
9 exchange between the --
10   Q   And -- and you had mentioned an e-mail
11 that may exist or you -- you thought you saw about
12 just merely redlining the IA Capital document.
13 And, you know, I've looked through the -- the
14 file, and this seems to be the closest one I've
15 found that shows some -- some drafting of these
16 documents, so.
17   A   Okay.
18   Q   So if you would look at 1 through 12 of
19 that first page, are those what you would consider
20 the -- the trust materials that we've been
21 discussing?
22   A   I believe so.
23   Q   And if you look at the last page, it
24 appears that it attached a copy of all of them?
25   A   Okay.

**Page 138**

1    Q   And do you see anywhere within this
2  letter whereby Mr. Wynne tells any of the parties
3  involved that this was merely a redlining or
4  copying of anything owned by FlexFunds or IA
5  Capital?
6        MR. THORNBURG:  Objection to the form.
7        THE WITNESS:  I'm reading through it.
8    No, I don't see any -- any of those
9  references in this particular e-mail.
10 BY MR. KOENIG:
11   Q   So -- so this is not the e-mail that --
12 that you thought you saw?
13   A   No.  The e-mail I -- I received, what --
14 what happened, just to give you more -- more
15 color, is that Garry when he typed "Florent" as
16 a -- as a -- as a recipient of the e-mail, I
17 believe that the e-mail system auto-populated that
18 Florent at FlexFunds, and of course that e-mail
19 got to me instead of to Florent at MarkETP during
20 the time that we are -- well, actually, I don't
21 remember the exact date.  I shouldn't say that.
22 But, anyway, that's how I got the -- the e-mail.
23   Q   Right.
24   A   So when I see the -- the first thing I
25 saw is the -- the recipients.  So since there is

**Page 139**

1  no FlorentRigaud@FlexFundsETP.com, I'm assuming
2  this is not the e-mail I'm referring to.
3    Q   Okay.
4        (Thereupon, Rivera Exhibit 7 was marked
5    for identification.)
6  BY MR. KOENIG:
7    Q   Let me show you what's been marked as
8  Exhibit 7.  Let me know when you're ready to talk
9  about it.
10   A   I'm ready.
11   Q   What is Exhibit 7?
12   A   It's an e-mail exchange -- oh, there you
13 go -- between FlexFunds and Deutsche Bank for the
14 PDVSA project issuance, and we are sharing with
15 Deutsche Bank the -- the master program memo.
16   Q   And -- and within this -- this e-mail,
17 it appears to have a copy of both the program
18 memorandum as well as the master conditions?
19   A   Correct.
20   Q   And these are the master conditions of
21 the trust materials we've been discussing today?
22   A   Correct.
23   Q   And I look at the folks receiving this,
24 and it appears to be -- who is Gabriel Roitman?
25   A   He is a senior person at Deutsche Bank.

**Page 140**

1    Q   And I also see that Gustavo Hernandez is
2  added to this as well?
3    A   Yep.
4    Q   So we have a -- an e-mail from Florent,
5  and it looks like you're copied on it as well as
6  Jose; is that accurate?
7    A   Yes.
8    Q   And it includes some of these documents
9  you've referred to as trade secrets earlier; is
10 that accurate?
11   A   That is completely accurate.
12   Q   And do you know whether you had a signed
13 engagement letter with Deutsche Bank?
14   A   We did sign an engagement letter with
15 Deutsche Bank.
16   Q   Did -- did Deutsche Bank sign it?
17   A   I -- I mean, I'm not a hundred percent
18 certain, but I believe.  I remember drafting it.
19 I just -- it's been awhile.  I can't remember if
20 we signed it, but that would be what we should --
21 what we do.
22   Q   So --
23   A   So my answer will be -- will be yes, but
24 I would like to confirm it.
25   Q   Would it surprise you to learn that

**Page 141**

1  Deutsche Bank never signed the engagement letter?
2    A   It would surprise me, yes.
3    Q   Did Mr. Hernandez sign any documents
4  that would -- that would be -- did Mr. Hernandez
5  sign an engagement letter as well?
6    A   Yes, for his series.
7    Q   And did that engagement letter cover
8  these master conditions that are contained in this
9  e-mail?
10   A   It should.
11   Q   And how --
12   A   Because he is under -- under
13 confidentiality between us.
14   Q   And is it for -- for the engagement
15 letter executed with Mr. Hernandez, what was the
16 scope of the engagement?
17   A   What was the scope of the scope of the
18 engagement letter?
19   Q   Correct.
20   A   The scope of the engagement is to work
21 with FlexFunds in the issuance of -- of a series.
22   Q   And was it for any series or was it for
23 the series that's the subject of this e-mail?
24   A   The master covers all series.
25   Q   So --

36 (Pages 138 - 141)

Page 142

1    A   It's about -- it's -- when we talk about
2  confidentiality, it's confidentiality about
3  FlexFunds, not about the specifics of the series.
4    Q   So any engagement letter signed by a
5  client of FlexFunds, it is FlexFunds' position
6  that it contains nondisclosure provisions for
7  anything and everything?
8    A   That is 100 percent correct.
9    Q   Okay.  And that's the same document that
10 we have as Exhibit -- I think it's 4, that you're
11 going to take a look at at one point and --
12      MR. THORNBURG:  Objection to the form.
13      THE WITNESS:  Like I said, it's -- I'm
14 not sure if it's the same.  As I mentioned to
15 you, it has been evolving to become better and
16 better.  But, yeah, that -- that is an
17 engagement letter.
18      One thing to know is that -- I mean,
19 when you work with companies like Deutsche
20 Bank and you work -- when you work with
21 high-level individuals, senior-level
22 individuals, there is a -- a complete
23 understanding of what's sensitive material and
24 what is not as well.  And we all work in the
25 services -- in the financial services

Page 143

1  industry, the securities services industry,
2  that it inherently includes confidential and
3  sensitive information.
4  BY MR. KOENIG:
5    Q   So it's a matter of trust?
6    A   To a certain degree, it's a matter of
7  ethics.
8    Q   But you -- you trust that they'll
9  have -- that they'll have ethics?
10   A   I trust at a senior level that Deutsche
11 Bank will understand that if I send them a -- a --
12 a document that says "confidential" in it, will
13 treat it as confidential.
14   Q   Does this e-mail discuss anything
15 regarding confidentiality?
16   A   This e-mail has a footer that says,
17 "This e-mail is confidential and subject to
18 important disclaimers and conditions."
19   Q   So it's a catchall that you hope --
20   A   It's not a catchall.  I mean, it is -- I
21 mean, sorry, it's not just a catchall.  We're
22 talking to a senior-level person at Deutsche Bank.
23 We're not talking to -- I don't know -- someone
24 that is not in the -- in the financial services
25 industry that doesn't understand the importance

Page 144

1  and the sensitive matter of these exchanges.
2    Q   Is that provision, to the extent that
3  you know or have a position on it, is that
4  something that protects this document as is or
5  would something like a nondisclosure agreement
6  protect it?
7    A   There is certain -- there is different
8  levels of protection.  Right.
9    Q   What -- what level is just saying
10 something is confidential?
11   A   It has a certain level of protection.
12 Do you want me to give you a number?
13   Q   Do you have one?
14   A   100.  I don't know, does that work for
15 you?
16   Q   Sure.  And then what level of protection
17 would the nondisclosure agreement be?
18   A   Another hundred.
19   Q   Okay.  Fair enough.  What kind of
20 conversations did you have with Mason Hayes
21 regarding Florent?
22   A   When?
23   Q   So at one point after -- after
24 Mr. Rigaud left, at what point did you make -- did
25 you make contact with Mason Hayes?

Page 145

1    A   I made contact with Mason Hayes when
2  I -- when I saw the e-mail, right, that Mason
3  Hayes was working with Florent.  Again, I -- I
4  wish I knew the exact date because I'm not
5  entirely sure if it was during his employment or
6  after.  But in any case, I talked to Mason Hayes
7  and I told them that Florent was no longer with
8  FlexFunds, and that was a surprise to them.
9        And then when they found out that that
10 was the case, Mason Hayes told me they were
11 advanced in the process.  And I told them that
12 it's up to them, I mean, what -- how they want to
13 handle the situation.
14       But there is -- there is a certain
15 conflict of interest when you are working with --
16 with two companies that are attempting to do the
17 same.  And if we encounter a situation or we have
18 an idea to amend or to improve our master
19 documents or series documents constituting
20 instruments, I meant to say, they can -- of
21 course, they cannot unlearn what they learned with
22 us and it could be a conflict of interest as they
23 apply it to -- to MarkETP.
24       So I said, "This could be an issue to
25 us, right, but you should do whatever you feel is

37 (Pages 142 - 145)

Page 146

1 correct."
2    Q   Did you e-mail, regarding Mason Hayes
3 about this e-mail you said you saw, about merely
4 redlining the IA Capital's document?
5    A   Did I e-mail that e-mail to Mason Hayes?
6    Q   Yes.
7    A   No, I -- I -- I spoke about it.  I --
8 sorry, did I e-mail it?  I -- sorry, maybe I did.
9 I just -- I'm not quite sure.  Maybe I did.
10    Q   But at one point, did you bring to Mason
11 Hayes' attention --
12    A   As soon as I got the e-mail, I called
13 them.  I thought it was alarming.  I'm not sure if
14 I re-mailed the e-mail just to prove them.
15 Actually, maybe I actually did.  But the most
16 important exchange was a conversation I had with
17 Daragh Bohan over the phone.
18    Q   And did you guys discuss that issue,
19 that supposedly Mason Hayes was merely redlining
20 an IA Capital's -- Capital document?
21    A   Yes.
22    Q   Did -- are there any e-mails showing
23 this?
24        MR. THORNBURG:  Objection to the form.
25        THE WITNESS:  I believe there are.  I

Page 147

1 have to check.  If not, definitely
2 conversations.
3 BY MR. KOENIG:
4    Q   Have you taken any actions against Mason
5 Hayes for doing so?
6    A   No.  We wouldn't have taken any action
7 either way, either if they continued or they
8 stopped, but they, by their -- by their own will,
9 they decided -- I believe they decided to stop
10 working with MarkETP.
11    Q   But isn't it true that they decided to
12 stop working with MarkETP because you had told
13 them that FlexFunds had this good relationship
14 with them and wanted to continue working with
15 them, but at no point did you say, "You stole our
16 documents and re-purposed them for our
17 competitor"?
18        MR. THORNBURG:  Object to the form.
19        THE WITNESS:  Who's "you"?
20 BY MR. KOENIG:
21    Q   Mason Hayes.
22    A   I don't believe Mason Hayes stole the
23 documents.
24    Q   But Mason Hayes merely -- that I think
25 it was your testimony re-purposed --

Page 148

1    A   No, I believe Florent stole the
2 documents.
3    Q   But at least with regard to your
4 communications with Mason Hayes, and you said that
5 you brought to their attention that -- that they
6 were working for a competitor.  I just want to be
7 clear --
8    A   Yeah.
9    Q   -- that it's your position that Mason
10 Hayes -- did Mason Hayes tell you that they were
11 provided IA Capital documents?
12    A   Yeah.  I mean, they were -- like I said,
13 the e-mail I said -- I saw, it read that they were
14 redlining IA Capital documents to create MarkETP's
15 documents.
16        MR. KOENIG:  I think we're on 8.
17        (Thereupon, Rivera Exhibit 8 was marked
18    for identification.)
19 BY MR. KOENIG:
20    Q   Let me know when you're ready to
21 discuss.
22    A   I'm ready.
23    Q   So at any point in -- well, first of
24 all, what is it we're looking at?
25    A   It's an e-mail that I sent Mason Hayes,

Page 149

1 specifically to Daragh and Garry, about their
2 involvement with Florent and MarkETP and, of
3 course, the importance of -- of that.
4    Q   At any --
5    A   Oh, the importance of that.
6    Q   At any point in this -- in any of these
7 e-mails -- it looks like multiple e-mails to and
8 from Mason Hayes.  At any point, did you raise the
9 issue about this alleged redlining of the IA
10 Capital's document?
11    A   I don't think there was a need.  I mean,
12 of course, I have to go through the e-mails.  I
13 don't think there was a need at this point.  The
14 purpose of this e-mail was to hope for them not to
15 work with MarkETP.
16    Q   But the idea being that Mason Hayes
17 would be a -- a key witness potentially to testify
18 in a case like this or provide evidence on a case
19 like this they had received the master documents
20 from one of the defendants?
21        MR. THORNBURG:  Objection to form.
22 BY MR. KOENIG:
23    Q   Wouldn't that be true?
24    A   Are you asking me whether Mason Hayes
25 received the master documents from one of the

Page 150

1 defendants?
2    Q    Yes.
3    A    I would believe so.  I -- I -- I only
4 saw that e-mail that says this redline IA Capital
5 Structures master documents.  I don't know how
6 they got it.  I don't know if -- if Florent or
7 Gustavo forward them the e-mail you just sent me
8 because they have access to or if Mason Hayes
9 thought, because that was their original
10 impression, that Florent worked -- still worked
11 for FlexFunds and they were doing a FlexFunds
12 project.
13    Q    So let's talk about what you know and
14 what -- and what you -- what you think might be.
15    A    Yes.
16    Q    I just want to make sure I have -- I
17 know what you know.  So your position is there's
18 an e-mail that references IA Capital's documents?
19    A    Correct.
20    Q    And you don't know whether -- you don't
21 know why it references it?
22    A    I do --
23    Q    You just went through about three
24 different scenarios that it could be Mason Hayes
25 was confused as to who was doing the work.

Page 151

1    A    Sorry, let me explain myself so it's
2 clear.
3    Q    Please.
4    A    The -- the redline of the IA Capital
5 Structures master documents was embedded in an
6 e-mail that I received, right, and that's how the
7 MarkETP documents were to be created.  That's --
8 that's what the e-mail that I read included,
9 number one.  And that's what, in my conversation
10 with Daragh, he mentioned, number one.
11        He also mentioned that he was confused
12 at first because Florent, of course, worked for
13 FlexFunds, and he failed to tell Daragh that he
14 doesn't -- no longer works at FlexFunds, so I'm
15 under -- I'm under the understanding that he
16 impersonated a FlexFunds employee to get Daragh's
17 attention and get them engaged to begin with
18 working with them.
19        That's the two things I know, that
20 Daragh or Mason was confused as to where Florent
21 worked and the master documents were redlined
22 by -- by Mason to create MarkETP documents.  Those
23 are the two statements.
24    Q    So even if Mason Hayes had engagement
25 letters, and you've seen one of them at least with

Page 152

1 regard to the series --
2    A    Series.
3    Q    -- that it's your position that Mason
4 Hayes was still confused as to who it was doing
5 work for?
6    A    At what point in time?  It's only in the
7 beginning.  It got to the point where they were
8 engaged for several hours, weeks that they
9 realized that they -- that Florent was not working
10 with -- with FlexFunds.  But at that point, they
11 were already I don't know how many euros into the
12 project.  And then when -- that was the big
13 question for Daragh, I said, "Daragh, what are you
14 going to do now?"
15    Q    Let me ask you about Exhibit 8.  If you
16 look at the -- looks like an e-mail from you to a
17 couple of individuals at Mason Hayes, and you
18 include Jose as well as Daniel Ramos.  Who is
19 Daniel Ramos?
20    A    He manages operations at FlexFunds.
21    Q    And this discusses the conflict of
22 interest, and this is the August 4th, 2016, the
23 bottom e-mail?
24    A    Correct.
25    Q    It says, "The conflict of interest," and

Page 153

1 then the second paragraph says, "The second
2 document is the FINRA report for GSI where, at a
3 first glance, you'll see disclosures of violation
4 that are -- that are familiar with the same
5 issuance they are working on."
6        What does that mean?
7    A    Well, since the main partner that
8 Florent picked is GSI, right, the Global
9 Securities -- it's part of Global Securities --
10 GSC as well, I believe it was important for Mason
11 to understand and to see the -- the record to make
12 educated decision.
13        As you can tell, I didn't tell him what
14 to do.  I'm just pointing out to the facts.  He --
15 in that -- in that record, I believe -- and again,
16 I -- I -- I'd read through it.  It's been a long
17 time, but I believe that there's some anti-money
18 laundering violations by Global Securities, not
19 one, but several violations of anti-money
20 laundering in relation to Venezuelan bonds.  And,
21 of course, PDVSA is, again, a bond issuance in
22 Venezuela.  It's the same thing.
23        So if you put the two and two together,
24 do you want to work with someone that has
25 anti-money laundering proved violations for bond

39 (Pages 150 - 153)

Page 154

1 issuance in Venezuela? You want to be related to --
2 you want to be linked to that partner or -- or
3 client? That's what I --
4    Q    Did FINRA find violations?
5    A    Yes. I --
6    Q    And -- and what did FINRA do -- do with
7 it?
8    A    I don't -- I don't know the -- that I
9 believe they were fined and they had to pay the
10 fine.
11   Q    Okay.
12        THE VIDEOGRAPHER: Five minutes.
13        MR. KOENIG: Okay. This is actually a
14 good place to break. You said we had five
15 minutes anyway? Let's take a break.
16        THE VIDEOGRAPHER: All right. Going off
17 the record. The time is 12:44 p.m.
18        (Thereupon, a lunch recess was observed
19 by all parties present from 12:44 p.m. to 2:16
20 p.m
21        THE VIDEOGRAPHER: We're back on the
22 record. The time is 2:16 p.m.
23 BY MR. KOENIG:
24   Q    Mr. Rivera, we are back on the record.
25 By chance, did you take a -- did you get a chance

Page 155

1 to look at the engagement letter?
2    A    Let's do it right now.
3    Q    Okay. I think our last discussion was I
4 pointed out Paragraph 17 of Exhibit 4 that might
5 stand for the purpose of a nondisclosure agreement
6 provision. I think you had --
7    A    You pointed out 17; right?
8    Q    Yes.
9    A    Okay. So it seems that Paragraph 17 is
10 the most relevant in terms of confidentiality.
11   Q    Okay. Are there other paragraphs?
12   A    No. I saw another one that talks about
13 information, but it's not -- this is the one,
14 right. Sorry about that.
15   Q    Okay. I just want to see, is there --
16 are there additional ones also?
17   A    Not that I think we should even discuss.
18   Q    Okay.
19   A    Let's just talk about 17. So would you
20 like me to go over it?
21   Q    It -- no, I just wanted to see what --
22 what it was, and that was -- that was the basis
23 for it.
24   A    The only thing that I see here, right,
25 that, of course, it's a mutual confidentiality,

Page 156

1 and then it talks about the...
2    Q    And -- and we're looking at 17?
3    A    Yeah. I know usually we have a -- the
4 appendix. And we're talking about the proposed
5 transactions. I'll look at the section documents.
6 Yeah, here it is, the definitions.
7        If -- if you -- if you look at the
8 proposed transactions, so we're talking about the
9 transaction documents is what's -- what's
10 confidential. And if you look at the appendix --
11 sorry, Annex A, not the appendix, it says that
12 transaction documents means the program documents
13 and the series documents. And the program
14 documents mean program memorandum and then, of
15 course, the master documents.
16   Q    And does -- and I may have missed it.
17 Does Paragraph 17 reference Annex A?
18   A    I mean, it's talking about the agreement
19 and its contents are intended for the exclusive
20 use of the clients. Right.
21   Q    Right. Okay. Thank you.
22        With regard to -- I think we had
23 testified about -- or you had testified about
24 customer dealings and whatnot and how the
25 defendants had caused some -- some problems. And

Page 157

1 one of the problems I forgot to follow up on was
2 you said that one of your distributors ended up no
3 longer providing services to FlexFunds; is that
4 right?
5    A    No. One new distributor, right, was
6 also approached by MarkETP to be a distributor.
7 And what happened is that, of course, MarkETP was
8 offering them something, some kind of agreement.
9 And for us -- in order to be competitive, we had
10 to modify our agreement and make it, of course,
11 more interesting, higher payout for them, lower
12 payout for us than the standard that we have in
13 order to engage with them.
14   Q    And did you end up engaging the
15 distributor?
16   A    Yes.
17   Q    Okay. And whom did the distributor have
18 a relationship with at FlexFunds prior? Was
19 that -- was that Mr. Rigaud?
20   A    No, no. They came to us separately, and
21 they -- they went directly to our head of sales.
22   Q    And -- and -- and who was the
23 distributor?
24   A    It's a company called Simple.
25   Q    And does it --

40 (Pages 154 - 157)

Page 158

1    A   Simple.
2    Q   Okay.
3    A   Yeah. The one thing you'll see is
4  that -- I mean, there is all distributors and all
5  customers that we have, because you asked me about
6  the -- the overlap between our customers, right --
7    Q   Right.
8    A   -- that I saw in the previous document.
9  I mean, we -- we have a -- a CRM that is -- it's
10 called Streak, right, that when I -- when I heard
11 about Florent's new CRM of MarkETP, I was actually
12 pretty shocked that he was also using Streak.
13        And actually, just yesterday, I was
14 looking at my e-mails about Streak and how that
15 developed, and we did a research internally, and
16 Florent was a big proponent of -- of Salesforce.
17 But for some reason, now that he's independent, he
18 continued to use Streak. And for some reason, we
19 have a big overlap in -- in clients.
20        So I just wanted to point that out as
21 something interesting.
22    Q   Would it also be -- it would also be
23 consistent, though, with the CRM system that
24 Florent was used to?
25    A   But not what he preferred, right.

Page 159

1    Q   Okay. But, for example, in -- in legal
2  research --
3    A   Sorry, can I --
4    Q   Go ahead.
5    A   I'm going to reject your -- your
6  argument because what he's used to is what he used
7  for 20 years at Pershing, which is Salesforce --
8    Q   Okay.
9    A   -- and Flexfunds, one year.
10   Q   I got it.
11        I'm going to try to get through some of
12 these documents quickly. I think -- we covered so
13 much ground this morning, and I thought you did a
14 very good job answering questions that we shaved
15 off at least a couple hours today.
16   A   Awesome.
17   Q   So -- and I'm going to try to pick this
18 up and start getting through documents. All I ask
19 is I'm going to ask you pretty pointed questions,
20 and if we can just get to the answers, I'll --
21 I'll move on because I have -- I brought down this
22 huge pile of documents with me that I just want to
23 make sure we get through and make sure that I -- I
24 marked the boxes.
25   A   I'll do my best.

Page 160

1    Q   But certainly if you have questions or
2  if there are issues, certainly raise them.
3        THE VIDEOGRAPHER: I think we're on 9.
4        (Thereupon, Rivera Exhibit 9 was marked
5  for identification.)
6        THE WITNESS: Were you able to find --
7  sorry to interrupt -- the exhibit about the
8  redline agreement?
9  BY MR. KOENIG:
10   Q   No.
11   A   You don't have it?
12   Q   No. I -- I could not find a document
13 whereby Mason Hayes says, "I'm -- I'm redlining a
14 FlexFunds document that you provided me."
15        I've -- I've shown you the documents
16 that I have --
17   A   No, no. And it's -- it's somewhere
18 along those lines, but I think it's important for
19 you to see it. I don't know if it's -- if I can
20 do this in a deposition. I -- please tell me if
21 I'm completely off base, but is there a way for
22 us -- for you to see it because I think it's --
23 it's relevant.
24   Q   Well, we can cover this, and we're going
25 to be back and forth with additional depositions,

Page 161

1  and I know you attend a lot of these depositions.
2  It may not be out of place for us to say, you
3  know, "We finished such and such deposition," we
4  put you right back on the record and we can finish
5  this out, because you've made a couple comments
6  that you don't have the information with you
7  today, but it's something you can get.
8        So it's something that we can -- we can
9  reopen this deposition to get the additional
10 answers, including the answers -- you know, any
11 other documents or whatnot that we need.
12        But I said -- but I found some documents
13 with Mason Hayes regarding, you know, them marking
14 up other documents or other -- with other lawyers,
15 but I can't find anything that is -- is between --
16 or Mason Hayes saying that FlexFunds -- or "We
17 were provided FlexFunds documents by any of the
18 defendants and we're marking it up." I just
19 haven't found those.
20   A   Okay. I don't remember who sent to it
21 who, but for sure it says "redline of IA Capital
22 documents for the benefit of MarkETP," but,
23 anyway, let's continue.
24   Q   All right. So I'm showing you
25 Exhibit 9. Let me know when you're ready to talk

41 (Pages 158 - 161)

Page 162

1  about it.
2    A   I'm ready.
3    Q   And this appears to be e-mails.  Who is
4  Elizabeth Chase at Sheppard Mullin?
5    A   Elizabeth Thompson.
6    Q   Well, there's an Elizabeth Chase
7  carboned also.
8    A   Oh, you're right.  Yes, both Elizabeths,
9  they work at this company, Sheppard Mullin, who is
10  the counsel of one of our clients.
11    Q   And this says, "Do you have copies of
12  the master documents and master trust terms
13  referenced in Recitals B and C of the constituting
14  instrument for Series 96 you can send to Liz Chase
15  and me."
16      What -- what deal was this?
17    A   This was -- I -- can I see?  Because we
18  work with them -- it says 96.  We worked with them
19  with several -- in several issuances.  They be --
20  they are counsel for a local company.  Should I
21  name the company?
22    Q   Sure.
23      MR. THORNBURG:  Well, is it
24  confidential?  I mean, is it publicly known
25  that you're dealing with them?

Page 163

1      THE WITNESS:  Yes, it's publicly known
2  that we work together.
3      MR. THORNBURG:  Okay.  Fine.
4      THE WITNESS:  It's called
5  BiscayneAmericas.
6  BY MR. KOENIG:
7    Q   Okay.
8    A   So we -- we work with them in several
9  issuances, and they are the ones that are counsel
10  to them.  We have an NDA with BiscayneAmericas.
11    Q   Okay.  That's my follow-up.  And I'm
12  going to have a couple more e-mails showing you
13  with other companies that this appeared to ask for
14  and provide some of the master documents, and
15  you're telling me that there was an NDA executed
16  with this?
17    A   Yes.
18    Q   Was it an NDA that preceded this e-mail?
19    A   Yes.
20    Q   Okay.  Let me show you Exhibit 10.
21    A   Yes.
22    Q   I'll have the same types of questions
23  for you.
24      (Thereupon, Rivera Exhibit 10 was marked
25  for identification.)

Page 164

1      THE WITNESS:  Okay.
2  BY MR. KOENIG:
3    Q   Have you seen this document before?
4    A   No.  But I -- I can tell what it is.
5          * * * * *
6      (Excerpt of this transcript has been
7  declared confidential and is sealed under
8  separate cover.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 165

1
2
3
4
5
6
7
8
9
10
11
12          [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25

42 (Pages 162 - 165)

Page 166

1
2
3
4
5
6
7
8
9
10
11
12        [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

1
2
3
4
5
6
7
8
9
10
11
12        [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 167

1
2
3
4
5
6
7
8
9
10
11
12        [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 169

1
2
3
4
5
6
7
8
9
10
11
12        [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25

43 (Pages 166 - 169)

Page 170

1      MR. THORNBURG: We're off the
2  confidential record.
3      THE WITNESS: We're off?
4      MR. THORNBURG: Unless we're -- I mean,
5  we're on a new line of questions. He can ask
6  his questions. If they elicit confidential
7  information about pricing, then we'll go back
8  on. He's asked about --
9  BY MR. KOENIG:
10     Q   Right. Is -- is -- when -- when you
11  were helping me compile a master list of trade
12  secrets, one of them were service providers.
13     A   Yes.
14     Q   So -- so let me start with a threshold
15  question, and I think I saw in your
16  interrogatories, it appears that FlexFunds'
17  position isn't that there's anything wrong with
18  using -- anyone using these service providers for
19  the same purposes FlexFunds has. Is that -- is
20  that accurate?
21     MR. THORNBURG: Objection to the form.
22     THE WITNESS: I just want to explain why
23  I hesitated before.
24  BY MR. KOENIG:
25     Q   Sure.

Page 171

1      A   You mentioned Bank of New York, and Bank
2  of New York was not a service provider during
3  Florent's tenure in the -- in the company. I'm
4  not sure if this is confidential or not, but we're
5  having a --
6      (Excerpt of this transcript has been
7      declared confidential and is sealed under
8      separate cover.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 172

[CONFIDENTIAL]

Page 173

[CONFIDENTIAL]

44 (Pages 170 - 173)

Veritext Legal Solutions

800-726-7007                                          305-376-8800

Page 174

1         * * * * *
2     Q   What, if anything, have the defendants
3  done as far as a -- a misappropriation of trade
4  secret or confidential information as it relates
5  to these service providers?
6         MR. THORNBURG:  We're off the
7     confidential record for that question.
8         THE WITNESS:  Number one, they contacted
9     the -- Florent, of course, through the course
10    of working with FlexFunds, knew who to
11    contact, knew, of course, how to engage with
12    them and in what -- in what way, and also had
13    access to the -- the fee structure, so.
14 BY MR. KOENIG:
15    Q   What do you mean by access to fee?  Is
16 this -- so, for example, let's talk about Citi.
17 Is that one of the service providers?
18    A   Yes, it is.
19    Q   And I'm not going to ask any
20 confidential information, at least as far as I
21 know.
22    A   Don't worry.
23    Q   Is -- when you say "access to fee," are
24 these fees that Citi would charge for a particular
25 transaction?

Page 175

1     A   I mean, Citi -- Citi, for example,
2  provides three services to us.  Right.  They do
3  issuing agent, they perform the paying agent
4  services, and they perform the custody agent
5  services.  Of course, as I mentioned earlier, in
6  the position, Florent is -- is very good at the
7  custody because that's what his background is
8  from, but before coming to FlexFunds had no clue
9  about the other two.
10        And by -- by virtue of his experience
11 with the custody, I remember that when I went down
12 to London to negotiate -- or renegotiate our --
13 our fee structure with Citi, I came back and I
14 shared everything with Jose, and Jose, of course,
15 told me, "Let's share with Florent because Florent
16 has worked in custody and see what he thinks."
17        So we -- we provided him -- I shared
18 with him that -- that fee agreement.  So in
19 regards to Citi specifically, he had access to
20 the -- to that service agreement.
21    Q   And why would you share the -- the fee
22 structure with regard to Citi with Florent?
23    A   Because a portion of that fee structure
24 included the custody part, and I wanted to get his
25 feedback.

Page 176

1     Q   Was he involved in the other -- other
2  fee structures with the other services providers?
3     A   I don't believe, so it's no.
4     Q   Okay.  So the first thing you mentioned
5  was Florent knew who to contact over at these
6  particular service providers.  Was he a contact
7  person?  Would he routinely contact someone from
8  Citi or Sanne or --
9     A   No, but he knew who the contacts were.
10    Q   And then the -- the second part was you
11 said he had access to the fee -- the fee
12 structure.  As far as the service provider fee
13 structures, it sounds as though the only one that
14 Florent had access to was Citi.  Is that accurate?
15    A   No.  Unfortunately, he had access to all
16 the fees two ways.  I mean, of course, we -- we
17 talk about these fees amongst ourselves,
18 especially the -- the directors.  So between Jose,
19 Florent, and I, we discussed these fees both in
20 meetings or in conference calls.
21        And also Florent was party to our
22 financial statements, which included all of our --
23 all of the P&L transactions, actually very
24 detailed transactions, even per series, and all of
25 our costs, even per service providers for the year

Page 177

1  2015.  So just by virtue of looking at those
2  numbers, you can see exactly how much we pay.
3     Q   So the -- but the -- the fee documents,
4  the arrangements, the schedules, whatever you want
5  to call it, the piece of paper that says, "Here's
6  what our fees are," these are documents other than
7  Citi that Florent would not have had access to,
8  but you're testifying that he did have access,
9  however, to FlexFunds' financials, and he could
10 have sat down and -- and done the math, if need
11 be, to figure out what the -- what the hard costs
12 were; is that right?
13    A   Correct.  And within -- within the
14 password-protected cloud service, we had a folder
15 that included all the service agreements.  Florent
16 did not have access to that.  It was, again, we
17 have usual measures to protect our confidential
18 information.
19        Our accounting information is also
20 protected in those folders, and Florent did not
21 have access to that.  However, Jose sent an e-mail
22 with that information to Florent.
23    Q   Was it -- was it on a -- on a routine
24 basis or -- or just one time?
25    A   No, one time.  One time with the

45 (Pages 174 - 177)

**Page 178**

1 complete 2015 report. Of course, it was because
2 we had a high level of trust with him.
3     Q    And did the service providers cut
4 FlexFunds particular breaks and give you guys
5 special pricing that they wouldn't give to anyone
6 else?
7     A    Of course. I mean, it's very different
8 when you issue one series or one issuance, right,
9 versus us that we issue 50, 60 a year, and we have
10 a volume over a hundred at this point. Right.
11     Q    I guess my -- my -- my better question
12 is, do you know that you're getting different
13 prices than anyone else, or are you guessing that
14 or assuming that?
15     A    Well, let me explain something. Again,
16 we are a unique customer for them so they don't
17 have anything like us, right, number one. That's
18 why our fee structure with every single service
19 provider has evolved to what it is now, which is
20 something that works for all parties.
21         So if you were to start fresh with the
22 service providers, you're -- and you wouldn't
23 know -- and you didn't know how to structure these
24 service agreements and the fees, you probably
25 wouldn't have such a beneficial agreement between

**Page 179**

1 the parties. So that's what I'm trying to tell
2 you. I tell you -- it's hard for me to tell if
3 I'm being charged a little or -- or -- or too much
4 because I have nothing to compare myself to.
5     Q    Well --
6     A    But I know that, judging from the fees
7 that we -- that you saw in the cost table that we
8 charge out and that we pay our service providers,
9 we have a delta, which is great.
10     Q    And do you know if the service providers
11 will charge the general public something different
12 than what they're charging you, assuming someone
13 in general public decides they want to do what you
14 do?
15     A    For sure. I mean, if you -- I would
16 think for sure because if I look at ourselves when
17 we first started with the -- with the plain
18 program, those fees were very different than the
19 fees now.
20     Q    Do you know what these groups -- well, I
21 guess do you have -- what basis do you have that
22 any of the defendants used this cost information
23 at all with regard to these service providers?
24     A    I mean, why wouldn't they, number one?
25 Right. If you -- if you know that you can pay two

**Page 180**

1 and they offer -- and they ask you to pay ten,
2 wouldn't you say, "I'm going to pay two instead of
3 ten"?
4     Q    And is -- and is -- are the defendants
5 getting the same deal that FlexFunds had with the
6 service providers?
7     A    First, I don't know what service
8 providers -- I mean, I'm sorry, I don't know what
9 deal they have. The point here is that they have
10 access to our confidential information and --
11     Q    So --
12     A    Go ahead.
13     Q    So MarkETP could be paying more to all
14 these service providers or less to all these
15 service providers; you don't know one way or the
16 other?
17         MR. THORNBURG: Objection to form.
18         THE WITNESS: I -- the answer to the
19     question is that I don't know what -- what
20     they're paying. However, any normal person
21     would use that information to their benefit
22     when they are talking to the same or similar
23     service providers, knowing what the agreements
24     they previously have with the competition.
25 BY MR. KOENIG:

**Page 181**

1     Q    Have you been in contact with these
2 service providers since Florent left FléxFunds?
3     A    With my service providers?
4     Q    Yes.
5     A    Of course, I talk to them often.
6     Q    Did you have conversations with any of
7 them about any of the defendants approaching them
8 saying, "I know what your costs are, I want -- I
9 want the same deal you gave FlexFunds"?
10     A    No, I don't have that information.
11     Q    Okay. We talked a little bit about the
12 pricing I was provided. Let me show you a couple
13 of e-mails because, really, I brought them. No, I
14 don't --
15         (Thereupon, Rivera Exhibit 11 was marked
16     for identification.)
17 BY MR. KOENIG:
18     Q    Let me show you what's been marked as
19 11. Let me know what you're ready to talk about
20 it.
21     A    I'm ready.
22     Q    And -- and what is -- what is
23 Exhibit 11?
24     A    It's an exchange between Florent and a
25 prospective client.

46 (Pages 178 - 181)

**Page 182**

1    Q    And who's the prospective client?

2    A    Monex USA.

3    Q    And with Monex USA, did they end up

4 being a client?

5    A    No.

6    Q    And when we talked about our first

7 meeting, second meeting, third meeting, does this

8 look like something within that second meeting

9 ballpark?

10    A    Yes. In fact, we -- we've been talking

11 to this group for quite some time, several years.

12 Even before Florent started with FlexFunds, I

13 spoke with them, I met with them. We met, I

14 believe, yeah, 2015. It would have been two years

15 in a row at the Pershing conference. So we know

16 them very well.

17    Q    And it appears that -- look at the -- at

18 the last sentence of the first page. It says,

19 "I've attached a copy of our cost structure that

20 we reviewed as well as our brochure. Let us know

21 when it is a convenient time to continue our

22 discussion."

23    A    Right. I'm assuming that -- let me see

24 what cost structure it is.

25    Q    Let me show you Exhibit 12.

**Page 183**

1        (Thereupon, Rivera Exhibit 12 was marked

2    for identification.)

3 BY MR. KOENIG:

4    Q    This was used, I believe -- this was

5 used in Florent's deposition. I believe it was

6 presented as the attachment to that e-mail. You

7 can let me know if you think I'm --

8    A    No, it's here actually, isn't it? Oh,

9 that's the other attachment. No, wait. Let's

10 see. Isn't this the attachment?

11    Q    It might be all one and the same. I can

12 just tell you that, in the deposition, Exhibit 12

13 was shown as the potential attachment. I just

14 want to make sure I'm -- I'm clear.

15    A    It's -- it's the same, however, this is

16 older and this is newer. Right.

17        MR. THORNBURG: Just let the record

18    reflect when you're pointing at things because

19    she can't get a record of it.

20        THE WITNESS: Sorry about that. The --

21    the piece of paper that's stapled to 14 --

22 BY MR. KOENIG:

23    Q    Well, it says -- it says "14" on it, but

24 it's actually part of 11.

25    A    I'm sorry. You're right.

**Page 184**

1        The -- the piece of paper attached to

2 Number 11 is an older version of the cost table,

3 and Exhibit 12 is a newer version of the cost

4 table. In any case, like this, this one is specific --

5 the -- the 12, Exhibit 12, is specific to a

6 FlexETP fund, and Exhibit 11 is -- it includes all

7 three products that we have in one page. That's

8 the difference.

9    Q    And when we discussed the trade secrets,

10 one of them being fees charged, are Exhibits --

11 the last page of Exhibit 11 and the entirety of

12 Exhibit 12, does that meet -- meet the

13 description --

14    A    Yes, for sure.

15    Q    -- of the cost tables?

16    A    I mean, our cost structure is not

17 something we publicize. It's only sent after we

18 had had a discussion with -- with a client. The

19 client has to tell us what the -- what the

20 strategy, pro strategy basis, development strategy

21 is. In this case, I can see it's to get -- to

22 produce a FlexETP fund.

23        And in order for us to move to the next

24 stage, they need to know the cost. There's no way

25 around it. Right. The one thing we make sure is

**Page 185**

1 we have the privilege and confidential footer and

2 make sure that -- what is it? I'm sorry. That

3 the audience, which here Jorge Heiras is the

4 president, and the other person, I believe, is

5 also like a manager --

6    Q    Pablo Alvarez?

7    A    Yes. Jorge Heiras is the president.

8 The other one is either a managing director or

9 above. I mean, they're both --

10    Q    And as far as when you're e-mailing, you

11 know, prospective clients like this, do you

12 dictate who from the prospective client is

13 permitted to view any of these documents, or is it

14 typically you'll have a point person who will say,

15 "I want you to copy so-and-so in my office," or is

16 it just automatically added? How is that -- is

17 it -- is there anything typical?

18    A    Typically we talk to the decision-maker.

19 I mean, when we do an issuance, it's usually a

20 significant move for any of our clients. We're

21 talking about issuances from 20 to 200 million

22 U.S., and these are midsize institutions. They're

23 not huge banks. So usually they're a big -- a big

24 step for them so we usually speak with the

25 decision-maker.

47 (Pages 182 - 185)

Page 186

1    Q   Do you ever tell these prospective
2 clients, "We don't want you to copy this
3 information" or, you know, "We're going to deal
4 with you only"?  Have you ever made a mandate
5 saying, "We're going to deal with you only, and we
6 don't want to see anyone copied on these e-mails"?
7        MR. THORNBURG:  Object to the form.
8        THE WITNESS:  I don't think it's
9    necessary because both of them -- they're
10   telling us their sensitive information, we're
11   telling them our sensitive information.  We
12   have that direct line of communication like I
13   mentioned to you before.
14 BY MR. KOENIG:
15   Q   Okay.
16   A   And it's -- and, of course, I know
17 it's -- it's -- it's a very generic thing, but in
18 our -- in our footer, it also says that -- that
19 this -- this information is confidential, as well
20 on top of the footer of the cost table.
21   Q   And we discussed some of the
22 confidentiality.  What's the privilege?
23   A   Good question.  I -- I don't have to
24 answer that question, to be honest.  I'm not a
25 lawyer.

Page 187

1    Q   Okay.  Well -- and you don't have to get
2 into it.  Did -- did -- who drafted the last page
3 of Exhibit 11 -- I guess I'll start with that.  Do
4 you know who drafted the cost table we've been
5 looking at, the last page of Exhibit 11?
6    A   The cost table itself?
7    Q   Yes.
8    A   Probably me.
9    Q   Do you know who would have stamped it
10 with privileged and confidential?
11   A   Maybe it was me, but maybe I'm not -- I
12 know what confidential means, but privilege is
13 for -- I mean, I've explained this many times.
14 I'm sorry.  Privilege must be for attorneys only,
15 right, or --
16   Q   I'm asking you.  It's -- it's -- you
17 know, I see it's here.  I just want to know why
18 it's there.
19   A   Why it says privileged, it's mainly
20 confidential.  Maybe the privilege should not be
21 there.  I don't know.
22   Q   Okay.  I'm not going to make these
23 exhibits just because I don't think it's
24 necessary, but it's part of the response to
25 interrogatories and it's part of the responses --

Page 188

1 the profit and loss sheet from 2015 as well as the
2 balance sheet for 2015.  Are those -- do these two
3 documents constitute the -- the sensitive
4 financial information that you addressed earlier?
5        MR. THORNBURG:  I'm going to object to
6    the fact that you can hand him that.  You
7    know, it's pretty small font and you're just
8    showing him from five feet away.
9        MR. KOENIG:  Let's make it part of the
10   record.
11       MR. THORNBURG:  No, I was just saying --
12       MR. KOENIG:  No, we'll make it part of
13   the record.  I'll make it easy.  I was trying
14   to keep it out of the record for various
15   reasons.
16       MR. THORNBURG:  You can keep it out of
17   the record.  You can just hand it to him and
18   just not mark it.
19       MR. KOENIG:  No, I think we should mark
20   it now.
21 BY MR. KOENIG:
22   Q   This is marked as Exhibit 13.
23       (Thereupon, Rivera Exhibit 13 was marked
24   for identification.)
25       THE WITNESS:  This looks like a portion

Page 189

1 of that -- of that financial -- yeah, and this
2 is another portion of it, that -- those
3 financial statements.
4        (Thereupon, Rivera Exhibit 14 was marked
5    for identification.)
6        MR. THORNBURG:  What you just handed me
7    was -- is the P&L's 14?
8        MR. KOENIG:  The P&L's 14 and the
9    balance sheet is 13.
10       MR. THORNBURG:  Just let the record
11   reflect that 13 and 14 are -- don't contain
12   any Bates stamping on them.
13       MR. KOENIG:  Correct.
14       THE WITNESS:  So what's the question?
15 BY MR. KOENIG:
16   Q   So -- so --
17   A   At least --
18   Q   So --
19   A   Sorry.
20   Q   So when -- but, you know, I was trying
21 to put, you know, this information in -- in
22 categories.
23   A   Uh-huh.
24   Q   One of the categories was sensitive
25 financial information.  And my question to you is

48 (Pages 186 - 189)

Page 190

1 is Exhibits 13 and 14 that sensitive financial
2 information that you discussed earlier that you
3 deem to be a trade secret?
4    A.  Yes.  The reason is because it includes
5 the payments to the service providers as well as
6 the income from each of the clients that we --
7 that we have.  And you cannot see in these two
8 sheets, but the -- the spreadsheet has other pages
9 that there's more detail.
10    Q    But it's the idea it's -- it's the
11 financials for 2015?
12    A    That is correct.
13    Q    And I think you had testified earlier
14 that it was only the financials for 2015?
15    A    Yes, I was referring to that document,
16 yes.
17    Q    And do you know why Jose provided that
18 to Florent?
19    A    Because he trusted him.
20    Q    I mean, was there a part of his job that
21 he wanted Florent to review this to -- to do
22 anything at all or -- or is that a better question
23 for Jose?
24    A    No, I can answer that question.  I mean,
25 Jose's intentions always were to have Florent be

Page 191

1 part of the company.  Right.  That's why -- that's
2 one of the reasons why we created FlexFunds to
3 begin with, to have a company that we all -- we
4 can all be a part of, a shareholder of.
5       He gave us -- both of us a chance.
6 Right.  We had -- we had a performance to be -- a
7 performance objective to -- to provide to the
8 company like in a certain time frame.  I fulfilled
9 my performance -- my three-year performance, I
10 filled it in two years.  And Florent did not
11 fulfill his performance objectives so he did not
12 get the shares.
13       That's why I have 25 percent is because
14 I fulfilled those performance objectives, but
15 Florent did not.  He became disenchanted with the
16 situation and then he -- he left.
17       But the reason why Jose provided this to
18 Florent is because Florent was in the path to
19 become a shareholder and part of -- of the
20 shareholder team, the owners of the company.
21    Q    What was -- what was the path?
22    A    The path is that he had distributor
23 agreement.  You'll see that if he performed
24 certain sales goals, he would get certain equity
25 in the company, but he didn't make it.  He

Page 192

1 didn't -- he didn't perform his -- his performance
2 objectives.
3    Q    And I'll just refer to the 2015
4 financial information, just the financial
5 information --
6    A    I'm sorry to -- I know I did a -- did a
7 bit of a tangent, but the reason why this was
8 shared with him was because of that intention,
9 because we wanted him to be part of the company.
10 We wanted him to be part of the -- of the
11 directors of the company that has access to this.
12 It's not -- usually it's just Jose and myself,
13 and, of course, a third-party accountant, but I
14 wanted to involve Florent in it.
15       MR. THORNBURG:  Let the record reflect
16    when he says the term "this," he's referring
17    and pointing to Exhibit 13 and 14.
18 BY MR. KOENIG:
19    Q    And as we sit here today, do you have
20 any basis to suggest that anyone other than
21 Florent actually viewed this financial
22 information?
23    A    Correct.  I don't -- I don't believe
24 anybody other than Florent, Jose, and myself, and
25 of course the accountant that prepared this, had

Page 193

1 access to this information.
2    Q    What about the other defendants, what
3 evidence do you have -- and -- and I know we
4 talked about -- I think I referred to it as
5 imputation of knowledge, that Florent is the owner
6 of Certus, so Florent is the owner of Certus, that
7 means Certus may have had access or seen this.
8       Do you have any facts to support that
9 someone from Global Securities ever viewed this
10 financial information?
11    A    I wouldn't have a way to know, other
12 than that Florent kept this information for
13 himself and he probably shared it with his
14 partners.
15    Q    But as we sit here today, do you have
16 any facts to support that?
17    A    Not at this point.
18    Q    Do you have any facts to support that
19 Florent used this information -- or any of the
20 defendants used this information for any purposes?
21    A    If this information was not interesting,
22 he wouldn't have tried to start a competing
23 company.
24    Q    Well, that's -- I understand, it's the
25 financials of the --

49 (Pages 190 - 193)

Page 194

1    A   For sure, he used it for his own
2  business plan.
3    Q   And then how -- how did he use it?
4    A   This is the roadmap for his business
5  plan.  Sorry to interrupt you.  This is the
6  roadmap for his business plan of MarkETP.  You
7  know how much you're going to make.  You know how
8  much you're going to charge.  You know the way
9  you're going to charge it.  You know how much is
10  going to -- you're going to get a fee with your
11  service providers.  You know how much you're going
12  to charge each of these clients.
13    Am I going too fast?
14    Et cetera, et cetera.
15  BY MR. KOENIG:
16    Q   But as far as actual use, have you seen
17  identical numbers or the like from any of the
18  defendants?
19    A   MarkETP -- as far as Florent's
20  deposition -- it was stated in Florent's
21  deposition -- only has $150,000 worth of setup
22  fees.  And by looking at their engagement letters,
23  I can attest that the pricing structure is
24  identical to ours.  Identical.  And like I
25  mentioned to you before, that was -- the final

Page 195

1  product of the -- of the pricing structure took
2  many years to -- to get to, but Florent took it as
3  his own.
4    Q   Well, and we talked before about the
5  pricing structure has been sent to a variety of
6  prospective clients as well.  I'm trying to just
7  get to the financial information.
8    A   Okay.
9    Q   And with regard to what you know or what
10  you think happened, I just want to pare down what
11  it is you know as we sit here today.
12    A   Okay.
13    Q   So what do you have personal knowledge
14  of Florent's use of this financial information?
15    MR. THORNBURG:  Objection to the form.
16    THE WITNESS:  I -- I'm trying to
17  structure my answer, right, because if you
18  look at the P&L, for example, you see the
19  income and you see the expenses.  Right.
20    In the income, I can -- I already
21  attested that for sure he used the income
22  section to prepare his -- his -- his pricing,
23  right, because it's exactly the same.
24    On the -- on the fees, right, I -- I
25  don't know how much he has negotiated his fees

Page 196

1  with his service providers, but of course
2  knowing this, he has a much better knowledge
3  and much better grounds to negotiate to a
4  better term.
5    Do I have a specific -- do I have his
6  contracts with third parties?  No, I don't
7  have -- I haven't seen them.
8  BY MR. KOENIG:
9    Q   Well, that's -- I'm just trying to -- to
10  ferret out where if you look at it and say, "Look,
11  he had this information and he's out there doing
12  the same work we're doing.  It would just stand to
13  reason that he's using our information against us"
14  versus, "I know from my discussions with someone
15  or I know from looking at an e-mail that had this
16  information, I know he's actually using this
17  information" --
18    A   Okay.
19    Q   -- or --
20    A   I haven't seen an e-mail from -- from
21  Florent that -- that I know of, that -- that says
22  that he's using this information to negotiate
23  against -- or with -- with his service providers.
24    Q   Or is he just using -- or do you have
25  any information, any facts to support that he is

Page 197

1  using this information?  Not whether he might be
2  using it, is using it.
3    A   I'm only using common sense.
4    Q   And the -- and my same question is for
5  Global Securities, do you have facts to support
6  that GSI has -- that GSM has used this
7  information?
8    A   Like I said, it makes complete common
9  sense to use the information if you have it
10  available to you.
11    Q   But as we sit here today, do you have
12  facts that they are using it?
13    A   I haven't been privy to the -- the
14  contracts with their service providers, no.  But
15  if you show it to me, I will compare them.
16    Q   Okay.  But even with the service
17  providers and the service providers decide to
18  charge whatever it is that they want to charge --
19    A   If I have this roadmap, I can negotiate
20  with them to the ground level because this is
21  ground level.
22    Q   But the service provider can charge
23  whatever the service provider wants to charge;
24  right?
25    A   Right.  But you only know what's the

Page 198

1  minimum margin that they're willing to accept, and
2  after five or six years, I think we reached that
3  minimum margin.
4      Q   Let me ask you this.  So by -- by
5  providing this financial information to Florent,
6  does that in and of itself preclude him from going
7  out and starting an ETP company, because it would
8  just be unfair because he knows of your -- your
9  financials?
10      MR. THORNBURG:  Objection to the form.
11      THE WITNESS:  I mean, Florent, from his
12      seniority and his experience, he would know
13      that it's not ethical to use confidential
14      information to create a company that competes
15      against his existing employer.  All right?
16  BY MR. KOENIG:
17      Q   But at least with regard to this
18  financial information?
19      A   The answer is yes.  I think that if you
20  have confidential information from -- from the
21  company you work for and, during the term of your
22  employment, try to start a new company at the same
23  time using the financial information of the
24  company, yes, that's completely unethical and
25  illegal.

Page 199

1      Q   Well, I didn't say using the financial
2  information.  I said just by him becoming privy to
3  it, he should not be allowed to go out and start a
4  competing ETP company because he knows of this
5  information just by him knowing it.
6      MR. THORNBURG:  Objection to form.
7      THE WITNESS:  Yes.
8  BY MR. KOENIG:
9      Q   Okay.
10      MR. THORNBURG:  Are we done with 13 and
11      14?
12      MR. KOENIG:  For now.
13      MR. THORNBURG:  Okay.  Just for the
14      record, it appears that Counsel is producing
15      13 and 14 without confidential designations.
16      I'm assuming these documents came from your
17      clients, not from our production; correct?
18      MR. KOENIG:  I'm actually not certain.
19      I think it may have actually been attached to
20      the interrogatory responses, but I'm not
21      entirely certain.
22      MR. THORNBURG:  It wasn't, so do you
23      know -- can you put on the record to say
24      whether or not this came from your client?
25      MR. KOENIG:  Well, at least at the

Page 200

1  minimum, let's designate Exhibits 13 and 14 as
2  confidential.
3      MR. THORNBURG:  That was my next point.
4      MR. KOENIG:  Yeah.
5      MR. THORNBURG:  But are you going to let
6  us know whether or not these came from your
7  client?
8      MR. KOENIG:  Yeah, I -- I'm fairly
9  certain that we have received these documents
10  from FlexFunds, and we have produced them in
11  our first batch of discovery, both, because I
12  think this all came from the Google drive.
13      MR. THORNBURG:  Okay.  That's what I'm
14  saying, is this came from Mr. Rigaud's Google
15  drive; yes or no?
16      MR. KOENIG:  I don't know.  I think so.
17  My best --
18      MR. THORNBURG:  I think that -- I think
19  we should put that on the record if you know.
20      MR. KOENIG:  I don't think we need to
21  put it on the record.
22      MR. THORNBURG:  You don't think so?
23      MR. KOENIG:  No.
24      MR. THORNBURG:  Interesting.
25      MR. KOENIG:  I -- I just don't see --

Page 201

1  it's not that there's something.  This has
2  been produced, I believe, by both sides so
3  that's why I don't understand putting it on
4  the record.
5      MR. THORNBURG:  The question is whether
6  this is in the possession of Mr. Rigaud still.
7      MR. KOENIG:  That, I don't know.  I said
8  it may have come from his Google drive, but
9  that's one of those -- for the
10  production-wise, it's all there.
11      MR. THORNBURG:  Okay.
12      MR. KOENIG:  But I think this was --
13  this was produced by your folks.  I'll -- I'll
14  look when we have a break.
15      And I believe it's Bates labels
16  3874-3875 is the e-mail from Jose Gonzalez
17  that includes the information.  So I don't
18  know if -- if by virtue of when we were
19  copying or printing, there's a chance we cut
20  off the Bates labels in that.  But I know I
21  have it down 3874-3875, so you can look that
22  up.
23      MR. THORNBURG:  Okay.  The question that
24  was raised was whether or not we produced it
25  or not.  I think we did produce it and we

51 (Pages 198 - 201)

Page 202

1 Bates-stamped it. The question is is whether
2 the exhibit you had was produced or derived
3 from your client. That was the question.
4       MR. KOENIG: Okay.
5 BY MR. KOENIG:
6    Q   Let's change gears to client pitch
7 information. Let me show you what's been marked
8 as Exhibit 14.
9       Are we on 15? We're on 15.
10       (Thereupon, Rivera Exhibit 15 was marked
11 for identification.)
12       THE WITNESS: I'm ready.
13 BY MR. KOENIG:
14    Q   What is Exhibit 15? I think we've
15 talked about these.
16    A   Transaction memorandum.
17    Q   And these -- this would have been part
18 of potentially a second meeting type with
19 prospective clients; does that sound right?
20    A   Definitely a second meeting because we
21 wouldn't be able to generate this -- this graphic
22 without really knowing what the client wants or
23 needs.
24    Q   And this is one of the documents that
25 you deem to be a trade secret?

Page 203

1    A   Yes.
2    Q   Okay.
3    A   It's not only a trade secret, it's a
4 very sensitive information from our client and, of
5 course, our solution, both.
6    Q   Do you know why, then, on this document
7 doesn't have your confidential and privileged
8 stamp on it?
9    A   If it doesn't, it should. I know that
10 the ones we have now, for sure they have it.
11    Q   Okay.
12    A   Maybe this one is a previous one. But,
13 again, as I mentioned before, we take reasonable
14 measures to make sure that these documents are
15 held in -- in confidence by, again, keeping them
16 within our unique password-protected cloud based
17 system and sending it through a unique
18 password-protected e-mail directly to the
19 decision-maker, only to the decision-maker of this
20 company.
21    Q   Was there a PowerPoint at one -- at one
22 time made for the PDVSA?
23    A   Yes.
24    Q   And were there -- was a PowerPoint
25 something pretty -- was that a pretty standard

Page 204

1 practice for clients?
2    A   No. This is more standard than a
3 PowerPoint. Sometimes we did a PowerPoint in case
4 we needed to present something, what, more formal
5 to the -- to the customer.
6    Q   Is it your position that any of the
7 defendants made use of the FlexFunds PowerPoints?
8    A   What's the question?
9    Q   So as far as we talked about these,
10 these trade secret issues --
11    A   Yeah.
12    Q   -- would you consider the PowerPoint
13 presentations that we've discussed -- and you said
14 you've done it for PDVSA?
15    A   Yes.
16    Q   Do you remember anyone else?
17    A   I believe I remember, from seeing on
18 the -- on the exhibits, I think in Bank Colombia
19 we did one, Bank Colombia.
20    Q   Was Bank of New York Mellon, was that
21 part of PDVSA?
22    A   No, no, that's not a client.
23       Sorry, I don't remember which ones we
24 did PowerPoint versus a transaction memorandum
25 format.

Page 205

1    Q   And -- and you would consider any of
2 those PowerPoint presentations -- I'll call them
3 pitch materials; does that -- that sound fair?
4    A   If you include this as --
5    Q   Yes.
6    A   -- within the pitch materials?
7       Let's say we have at least two different
8 types of documents. One is a transaction
9 memorandum, one is a presentation; is that -- is
10 that fair?
11    Q   Yeah. Let me show you -- it's easier
12 showing you.
13       MR. KOENIG: Actually, on some of these
14    documents, I'm covering them up.
15       MR. THORNBURG: You don't have to cover
16    them up, but I think -- I would prefer you not
17    to. I mean, that way at least we know that it
18    was previously shown to other witnesses.
19       (Thereupon, Rivera Exhibit 16 was marked
20    for identification.)
21 BY MR. KOENIG:
22    Q   I'll show you 16.
23    A   Yep.
24    Q   Now, with the -- you have -- I think you
25 have -- you have a copy under that also. I think

52 (Pages 202 - 205)

Page 206

1  it's stuck to it also.
2        MR. THORNBURG:  I'll take that one.
3        THE WITNESS:  Sorry.
4        MR. THORNBURG:  No worries.
5  BY MR. KOENIG:
6    Q   And what is Exhibit 16?
7    A   It's a FlexFunds presentation.
8    Q   Do you know to whom this was shown?
9    A   Right now, I see it's an internal
10  presentation.  It says here it's for BNY.  I
11  believe this was because we wanted to get BNY as a
12  service provider.
13    Q   So would this have been a -- was this a
14  presentation, you think, was ever shown to be BNY?
15    A   I believe it was shown because Florent
16  was leading a conversation with them to try to get
17  them as our custody provider, but we never entered
18  into an agreement with BNY as a customer provider
19  back then.
20    Q   And as far -- would you consider
21  Exhibit 16, at least the PowerPoint attached to
22  it, a trade secret?
23    A   This specific one, let me see.
24        MR. THORNBURG:  Object to the form.
25        THE WITNESS:  I would say that the only

Page 207

1  one -- there's a couple of pages that I would
2  consider secret.  The rest is not.
3  BY MR. KOENIG:
4    Q   And which -- which pages are they?
5    A   The one that is titled FlexFunds
6  Numbers.
7    Q   So it says "FlexFunds Numbers" and it
8  has 2013 through 2016?
9    A   Yes.  And the previous ones are.
10  FlexFunds Growth, FlexFunds Numbers, and Future
11  Plans for 2015, those -- those three pages are not
12  public information.
13    Q   And you believe this was shown to Bank
14  of New York?
15    A   Yes.
16    Q   Do you recall if there was a
17  nondisclosure agreement?
18    A   No.  But, again, I wouldn't necessarily
19  request one in this situation.
20    Q   And why is that?
21    A   Because we're dealing with Bank of New
22  York, one of the largest banks in the world.  And
23  this was to present ourselves as a -- as a
24  potential client for them.  And just by virtue of
25  the communication between the parties, I think

Page 208

1  it's very well understood that each of our
2  communications is -- is confidential.
3        By the way, I mean, the next stage after
4  this presentation happened, Bank of New York sent
5  us their fee agreement with their prices, and we
6  didn't sign an NDA with them to -- for them to
7  send us their prices.  It was understood that it's
8  sensitive information, is only private to both
9  parties.
10    Q   When -- and you've said that a couple of
11  times now that you've dealt with some of these
12  organizations, especially larger ones and/or
13  you're dealing with -- with the decision-maker of
14  a particular company, large or small, and that
15  you've said it was understood that some of these
16  in -- some of this information would be deemed
17  confidential.  Is that accurate?
18    A   Right.  And the reason is because,
19  again, for -- there's different levels of
20  sensitivity for -- for -- for the information that
21  we share.  Right.  And we -- we take reasonable
22  measures for each level of sensitivity.  Like, for
23  example, we don't need an NDA to show this -- this
24  information, but I wouldn't publish this
25  information on our website.  Right.  This is a --

Page 209

1  a one-to-one e-mail to the decision-maker at Bank
2  of New York from -- from us to them for them --
3  for them to consider us as a client.  Right.
4    Q   But at least as far as when you say "it
5  was understood between us," was it a silent
6  understanding or were there actually e-mails
7  saying, "We're going to be sending you
8  information, we need you to hold it in strict" --
9    A   No, I think this is an industry standard
10  when -- when -- when you -- like I said -- I mean,
11  I keep repeating myself about the
12  password-protected, but it's true.  I mean, we
13  have a password-protected cloud-based system, a
14  password-protected e-mail system, and we direct a
15  specific confidential document to a specific
16  person.  You know, a decision like Bank of New
17  York, I think I can provide them with our -- our
18  revenue numbers, right, to them.  So "to them"
19  meaning Bank of New York or that specific person
20  at Bank of New York.  But then, again, I wouldn't
21  publish this information on our website.  That's
22  not taking reasonable measures of protection and
23  confidentiality.
24    Q   Okay.  I was just trying to get a feel
25  whether it was follow-up e-mails or conversations

53 (Pages 206 - 209)

Page 210

1  or something --
2      A    After this, as I mentioned to you
3  before, after the presentation to them and the
4  conversation between Florent and them, I believe
5  they sent us the fee agreement between Bank of New
6  York and FlexFunds, but we didn't -- we didn't
7  execute in that agreement.
8      Q    Okay.  Let me show you Exhibit 17.
9          (Thereupon, Rivera Exhibit 17 was marked
10  for identification.)
11  BY MR. KOENIG:
12      Q    Let me know when you're ready to
13  discuss.
14      A    I'm ready.
15      Q    So as part of your interrogatory
16  responses with regard to trade secrets, Exhibit 20
17  from Florent's deposition was named as information
18  used by the defendants.  And so I have handed you
19  what was Exhibit 20 from Florent's deposition.
20  And if you would, show me what it is that Florent
21  or the other defendants used.
22      A    Used.  I mean, let's go through it.  The
23  first thing I see is the financials.  It's a table
24  that says what the expected assets of their
25  management is FlexFunds going to have.  Of course,

Page 211

1  looking at these numbers, you would consider
2  FlexFunds as a successful and promising business,
3  and I would -- if I was them and I see this --
4  this information, I would use them as -- as the
5  reason why to copy a company, number one.
6          MR. KOENIG:  We may want to deem this as
7  confidential, Exhibit 17.
8          MR. THORNBURG:  I was going to remark
9      that, but thank you.  Remark that, but you did
10      it for me.
11          THE WITNESS:  That's the first point.
12      The second point, I see a list of clients in
13      the section.
14  BY MR. KOENIG:
15      Q    And -- and -- and if you don't mind, I'm
16  going to cut you off.  As we go down each
17  category --
18      A    Yes.
19      Q    -- for the financials, does the use of
20  the financials by the defendants, does that fall
21  within the same type of category as use of the
22  other financial information we saw, and that's you
23  don't have actual knowledge of the use, but a
24  common sense belief it may be used?
25      A    That's correct.

Page 212

1      Q    Thank you.
2      A    Then in the second section -- or,
3  actually, it says Section 1.  You see a list of
4  clients, the type of product or strategy they're
5  looking into implementing in the company, and the
6  amount they're looking to issue.  Right.  So by
7  looking at this, you have a list of -- of
8  potential clients you can talk to.  Right.
9      Q    And did -- did the defendants go and
10  talk to any of these clients in an attempt to --
11  to take them on as their own?
12      A    I believe -- I know that, yes, there's
13  been a couple of them.
14      Q    And -- and which ones?
15      A    For example, Northeast Financial
16  Services, I know that I met with who's the head of
17  Northeast now, and he showed me a card of Florent
18  when I went to see him, so I'm assuming he talked
19  to him.
20      Q    Well, what -- what did he say about --
21      A    "Florent came to see me.  Look at the
22  card."
23      Q    And was that it?
24      A    Yeah.
25      Q    Okay.

Page 213

1      A    "He's doing the same thing you're
2  doing," blah, blah, blah.
3          IB Corp., I believe in one of the
4  e-mails that had been -- I don't know what the
5  number of the exhibit is, but I've seen an
6  exchange between IB Corp. and -- and Gustavo and
7  Florent in the same e-mail.  Han Corp., same
8  thing.  Actually, Han Corp. now is the owner of
9  Northeast.  And also Capital Markets Argentina is
10  one of the ones that Florent always talks to.
11      Q    Which -- which one?
12      A    So the first one.
13      Q    Oh, the first one?
14      A    Yes.  And the last one, the Madison
15  ADCAP Malta, those were -- that company is
16  Biscaye Capital, and those were in your documents
17  as -- as a strategic partner, those guys, and we
18  have issued like five or six.
19      Q    Did -- are any of these clients those
20  that Florent brought to FlexFunds?
21      A    No.  They -- I -- I admit that Florent
22  had a -- it was some of them a stronger
23  relationship than me, for example.  I'll give you
24  an example.  Capital Markets, I did talk to them
25  many times.  When Florent came, he had a better --

54 (Pages 210 - 213)

Page 214

1 or let's say stronger relationship with them, and
2 thanks to him, we -- we got to close this --
3 this -- this client. But, again, it's not a
4 client that he brought in. He was already there,
5 but he helped close.
6         Madison ADCAP Malta is actually a client
7 that Jose provided to Florent to manage, and
8 Florent did well managing that client. And this
9 client actually issued, like I mentioned, five
10 issuances or whatever. But then, in your
11 documents, it -- it appears that Biscayne Capital,
12 which is this one, they are a strategic partner of
13 MarkETP. So that tells me that they, Florent and
14 Gustavo, took one of our clients to work with
15 them.
16         IB Corp., I believe this person --
17 there's an e-mail exchange between Gustavo and
18 Florent and the head of IB Corp. At the end, this
19 person ended up issuing with us -- doing an
20 issuance with us, but -- but, yeah, there was some
21 exchanges with them.
22     Q   Okay.
23     A   And what else? And Han Corp. -- Han
24 Corp. is the -- is -- it was the head also of
25 Northeast, is the one I mentioned to you that

Page 215

1 showed me the card. There's been no issuance to
2 them, but both of us have a good relationship with
3 the -- with the owner.
4     Q   Okay.
5     A   Then looking at the -- at the
6 deliverable, when it says -- Number -- in -- I
7 guess at Point Number 4 here, here we're talking
8 about all the entire internal operation strategy
9 for FlexFunds. We're talking about how our
10 records are going to be.
11     Q   Well, I guess with -- with regard -- as
12 I said, we could up spending a lot of time on this
13 document. I guess --
14     A   But you're asking me what has been used,
15 right, or what can be used.
16     Q   Well, and -- and that's why I'm -- I'm
17 not interested in what could be used. What I'm
18 interested in is what you know was used.
19     A   I mean, it's -- it's hard for me to tell
20 you because I don't work for MarkETP. But this is
21 a roadmap of all the guts of the company of
22 FlexFunds, like every -- every single operations
23 and every single aspect of the operation, all the
24 risks, how they're managed, how they -- how the
25 contingency plan, the mitigation plan, talking

Page 216

1 about the master docs and -- and how we're going
2 to be reviewing them, the accounting, how we're
3 going to create the FlexFunds offshore, the one in
4 Cayman. Product suite and cost, how we're going
5 to create new cost structure for the different
6 products.
7     Q   Let me -- let me ask you a question.
8 I've asked you similar ones on different
9 documents. By virtue of Florent having been privy
10 to Exhibit 17 and the information contained
11 therein, should that bar him from setting up a
12 competing ETP?
13     A   Yes. Yes. Florent is a high-level
14 executive or director or manager at FlexFunds, and
15 by virtue of that level of responsibility and
16 virtue of being a party of this information, he
17 cannot be starting a competing equal -- I mean
18 same company while working for FlexFunds.
19     Q   Got you. Let me direct your attention
20 to Page 6 of that document.
21     A   Sorry. Page 6?
22     Q   Page -- Page 6.
23     A   Yes.
24         MR. THORNBURG:  Well, the Pagination 6;
25     right?

Page 217

1         MR. KOENIG:  Yeah. It's a little odd.
2 BY MR. KOENIG:
3     Q   It's the second-to-last page. I see --
4 and it is under a heading on the previous page
5 saying, "There's risk and competing products
6 arise." Do you see that?
7         THE WITNESS:  Yes.
8 BY MR. KOENIG:
9     Q   4.1. And then following the next page,
10 one has mitigation plan and then a contingency
11 plan. And I see one of them is filed "Trademark
12 and patent to protect intellectual property from
13 imitators." And I know that there's some
14 objections about this earlier. Do you know if a
15 patent was, in fact, applied for?
16         MR. THORNBURG:  Instruct the witness not
17     to answer. Privilege.
18 BY MR. KOENIG:
19     Q   And I notice there's -- there's no
20 mention of a non-- a nondisclosure agreement or
21 the engagement letter being mentioned there to
22 protect anything. Do you know why that isn't
23 in -- why that isn't contained here?
24     A   This is competing products arising from
25 third parties.

55 (Pages 214 - 217)

Page 218

1  Q  Okay.
2  A  All right.  So I think that's a
3 different topic.
4  Q  I get it.
5     MR. THORNBURG:  Are we moving documents?
6     MR. KOENIG:  I'm sorry?
7     MR. THORNBURG:  Are you off the
8 document?
9     MR. KOENIG:  I'm off the document.
10     MR. THORNBURG:  Okay.  You may want to
11 take a break for a quick.  I think it's been a
12 little over an hour.
13     MR. KOENIG:  Okay.  Just for timing
14 purposes, it looks like you have a variety of
15 things you're going to cover?
16     MR. THORNBURG:  Potentially or
17 potentially not.  These are actually
18 supplemental production that I wanted to give
19 you during the break.
20     MR. KOENIG:  Okay.
21     MR. THORNBURG:  So that's what this is.
22     MR. KOENIG:  Going to give me more heavy
23 documents to bring back.  At least I'm in a
24 car.
25     MR. THORNBURG:  Well, I want to give you

Page 219

1 the benefit of having them during the
2 deposition.  I'm certainly willing to put
3 these on our -- on our drive as we've done in
4 the past.
5     MR. KOENIG:  Why don't you put it on the
6 drive.  I may take a quick look at it, but I
7 don't know if I have enough time to review
8 them adequately to --
9     MR. THORNBURG:  I would -- sure,
10 certainly -- at least want to give you the
11 benefit of doing that before you headed home.
12     MR. KOENIG:  Okay.  Thank you.
13     MR. THORNBURG:  That's the kind of guy I
14 am.
15     THE VIDEOGRAPHER:  We're going off --
16 going off the record.  The time is 3:23 p.m.
17     (Thereupon, a brief recess was observed
18 by all parties present from 3:23 p.m. to
19 4:00 p.m.)
20     THE VIDEOGRAPHER:  Back on the record.
21 The time is 4:00 p.m.
22 BY MR. KOENIG:
23  Q  All right.  So we're -- we're back on
24 and we've covered a variety of these grounds that
25 I -- I had to cover with you.  And just so I can

Page 220

1 short up, we discussed sometime about client
2 relationships, and to the extent that any of the
3 defendants have stolen clients or prospective
4 clients from FlexFunds, are there any additional
5 names or additional prospects or clients that you
6 can think of that FlexFunds did?
7     MR. THORNBURG:  Objection to the form.
8 BY MR. KOENIG:
9  Q  I'm sorry, that the defendants had a
10 part to play in?
11     MR. THORNBURG:  Same.
12     THE WITNESS:  So the question is, do I
13     know of any other customers or maybe even the
14     relationships that FlexFunds had or has that
15     the defendants have also used for benefit?
16 BY MR. KOENIG:
17  Q  Correct, that you haven't -- that we
18 haven't already discussed.
19  A  So we -- we talked about the service
20 providers.  We talked about the -- the clients.
21 Of course, I would like to -- if you look at their
22 Streak system, right, and you compare it to us, it
23 would be a good way to see what have they
24 contacted that -- that we have.  I mean, and,
25 again, when I mentioned to you before that some of

Page 221

1 the offices that we have around the world have
2 encountered clients that say they have been
3 speaking with -- with MarkETP.
4     The others -- again, I don't -- I don't
5 have a list of those clients, but there've been
6 somewhere between 10 and 20 that I can -- that I
7 can -- that I can think of that I've been told by
8 my employees that have been -- that they have
9 talked to MarkETP.  Right.
10  Q  Well, let's -- let's divide this up so
11 it's a little easier so we have --
12  A  Service providers, clients, and the last
13 bucket I wanted to discuss is the distributors.  I
14 mentioned to you the Simple distributor that does
15 that entity, and also the other one that I
16 mentioned to you, his name is William Reekstin.
17 And also Tim Novack.  All those are -- are
18 distributors of FlexFunds that were contacted
19 by -- by Florent Rigaud and Gustavo Hernandez to
20 become distributors of MarkETP.
21  Q  So let's -- let's categorize it.  So we
22 have contact.  So we'll categorize this would be
23 any of the defendants making contact with either
24 clients, prospective clients, or service
25 providers.  And you said there are approximately,

56 (Pages 218 - 221)

Page 222

1  you said, 10 to 12?
2      A   I said 10 to 20 that I -- that I -- that
3  I've been -- that I've heard of from my employees
4  that they have talked to MarkETP.
5      Q   And are these prospective customers?
6      A   Either prospective or existing.  I can
7  actually say -- I'll actually -- let me increase
8  that number to over 20.
9      Q   So that would just be at least making
10 contact?
11     A   Yeah.  Like, for example, an employee of
12 mine in Buenos Aires or in Miami that tell me,
13 "I've been talking to this client."  However,
14 they're also talking to MarkETP, and we need to
15 compete against -- in price so we need to explain
16 we need to explain why we are better or why we are
17 a better choice for them.  All right.
18     Q   All right.  So we have 10 to 20-plus
19 clients or prospective clients?
20     A   Series ten.  It's more than 20 because
21 I'm starting to -- to -- to remember more.
22     Q   Okay.  How many distributors?
23     A   I mentioned three so far.
24     Q   So who are the three that you recall?
25     A   I would say -- sorry, there's four that

Page 223

1  I mentioned already.  One is Tim Novack, that I've
2  seen in your -- in your documentation.  The other
3  one is William Reekstin, I think is the last name.
4  Simple.  And also Alexia, I believe.  Those ones.
5      Q   And these are distributors of FlexFunds?
6      A   Yes, they are existing distributors of
7  FlexFunds.  Some of them already have successful
8  issuances that after the fact or during Florent's
9  employment with FlexFunds, while he was creating
10 MarkETP, he contacted them to become his
11 distributors.  In fact, I mean, I mentioned to you
12 that -- the engagement letter that I received by
13 mistake was sent by William Reekstin.
14     Q   And of the four distributors, did any of
15 them leave you?  And "you" being FlexFunds.
16     A   They didn't leave me.  However, I don't
17 know if they referred clients -- actually, no, one
18 of them for sure referred a client to Florent
19 rather than us.
20     Q   And which one was that?
21     A   William Reekstin.
22     Q   And who did he refer?
23     A   I don't recall the name of the client,
24 and I don't know if...
25     Q   Was it -- was it your client or was it a

Page 224

1  prospective client?
2      A   It was -- it was someone new.
3      Q   I -- I guess --
4      A   I would say prospective, let's say.
5      Q   And was it anyone that FlexFunds had any
6  communications with prior to that?
7      A   No.
8      Q   So it was a brand-new prospective
9  client?
10     A   Correct.  But, then again, the
11 distributor was an existing distributor that was
12 getting paid by FlexFunds during the -- during --
13 while Florent stole it for his own purposes.
14     Q   Is a distributor obligated to provide
15 any referrals to FlexFunds under any distribution
16 agreement?
17     A   Now they are.
18     Q   Was -- were they at the time?  Was
19 Mr. Reekstin --
20     A   At the time, no.
21     Q   Okay.  And as far as these 10 to 20-plus
22 clients or prospective clients, do you know if
23 FlexFunds has lost either the prospective
24 opportunity or actually lost a client based on
25 something the defendants did?

Page 225

1      A   Again, it's hard to tell because, as far
2  as I know, MarkETP has not done any issuance so
3  it's hard to tell whether or not we have lost it
4  because they haven't done any issuances yet.
5      Q   And the ones that are at least your
6  clients, have you reached out to them and talked
7  to them about MarkETP and "You should stay with
8  us" and "Are you going to stay with us?"  Have you
9  had those conversations?
10     A   Yes, of course.
11     Q   And are they all staying with you, to
12 the best of your knowledge?
13     A   To the best of my knowledge, I mean,
14 some of them, they did stay, I should say some of
15 them, and some of them we're still in
16 conversations with.
17     Q   And with regard to any of these --
18     A   Sorry -- I'm sorry to interrupt.
19     Q   Go ahead.
20     A   And the reason we're still in
21 conversations with them is because we have to
22 lower our -- we have to provide them a better fee
23 structure.  We have to lower our fees for them to
24 come with us instead of going with -- with anybody
25 else.

57 (Pages 222 - 225)

Page 226

1    Q    And is the issue that MarkETP is
2  competing with FlexFunds or is the issue that
3  MarkETP is competing with FlexFunds using trade
4  secrets against you --
5    A    I mean --
6    Q    -- if you know?
7       MR. THORNBURG: Objection to form.
8       THE WITNESS: The problem here is that
9  MarkETP is competing against us using trade
10  secrets. That's what we're here for. Again,
11  one thing I want to -- I want to make clear,
12  because you keep ask -- asking me the same
13  question about can Florent or can Gustavo
14  compete against FlexFunds just because they
15  have seen these trade secrets or they have
16  access to these trade secrets or they have
17  used these trade secrets.
18       Again, during the time of employment of
19  Florent in FlexFunds, it's -- it's not within
20  the -- again, the code of ethics and the --
21  the terms and conditions of his agreement with
22  us to compete with the company he works for.
23  So if he were to leave the company and maybe
24  wait for a typical reasonable period of time
25  and then he creates a new program not using

Page 227

1  our documentation, our trade secrets, then
2  that's fine. Of course, he can create his own
3  program, work in the ETP space, and compete
4  head on against us.
5  BY MR. KOENIG:
6    Q    And I know sometimes it's difficult for
7  us to see eye to eye, but at least I've got to ask
8  to get your information. As far as your personal
9  knowledge, have any of the defendants used trade
10  secrets when approaching these 10 to 20-plus
11  prospects or clients?
12    A    And you always ask me the same question,
13  and I -- and I want to -- to try to explain myself
14  very clearly. It's hard for me to be 100 percent
15  sure because I don't -- I don't work at MarkETP.
16  I'm not in their office, in their conversations,
17  in their e-mail exchanges, so I don't know for a
18  fact.
19       But we all have seen enough
20  circumstantial evidence that they have access, and
21  they have used the same format, the same price
22  structure, the same documents, similar website and
23  similar approach than FlexFunds, and of course
24  the -- the -- the -- the trust documents. So with
25  all that combined and Streak with the clients, and

Page 228

1  then you look at the same clients, we're talking
2  to the same people.
3       Sorry, the last point is that we have
4  enough circumstantial evidence to realize that all
5  of our trade secrets are being used against us.
6  And again, it would have been okay for Florent to
7  compete if he did not use his trade secrets and he
8  left FlexFunds and waited for a reasonable period
9  of time to compete against us. That would be
10  completely fine.
11    Q    What would you deem to be a reasonable
12  amount of time?
13    A    I know I said reasonable because it
14  depends, I believe, on company by company state by
15  state, but usually it's like it's one or two
16  years, I believe.
17    Q    So he would need to be out of the
18  industry altogether for one to two years?
19    A    Not industry. I'm not --
20    Q    Or ETP?
21    A    Yes. Yes.
22    Q    Okay. Tell me about the PDVSA. And I'm
23  familiar, I know you've heard some testimony from
24  Florent in his deposition as well as Gustavo, a
25  little bit of his. And I'm going to fast-track it

Page 229

1  so you don't have to describe the entire deal that
2  we've heard a few times.
3    A    No worries.
4    Q    At the time of Florent's departure from
5  FlexFunds, what was the status of any deal that
6  FlexFunds had directly with PDVSA?
7       MR. THORNBURG: Objection to the form.
8       THE WITNESS: We were working alongside
9    Florent. I know Florent was work- -- was part
10    of FlexFunds, of course, during the time of
11    his employment with FlexFunds so we depended
12    on him to lead us through the process of
13    engaging.
14  BY MR. KOENIG:
15    Q    How did the PDVSA deal originally come
16  to FlexFunds?
17    A    Let me answer the original question.
18    Q    Okay. Okay. I'm sorry. I thought you
19  stopped. I'm sorry. Go ahead.
20    A    No, no. Sorry, so the original question
21  was --
22    Q    The status.
23    A    The status when Florent left; right?
24    Q    Yes.
25    A    So months prior -- actually, you know

Page 230

1 what, let me answer the first question, and then
2 I'll move towards the end.
3     Q   I should have asked the second one
4 first.
5     A   No worries.  No worries.
6        So the PDVSA deal was a deal that
7 Deutsche Bank had with PDVSA to issue a credit
8 agreement and use notes in lieu of invoices that
9 the service providers had.  Right.  I hope I
10 explained myself correctly.
11        To issue the credit agreement and to
12 issue the notes, Deutsche Bank, I believe, was
13 working with Gustavo and Gustavo's company, but
14 Gustavo could not perform those duties, and that's
15 why he reached out to Florent to talk to FlexFunds
16 to see if we could do that deal for him.
17     Q   So it -- so it started with Gustavo, who
18 reached out to Florent to FlexFunds?
19     A   That's right.
20     Q   Okay.
21     A   So the deal came to FlexFunds, and then
22 FlexFunds interacted with Deutsche Bank directly,
23 and FlexFunds took the initial stages of our
24 project and developed it to its final stages.
25 Right.  So if you look at the first iteration

Page 231

1 until the last one, it's -- it's -- is very
2 different, right, and we worked very hard
3 internally with our legal counsel, we spent a lot
4 of time, and also working with -- with Deutsche
5 Bank to create this -- this final deliverable.
6        And, in fact, we reached that final
7 deliverable and we were two days from the
8 issuance.  I believe it was December 28th, 2015, I
9 believe.  One of those days, 28th, 29th, I'm not
10 really sure, where the issuance date was going to
11 have, and then Deutsche Bank announced that they
12 were stepping out of the entire region so we
13 couldn't perform the issuance and the trade.
14        So fast forward, during the first half
15 of 2016, we completely relied on Florent to be
16 the -- the lead person on that -- on that project
17 since it was -- he was the operator -- he was the
18 relationship manager of.  Of course, we didn't
19 know that he was working behind the scenes, behind
20 our backs, with Gustavo to take this project for
21 himself, so we pretty much let him -- let him
22 handle it.
23        Then another company came in, which is
24 CP Capital, and took the project -- or, I'm sorry,
25 took the mandate from -- from PDVSA, so they had

Page 232

1 an agreement with PDVSA.  Again, we continued to
2 rely on Florent to manage that -- those talks and
3 negotiations with CP or with Gustavo with PDVSA.
4        When it got time to get to Florent's
5 departure, CP Capital was engaged by PDVSA,
6 FlexFunds was not in the -- in the picture, and I
7 believe Florent and Gustavo were trying to get a
8 mandate on their own with PDVSA completely
9 separate from FlexFunds.
10        In other words, I mean, he took -- he
11 stole the project from us.  So he brought it -- he
12 brought it to us.  It was our project.  We
13 developed the project.  And then he tried to
14 re-create the same program that we had to do it
15 himself.
16     Q   So was there an issue with something
17 regarding Euroclear?
18     A   In what fashion?
19     Q   That -- that there was an issue that
20 Euroclear and I think another -- and there was
21 another bank or clearinghouse that just refused to
22 deal with PDVSA.
23     A   Let's see if I understand.  I mean, I --
24     Q   I guess -- I guess my question is -- is
25 do you have personal knowledge as to why FlexFunds

Page 233

1 did not get the PDVSA deal that -- that you've
2 been discussing, that you said that Florent was
3 working on, and Florent at one point left and you
4 said he tried to take the business with him.
5        And -- and my original question that
6 we're circling back to is --
7     A   Yes.
8     Q   is what was the status of PDVSA now
9 that you've had a chance, I assume, to go back and
10 look at what happened --
11     A   Yeah.
12     Q   -- and piece it together?  Was there a
13 viable deal for FlexFunds with the -- with -- with
14 PDVSA at or about the time that Florent left?
15     A   Yes.  It's actually a very interesting
16 and, to a certain degree, unfortunate situation
17 because once CP Capital got the deal -- sorry,
18 when CP Capital got the engagement letter with
19 PDVSA, we tried to work alongside CP Capital, but
20 Florent advised us not to, right, because he was
21 going to get it himself for us, right.
22        When then Florent left, we pretty
23 much -- we let it go actually.  We let it go.  And
24 then he is the one that got an agreement with
25 PDVSA with MarkETP to -- to try to do the project

59 (Pages 230 - 233)

Page 234

1 himself alongside with Gustavo with MarkETP.
2        From -- we were approached by CP to
3 actually help them get this deal done.  And
4 through them, we actually got to talk to PDVSA
5 directly, and then PDVSA engaged us to do the
6 deal -- to do the transaction with -- with PDVSA,
7 right.
8        I believe MarkETP failed to provide the
9 services that they were engaged to, and what
10 happened to us is that the situation of the
11 country and the company from over a year ago until
12 that moment had deteriorated to the point that our
13 issuing agent, CitiBank, decided that they didn't
14 want to do that transaction anymore.
15       A year back, I actually went to London
16 to meet with Citi to talk about this specific
17 PDVSA transaction.  I explained everything and
18 they approved it.  Fast-forward, they didn't want
19 to do it anymore because, again, Venezuela, as you
20 probably read --
21    Q    Sure.
22    A    -- is not doing very well, so we
23 actually -- actually resigned from the -- from the
24 transaction ourselves altogether.
25    Q    With regard to MarkETP's attempt to --

Page 235

1 to work out some deal with -- with PDVSA, do you
2 have firsthand knowledge as to who PDVSA
3 approached for that deal?
4    A    Who PDVSA approached for -- repeat the
5 question.  Let me make sure I understand it.
6    Q    Correct.  So -- so you discussed that
7 when -- when Florent left, at one point MarkETP
8 attempted to work out a deal for PDVSA.  Do you
9 have personal knowledge as to who PDVSA approached
10 to make that deal happen?
11   A    I believe you're asking -- I mean, it's
12 not PDVSA approaching.  I believe -- I know
13 Gustavo and -- and Florent went to Caracas,
14 PDVSA's headquarters, to meet with the financial
15 officer of PDVSA, the chief financial officer of
16 PDVSA, and presented their solution, which again
17 was a copy of our solution, to -- to the -- to the
18 CFO.  Right.
19   Q    Did -- did Gustavo have any sort of
20 preexisting relationship with PDVSA?
21   A    Yes, of course.  That's why Gustavo was
22 engaged through Deutsche Bank in the first place,
23 right.
24   Q    So the deal started with Gustavo, and
25 then Gustavo --

Page 236

1    A    Yes.
2    Q    -- started the process to get MarkETP?
3    A    Gustavo tried to do the deal himself.
4 He wouldn't have hired FlexFunds if he could do
5 the deal himself.  But he couldn't.  Right?  He
6 has -- or he had -- he has his own company, but
7 his own company could not do that deal, and that's
8 why he -- he was willing to split the fee with us,
9 because we could do it and he couldn't.
10   Q    Okay.
11   A    And when he approached, he came to me
12 with the deal, he had a concept of how it could be
13 done, which was incorrect.  And we developed the
14 solution internally, FlexFunds, alongside our
15 service providers and Deutsche to what the final
16 product is.  And we moved -- we moved it all the
17 way through the finish line.
18   Q    Given the conditions in Venezuela, are
19 you certain that had MarkETP not been involved at
20 all, that FlexFunds would have absolutely closed
21 the deal?
22   A    If Venezuela was a -- was a country that
23 was in good --
24   Q    No.  No.  The way Venezuela is.  I guess
25 my question is, as we sit here today, are you able

Page 237

1 to testify that FlexFunds would have closed the
2 PDVSA deal if MarkETP never existed --
3        MR. THORNBURG:  Object to the form.
4 BY MR. KOENIG:
5    Q    -- if -- if you know?
6    A    Let me say this.  If MarkETP never
7 existed, we -- FlexFunds would have gotten the
8 agreement earlier.  I believe that getting the
9 agreement earlier before Venezuela deteriorated
10 significantly in the past few months, we could
11 have 100 percent done the deal.
12   Q    So you can say with absolute certainty
13 you would have closed the deal?
14   A    Absolute certainty.
15   Q    Even though the climate in Venezuela was
16 what it was?
17   A    That's the big variable.  It's all about
18 time, right.
19   Q    Who would have been -- would you have --
20 would you have used Euroclear for that?
21   A    Yes, of course.  You have to use
22 Euroclear.  But Euroclear is not the issue.  The
23 issue is the issuing agent.
24   Q    I understand.
25   A    Okay.  And again, I want to -- I want to

60 (Pages 234 - 237)

Page 238

1 clarify that, is it's a matter of time and how --
2 how much has Venezuela deteriorated. We can do
3 that deal in four weeks. The problem is that when
4 we got to -- to the deal, the situation in
5 Venezuela was very bad.
6     Q    Have you ever dealt with Archer Square
7 Capital?
8     A    No.
9     Q    Have you ever dealt with AP Sur?
10     A    No, not that I know of.
11     Q    How about Bancredito Group?
12     A    Yes.
13     Q    What do you know about Bancredito Group?
14     A    It's a Puerto Rican bank.
15     Q    And have you done any business with that
16 group?
17     A    No. We just had conversations.
18     Q    What about Energy Finance Partners/GP
19 International Capital?
20     A    Not sure about that one.
21     Q    Oak Leaf Management?
22     A    Not sure about that one.
23     Q    Income Capital Partners Limited?
24     A    That one, I don't think so.
25     Q    Midtown Capital Advisors LLC?

Page 239

1     A    I don't recall that name either.
2     Q    And we talked earlier about the process
3 that MarkETP -- I'm sorry, FlexFunds ETP has
4 certain processes that you would deem to be trade
5 secrets, and I told you at one point we're going
6 to kind of chunk this information, and we've
7 talked about all the categories of the trade
8 secrets, and this is the only one that we have
9 left.
10         And can you describe to me with as much
11 detail as you can -- and I'll just list them
12 out -- what are those processes that you would
13 deem to be trade secrets?
14     A    Yes. Let's see if I can process in four
15 steps. Okay. The first step is the marketing
16 step, which includes an education of the client.
17     Q    And -- and are each of these steps trade
18 secrets or are you going to tell me when there's a
19 trade secret?
20     A    I will tell you when it's a trade
21 secret.
22     Q    Okay.
23     A    So, of course, talking to a client
24 educating about FlexFunds is not a trade secret.
25 Would you like me to skip those parts?

Page 240

1     Q    Yeah, I -- I just want to -- I mean, I
2 like the categories so I -- I have some context --
3     A    All right. So --
4     Q    -- but is there -- is there a trade
5 secret involved in the marketing process?
6     A    I would say the way we onboard clients.
7     Q    What does that mean, "onboard clients"?
8     A    The way we collect information and store
9 it.
10     Q    And what's different about that?
11     A    We do it through an online system.
12         (Excerpt of this transcript has been
13 declared confidential and is sealed under
14 separate cover.)
15
16
17
18
19
20
21
22
23
24
25

Page 241

1
2
3
4
5
6
7
8
9
10
11
12         [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25

61 (Pages 238 - 241)

Page 242

```
1
2
3
4
5
6
7
8
9
10
11
12          [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 244

```
1
2
3
4
5
6
7
8
9
10
11
12          [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 243

```
1
2
3
4
5
6
7
8
9
10
11
12          [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 245

```
1
2
3
4
5
6
7
8
9
10
11
12          [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

62 (Pages 242 - 245)

Page 246

```
1
2
3
4
5
6
7
8
9
10
11
12        [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 248

```
1
2
3
4
5
6
7
8
9
10
11
12        [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 247

```
1
2
3
4
5
6
7
8
9
10
11
12        [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 249

```
1
2
3
4
5
6
7
8
9
10
11
12        [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

63 (Pages 246 - 249)

Veritext Legal Solutions
800-726-7007                                                    305-376-8800

Page 250

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 252

```
 1                    * * * * *
 2          MR. KOENIG:  Let's take a quick break.
 3  I might be done.
 4          MR. THORNBURG:  Okay.
 5          THE VIDEOGRAPHER:  Off the record.  The
 6  time is 4:37 p.m.
 7          (Thereupon, a brief recess was observed
 8  by all parties present from 4:37 p.m. to
 9  5:00 p.m.)
10          THE VIDEOGRAPHER:  We're back on the
11  record.  The time is 5:00 p.m.
12          MR. KOENIG:  Mr. Rivera, I have no more
13  questions.
14          MR. THORNBURG:  We reserve the right to
15  read.  We're off the record.
16          THE VIDEOGRAPHER:  We're off the record.
17  The time is 5:00 p.m.
18          (Thereupon, the deposition was concluded
19  at 5:00 p.m., and the reading and signing
20  having not been waived.)
21
22
23
24
25
```

Page 251

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          [CONFIDENTIAL]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 253

```
 1  RE:      Flexfunds ETP vs. MarkETP, et al.
    DEPO OF:   MARIO RIVERA
 2  TAKEN:     June 8, 2017
 3
 4          EXCEPT FOR ANY CORRECTIONS
            MADE ON THE ERRATA SHEET BY
 5          ME, I CERTIFY THIS IS A TRUE
            AND ACCURATE TRANSCRIPT.
 6          FURTHER DEPONENT SAYETH NOT.
 7          _____
 8              MARIO RIVERA
 9  STATE OF FLORIDA      )
                          ) SS:
10  COUNTY OF MIAMI-DADE  )
11      Sworn and subscribed to before me this
12  ____ day of _____, 2017.
13  PERSONALLY KNOWN ____ or I.D. _____
14
15          _____
            Notary Public in and for the
16          State of Florida at Large
17
18  My commission expires:
19
20
21
22
23
24
25
```

64 (Pages 250 - 253)

Page 254

```
 1          ERRATA SHEET
 2  RE:   Flexfunds ETP vs. MarkETP, et al.
         DEPO OF:  MARIO RIVERA
 3  TAKEN:    June 8, 2017
 4  DO NOT WRITE ON TRANSCRIPT.  ENTER CHANGES HERE.
 5  Page #| Line #| Change     | Reason
 6  ___|___|___|___
 7  ___|___|___|___
 8  ___|___|___|___
 9  ___|___|___|___
10  ___|___|___|___
11  ___|___|___|___
12  ___|___|___|___
13  ___|___|___|___
14  ___|___|___|___
15  ___|___|___|___
16  ___|___|___|___
17  ___|___|___|___
18  ___|___|___|___
19  ___|___|___|___
20  State of Florida  )
    County of _____)
21
    Under penalties of perjury, I declare that I have
22  read by deposition transcript, and it is true and
    correct subject to any changes in form or
23  substance entered here.
24  _____     _____
    Date          MARIO RIVERA
25
```

Page 255

```
 1      CERTIFICATE OF OATH OF WITNESS
 2
    STATE OF FLORIDA
 3          :SS
    COUNTY OF MIAMI-DADE
 4
 5     I, JENNIFER QUINTANA, Florida Professional
 6  Reporter, Notary Public in and for the State of
 7  Florida at Large, certify that the witness, MARIO
 8  RIVERA, personally appeared before me on June 8,
 9  2017 and was duly sworn by me.
10  WITNESS my hand and official seal this 18th day of
11  June, 2017.
12
13
14  _____
    JENNIFER A. QUINTANA, FPR
15  Notary Public State of Florida
    My Commission Expires: 1/10/18
16  Commission No. FF 053280
17
18
19
20
21
22
23
24
25
```

Page 256

```
 1      REPORTER'S DEPOSITION CERTIFICATE
 2     I, JENNIFER QUINTANA, Florida Professional
 3  Reporter, certify that I was authorized to and did
 4  stenographically report the deposition of MARIO
 5  RIVERA, the witness herein on June 8, 2017, that a
 6  review of the transcript was requested; that the
 7  foregoing pages numbered from 1 to 251 inclusive
 8  is a true and complete record of my stenographic
 9  notes of the deposition by said witness; and that
10  this computer-assisted transcript was prepared
11  under my supervision.
12     I further certify that I am not a relative,
13  employee, attorney or counsel of any of the
14  parties nor am I a relative or employee of any of
15  the parties' attorney or counsel connected with
16  the action.
17     DATED this 18th day of June, 2017.
18
19
20  _____
    JENNIFER QUINTANA
21  Florida Professional Reporter
22
23
24
25
```

Page 257

```
 1      VERITEXT FLORIDA REPORTING CO.
       2 South Biscayne Boulevard, #2200
 2       Miami, Florida  33130
          (305) 376-8800
 3
 4  June 21, 2017
 5
    MARIO RIVERA
 6  c/o Robert Thornburg, Esq.
    Allen Dyer Doppelt & Gilchrist, P.A.
 7  1221 Brickell Avenue
    Suite 2400
 8  Coral Gables, FL  33134
 9
    RE:      Flexfunds ETP vs. MarkETP, et al.
10  DEPO OF:   MARIO RIVERA
    TAKEN:       June 8, 2017
11  READ & SIGN BY: 30 Days
12
13  Dear MARIO RIVERA:
14  This letter is to advise you that the transcript
    of the deposition listed above is completed and is
15  awaiting reading and signing.
    Please arrange to stop by our office in Suite
16  2200, 2 Biscayne Boulevard, Miami, Florida to read
    and sign the transcript.  Our office hours are
17  from 8:00 a.m. to 4:00 p.m. Monday through Friday.
    Depending on the length of the transcript, you
18  should allow yourself sufficient time.
19  If the reading and signing has not been completed
    prior to the referenced date, we shall concluded
20  that you have waived the reading and signing of
    the deposition transcript.  Your prompt attention
21  to this matter is appreciated.
22  Sincerely,
23
24  Jennifer Quintana, FPR
25  cc:  All counsel on appearance page
```

65 (Pages 254 - 257)

Page 258

```
 1        VERITEXT FLORIDA REPORTING CO.
          2 South Biscayne Boulevard, #2200
 2           Miami, Florida  33130
               (305) 376-8800
 3
 4  June 21, 2017
 5
    Eric Koenig, Esquire
 6  Trenam Law
    101 East Kennedy Boulevard
 7  Suite 2700
    Tampa, FL 33602
 8
 9  RE:      Flexfunds ETP vs. MarkETP, et al.
    DEPO OF:   MARIO RIVERA
10  TAKEN:       June 8, 2017
    READ & SIGN BY: 30 Days
11
    Dear Counsel:
12
    The original transcript of the deposition listed
13  above is enclosed for your file.  The witness did
    not waive reading and signing and has been sent a
14  letter notifying them to come in and read and sign
    their deposition transcript.
15
    The witness will be provided a copy of their
16  deposition transcript for reading in our office
    should they come in to review the transcript, and
17  we will forward to you any corrections made by the
    witness at that time, along with an original
18  signature page which should be attached to the
    original transcript which is in your possession.
19
20  Sincerely,
21
22  Jennifer Quintana, FPR
23
24
25
```